UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------- x

DENISE K. SHULL and THE RETHINK
GROUP, INC.,

                Plaintiffs,

       v.

ANDREW ROSS SORKIN, BRIAN
KOPPELMAN, DAVID LEVIEN, DAVID
NEVINS, TBTF PRODUCTIONS INC.,
SHOWTIME NETWORKS INC., and CBS
CORPORATION,

                Defendants.

------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil No.: 18 Civ. 12400 (GPD)

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO <u>DISMISS PLAINTIFFS' COMPLAINT</u>

Elizabeth A. McNamara
Rachel F. Strom
Jamie S. Raghu
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone:  (212) 489-8230
Facsimile:  (212) 489-8340

*Attorneys for Defendants Andrew Ross Sorkin,*
*Brian Koppelman, David Levien, David Nevins,*
*TBTF Productions Inc., Showtime Networks Inc.,*
*and CBS Corporation*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTS ........................................................................................................................................ 3

    A.    The Parties ................................................................................................. 3

    B.    The Two Works ......................................................................................... 3

        1.    Defendants' Television Series:  *Billions* ...................................... 3

        2.    Plaintiffs' Book: *Market Mind Games* ....................................... 5

    C.    The Complaint ........................................................................................... 7

ARGUMENT .............................................................................................................................. 9

    I.    DISMISSAL OF PLAINTIFFS' COPYRIGHT INFRINGEMENT
        CLAIM IS REQUIRED AS THE  WORKS ARE NOT
        SUBSTANTIALLY SIMILAR ................................................................ 9

        A.    Copyright Infringement Requires Substantial Similarity of
            Protectible Expression and Cannot be Premised on Similar Ideas or
            Stock Elements........................................................................... 10

        B.    The Court May Dismiss Plaintiffs' Claim as a Matter of Law
            Without Discovery Based on the Lack of Substantial Similarity of
            the Works .................................................................................... 12

    II.    THE WORKS ARE COMPLETELY DISSIMILAR ........................................... 14

        A.    The Plots of the Works are Not Similar..................................... 14

        B.    The Characters in the Works are Not Similar............................ 18

        C.    The Settings of the Works are Not Similar................................ 20

        D.    The Themes of the Works Are Not Similar ................................ 20

        E.    The Total Concept and Feel of the Works Are Not Similar ...................... 21

    III.    THE MAJORITY OF PLAINTIFFS' STATE LAW CLAIMS ARE
        PREEMPTED BY THE COPYRIGHT ACT ...................................................... 22

IV.   PLAINTIFFS FAIL TO PLAUSIBLY STATE THE NECESSARY
      ELEMENTS FOR THE STATE LAW CLAIMS UNDER NEW YORK
      LAW .................................................................................................. 26

      A.   Plaintiffs Fail to State a Claim for Implied-In-Fact Contract ................... 27

      B.   Plaintiffs Fail to State a Claim for Misappropriation ............................... 29

      C.   Plaintiffs Fail to State a Claim for Injury to Business Reputation,
           Dilution and Unfair Competition in Violation of Section 360-L .............. 29

      D.   Plaintiffs Fail to State a Claim for Deceptive Trade Practices in
           Violation of Section 349 and Common Law .............................................. 30

      E.   Plaintiffs Fail to State a Claim for Unjust Enrichment under
           Section 350 ................................................................................................. 31

      F.   Plaintiffs Fail to State a Claim for Accounting ........................................ 32

      G.   Plaintiffs Fail to State a Claim Under Section 51 ..................................... 32

CONCLUSION ................................................................................................... 35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbey House Media, Inc. v. Apple Inc.*,
   66 F. Supp. 3d 413 (S.D.N.Y. 2014) ................................................................22

*Adsani v. Miller*,
   No. 94 Civ. 9131, 1996 WL 194326 (S.D.N.Y. Apr. 22, 1996) ..............................12

*Alexander v. Irving Tr. Co.*,
   132 F. Supp. 364 (S.D.N.Y. 1955), *aff'd*, 228 F.2d 221 (2d Cir. 1955) ..................11

*Alexander v. Murdoch*,
   No. 10 Civ. 5613(PAC)(JCF), 2011 WL 2802923 (S.D.N.Y. July 14, 2011),
   *aff'd*, 502 F. App'x 107 (2d Cir. 2012), *cert. denied*, 569 U.S. 1036 (2013) .........16

*Allen v. Scholastic, Inc.*,
   739 F. Supp. 2d 642 (S.D.N.Y. 2011) ..........................................................15, 19

*Am. Movie Classics Co. v. Turner Entm't Co.*,
   922 F. Supp. 926 (S.D.N.Y. 1996) .................................................................25

*Baiul v. NBC Sports*,
   No. 15 Civ. 9920 (KBF), 2016 WL 1587250 (S.D.N.Y. Apr. 19, 2016) .........25, 32

*Banff Ltd. v. Ltd., Inc.*,
   869 F. Supp. 1103 (S.D.N.Y. 1994) ...............................................................22

*Beal v. Paramount Pictures*,
   806 F. Supp. 963 (N.D. Ga. 1992) .................................................................11

*Betty, Inc. v. PepsiCo, Inc.*,
   283 F. Supp. 3d 154 (S.D.N.Y. 2017) ..............................................24, 26, 27, 28

*Blakeman v. The Walt Disney Co.a*,
   613 F. Supp. 2d 288 (E.D.N.Y. 2009) ............................................................21

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) ...............................................................22, 24, 31

*Broughel v. Battery Conservancy*,
   No. 07 CV 7755 (GBD), 2010 WL 1028171 (S.D.N.Y. Mar. 16, 2010)
   (Daniels, J.) ............................................................................................29

*Brown v. Perdue*,
   No. 04 Civ. 7417 (GBD), 2005 WL 1863673 (S.D.N.Y. Aug. 4, 2005)

(Daniels, J), *aff'd*, 177 F. App'x 121 (2d Cir. 2006) ................................................................13

*Brown v. Time Warner, Inc.*,
    287 F. Supp. 3d 380 (S.D.N.Y. 2017)....................................................................................12

*Burck v. Mars, Inc.*,
    571 F.Supp.2d 446 (S.D.N.Y. 2008)................................................................................33, 34

*Castle Rock Entm't v. Carol Publ'g Grp.*,
    150 F.3d 132 (2d Cir. 1998)...................................................................................................9

*CK Co. v. Burger King Corp.*,
    No. 92 Civ. 1488, 1994 WL 533253 (S.D.N.Y. Sept. 30, 1994), *aff'd*, 122
    F.3d 1055 (2d Cir. 1995)......................................................................................................18

*Costanza v. Seinfeld*,
    279 A.D.2d 255, 719 N.Y.S.2d 29 (1st Dep't 2001) ...........................................................34

*Crane v. Poetic Productions, Ltd.*,
    593 F. Supp. 2d 585 (S.D.N.Y. 2009), *aff'd*, 351 F. App'x 516 (2d Cir. 2009).....................21

*Dellar v. Samuel Goldwyn, Inc.*,
    150 F.2d 612 (2d Cir. 1945)...................................................................................................1

*DiTocco v. Riordan*,
    815 F. Supp. 2d 655 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012)...............12, 13

*Eyal R.D. Corp. v. Jewelex New York, Ltd.*,
    784 F. Supp. 2d 441 (S.D.N.Y. 2011)........................................................................25, 29, 31

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)................................................................................................................9

*Forest Park Pictures v Universal Tel. Network, Inc.*,
    683 F3d 424 (2d Cir. 2012)...................................................................................25, 26, 27, 28

*FragranceNet.com, Inc. v. FragranceX.com, Inc.*,
    493 F. Supp. 2d 545 (E.D.N.Y. 2007) .................................................................................30

*Gal v. Viacom Int'l, Inc.*,
    403 F. Supp. 2d 294 (S.D.N.Y. 2005)...................................................................................12

*Gaste v. Kaiserman*,
    863 F.2d 1061 (2d Cir. 1988).................................................................................................9

*Gottlieb Dev. LLC v Paramount Pictures Corp.*,
    590 F. Supp. 2d 625 (S.D.N.Y. 2008)....................................................................................3

*Green v. Harbach*,

No. 17 Civ. 6984 (AKH), 2018 WL 3350329 (S.D.N.Y. July 9, 2018), *aff'd*,
750 F. App'x 57 (2d Cir. 2019) ...................................................................................12

*Greene v. Paramount Pictures Corp.*,
138 F. Supp. 3d 226 (E.D.N.Y. 2015) ........................................................................33

*Groden v. Random House, Inc.*,
61 F.3d 1045 (2d Cir. 1995)........................................................................................35

*Hallford v. Fox Entm't Grp., Inc.*,
No. 12 Civ. 1806 (WHP), 2013 WL 541370 (S.D.N.Y. Feb. 13, 2013), *aff'd*,
556 F. App'x 48 (2d Cir. 2014) ..................................................................................12

*Hampton v. Guare*,
195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dep't 1993) .................................................34

*Harding v. Paramount Pictures*,
No. 12 Civ. 66 (DAB)(HBP), 2013 WL 174401 (S.D.N.Y. Jan. 16, 2013),
*report accepted,* No. 12 Civ. 66(DAB), 2013 WL 1285423 (S.D.N.Y. Mar.
28, 2013) ....................................................................................................................33

*Hoehling v. Universal City Studios, Inc.*,
618 F.2d 972 (2d Cir. 1980)...............................................................................10, 11

*Hogan v. DC Comics*,
48 F. Supp. 2d 298 (S.D.N.Y. 1999)...........................................................10, 18, 19

*Hord v. Jackson*,
281 F. Supp. 3d 417 (S.D.N.Y. 2017)........................................................................13

*Jeffrey Milstein v. Greger, Lawlor, Roth Inc.*,
58 F.3d 27 (2d Cir.1995)............................................................................................29

*Jones v. CBS, Inc.*,
733 F. Supp. 748 (S.D.N.Y. 1990) .....................................................................10, 21

*Jorgensen v. Epic/Sony*,
351 F.3d 46 (2d Cir. 2003)...........................................................................................9

*Kane v. Comedy Partners*,
No. 00 CIV. 158 (GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003)
(Daniels, J) ...............................................................................................................35

*Khreativity Unlimited v. Mattel, Inc.*,
101 F. Supp. 2d 177 (S.D.N.Y. 2000), *aff'd sub nom.*, *Khreativity Unlimited,
Inc. v. Mattel, Inc.*, 242 F.3d 366 (2d Cir. 2000) ...............................................28, 29

*KJ Roberts & Co. v. MDC Partners Inc.*,
   No. 12-CV-5779, 2014 WL 1013828 (S.D.N.Y. Mar. 14, 2014) ............................................27

*Lemerond v. Twentieth Century Fox Film Corp.*,
   No. 07 Civ. 4635 (LAP), 2008 WL 918579 (S.D.N.Y. Mar. 31, 2008) ..................................34

*Lohan v. Perez*,
   924 F.Supp.2d 447 (E.D.N.Y. 2013) ....................................................................................35

*Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*,
   868 F. Supp. 2d 172 (S.D.N.Y. 2012).................................................................................30

*Mallery v. NBC Universal, Inc.*,
   No. 07 Civ. 2250(DLC), 2007 WL 4258196 (S.D.N.Y. Dec. 3, 2007) ..................................19

*Maurizio v. Goldsmith*,
   230 F.3d 518 (2d Cir. 2000)...........................................................................................30, 31

*Messenger ex. rel. Messenger v. Gruner + Jahr Printing & Publ'g.*,
   94 N.Y.2d 436,  706 N.Y.S.2d 52 (2000), *cert. denied,* 531 U.S. 818 (2000) ........................32

*Nadel v. Play-By-Play Toys & Novelties, Inc.*,
   208 F.3d 368 (2d Cir. 2000)................................................................................................28

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
   861 F. Supp. 2d 344 (S.D.N.Y. 2012)..................................................................................27

*Nichols v. Universal Pictures Corp.*,
   45 F.2d 119 (2d Cir. 1930)..................................................................................................10

*Nobile v. Watts*,
   289 F. Supp. 3d 527 (S.D.N.Y. 2017), *aff'd,* 747 F. App'x 879 (2d Cir. 2018).....................13

*Nussenzweig v. diCorcia*,
   9 N.Y.3d 184, 848 N.Y.S.2d 7 (2007) ..................................................................................35

*Perry v. Mary Ann Liebert, Inc.*,
   No. 17-CV-5600 (CS), 2018 WL 2561029 (S.D.N.Y. June 4, 2018)..............................11, 15

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010)..................................................................................................12

*Repp v. Webber*,
   132 F.3d 882 (2d Cir. 1997)..................................................................................................9

*Reyher v. Children's Television Workshop*,
   533 F.2d 87 (2d Cir. 1976)......................................................................................11, 12, 21

*Rice v. Fox Broadcasting Co.*,

330 F.3d 1170 (9th Cir. 2003) .............................................................................................18

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir.1989)...........................................................................................30

*Sheldon Abend Revocable Trust v. Spielberg*,
748 F. Supp. 2d 200 (S.D.N.Y. 2010)...........................................................................18

*Shepard v. European Pressphoto Agency*,
291 F. Supp. 3d 465 (S.D.N.Y. 2017)...........................................................................24

*Silas v. Home Box Office, Inc.*,
201 F. Supp. 3d 1158 (C.D. Cal. 2016) ..................................................................12, 16

*Songbird Jet Ltd., Inc. v. Amax, Inc.*,
581 F. Supp. 912 (S.D.N.Y. 1984) ................................................................................32

*Stadt v. Fox News Network LLC*,
719 F. Supp. 2d 312 (S.D.N.Y. 2010)...........................................................................31

*Stanacard, LLC v. Rubard, LLC*,
No. 12 Civ. 5176, 2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) ................................22

*Starobin v. King*,
137 F. Supp. 2d 93 (N.D.N.Y. 2001) .............................................................................11

*Stephano v. News Group Publ'ns Inc.*,
64 N.Y.2d 174, 485 N.Y.S.2d 220 (1984) ....................................................................35

*Tanksley v. Daniels*,
902 F.3d 165 (3d Cir. 2018)...........................................................................12, 13, 18

*Tiffany (NJ) Inc. v. eBay Inc.*,
600 F.3d 93 (2d Cir. 2010)............................................................................................30

*Touch Air Inc. v. Launch 3 Commc'ns Inc.*,
7 Misc. 3d 1014(A), 801 N.Y.S.2d 243 (Sup. Ct. Nassau Cty. 2005) .....................31

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986)............................................................................................11

*Warner Bros., Inc. v. American Broad. Cos., Inc.*,
720 F.2d 231 (2d Cir. 1983)............................................................................................3

*Williams v. A & E Television Networks*,
122 F. Supp. 3d 157 (S.D.N.Y. 2015)...........................................................................22

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996)............................................................................... *passim*

*Wilson v. Ledger*,
 97 A.D.3d 1028, 949 N.Y.S.2d 515 (3d Dep't 2012) ............................................................27

*Wolstenholme v. Hirst*,
 271 F. Supp. 3d 625 (S.D.N.Y. 2017) ....................................................................................24

**Statutes**

17 U.S.C. § 106 ....................................................................................................................22

17 U.S.C. § 301(a) ...............................................................................................................22

17 U.S.C. § 505 .......................................................................................................................1

Federal Rule of Civil Procedure 12(b)(6) .........................................................................2, 12, 35

New York Civil Rights Law § 51 ............................................................................... *passim*

New York General Business Law Section 349 ............................................................ *passim*

New York General Business Law Section 350 ..........................................................8, 24, 31

New York General Business Law Section 360-L ........................................................ *passim*

New York Civil Practice Rule 215(3) ...................................................................................35

Defendants Andrew Ross Sorkin ("Sorkin"), Brian Koppelman ("Koppelman"), David Levien ("Levien"), David Nevins ("Nevins"), TBTF Productions Inc. ("TBTF"), Showtime Networks Inc. ("Showtime"), and CBS Corporation ("CBS") (collectively, "Defendants") submit this memorandum of law in support of their motion for an order dismissing the Complaint and awarding Defendants their attorneys' fees and costs pursuant to 17 U.S.C. § 505.

## PRELIMINARY STATEMENT

Since the highly acclaimed television series *Billions* first aired, it has become a parlor game to speculate as to who "inspired" its lead characters, with Plaintiff Denise Shull ("Shull") piling on and publicly touting herself as the inspiration for the show's character, Wendy Rhoades ("Wendy").  By this action, Shull (and her company) now attempt to elevate a parlor game to a federal action, bringing a litany of claims against Defendants – from copyright infringement to various state law torts – all which are entirely meritless.

Plaintiffs' main claim is that *Billions* infringes the copyright in their book, *Market Mind Games*.  Even a cursory review, however, reveals that the works are strikingly dissimilar. Indeed, this is yet another example of "that obsessive conviction, so frequent among authors… that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism."  *Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945). *Market Mind Games* is a 236-page largely non-fiction academic book that, in Shull's own words, "combines [Shull's] years of study in neuroscience with her extensive trading experience to explain the basics of neuroscience and how to rethink your thinking about market risk."[1] *Billions*, on the other hand, is a richly conceived fictional serial drama about the high stakes battle between Chuck Rhoades ("Chuck"), a United States Attorney, and Bobby Axelrod

---

[1] https://therethinkgroup.net/about-us/a-radical-psychology/

("Axe"), the self-made billionaire hedge fund founder, arising out of Chuck's pursuit of Axe for insider trading.  In the middle of this struggle, is Chuck's wife, Wendy Rhoades ("Wendy"), a dominitrix at night who willingly takes on both Chuck and Axe.  From these two dramatically different works, Plaintiffs attempt to construct a copyright claim based only on a broad unprotectible idea – a female hedge fund performance coach counseling clients about their emotions.

The Copyright Act, however, does not protect ideas and stock elements that flow from such ideas.  Only a finding of "substantial similarity" of *copyrightable* expression contained within the works can support an infringement claim.  Since the total lack of similarity of protected expression may be readily determined by a back-to-back review of the two works, this Court should dismiss the Complaint with prejudice pursuant to Rule 12(b)(6), and award Defendants their attorneys' fees.

Plaintiffs' seven state law claims similarly fail as a matter of law.  Six of these claims are preempted by the Copyright Act (and otherwise fail to state claims).  Plaintiffs' own allegations establish that these claims seek to vindicate the identical rights created by the Copyright Act and allege harms solely arising from Defendants' purported unauthorized use of *Market Mind Games*.  That leaves Plaintiffs' right of publicity claim.  But New York's Section 51 only "provide[s] a limited statutory right of privacy" by prohibiting the use of a plaintiff's "name, portrait, picture or voice" for advertising or trade purposes without written consent.  Here, however, *Billions* does not use any such attributes of Shull's.  And, even if they had, *Billions* is a fully protected entertainment series and, by any measure, is not "advertising" or "trade" as those terms have been narrowly defined.

For the reasons stated herein, Defendants respectfully request that this Court dismiss

Plaintiffs' Complaint in its entirety with prejudice.

## FACTS

### A.      The Parties

Plaintiff Denise Shull ("Shull") is the author of *Market Mind Games* and a professional performance coach in the financial industry.  Compl. ¶ 3.  Shull is also an expert in the scientific fields of neuropsychoanalysis, neuroeconomics, and modern psychoanalysis.  *Id.* ¶ 20.  Plaintiff The Rethink Group (collectively with Shull, "Plaintiffs") owns the copyright in *Market Mind Games* and is a risk and performance advisory consulting firm founded by Shull.  *Id.* ¶ 6.

*Billions* is a television series that airs on Showtime's premium television network, SHOWTIME, and Showtime is a wholly-owned subsidiary of CBS.  *Id.* ¶ 12.  Nevins is the Chief Executive Officer ("CEO") of Showtime and Chief Creative Officer of CBS.  *Id.* ¶ 10.  Sorkin, Koppelman, and Levien (the "Individual Defendants") are the creators of *Billions*.  *Id.* ¶¶ 7-9.  TBTF Productions Inc. ("TBTF") is a production company.  *Id.* ¶ 11.

### B.      The Two Works

Since "a determination of substantial similarity requires a detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir. 1996) (citation and quotation marks omitted), a summary of each of the works at issue follows.[2]

#### 1.      Defendants' Television Series:  *Billions*

This claim arises out of the premium television series, *Billions*.  Compl. ¶ 2; McNamara

---

[2] To provide the Court with the opportunity to review the works in their entirety, as the law requires, copies of Season One of *Billions* and Plaintiffs' book are annexed to the moving Declaration of Elizabeth A. McNamara ("McNamara Decl.") as Exhibits A and B respectively.  *See Warner Bros., Inc. v. American Broad. Cos., Inc.*, 720 F.2d 231, 240-41 (2d Cir. 1983) (substantial similarity requires review of the two works at issue).  On this motion to dismiss, this Court may review the two works themselves because they are central to Plaintiffs' copyright infringement claims and are both referenced throughout the Complaint.  *See, e.g Gottlieb Dev. LLC v Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 629-30, n.1 (S.D.N.Y. 2008) (reviewing two works at issue, including DVD of defendant's movie attached to declaration in support of defendant's motion to dismiss, because they were "referred to in the complaint" and "integral to [plaintiff's] claims" and finding that the works are not substantially similar).

Decl. Ex. A.  *Billions* is an hour-long drama that has aired on SHOWTIME for three seasons

with a fourth season about to air.[3]  *Billions* is:

> a complex drama about power politics in the world of New York
> high finance.  Shrewd, savvy U.S. Attorney Chuck Rhoades . . . and
> the brilliant, ambitious hedge fund king Bobby "Axe" Axelrod . . .
> are on an explosive collision course, with each using all of his
> considerable smarts, power and influence to outmaneuver the other.
> The stakes are in the billions in this timely, provocative series.

McNamara Decl. Ex. A, Back Cover.

Axe is a folk hero who went from a working class background to billionaire founder of

the hedge fund, Axe Capital, by using means both legal (his cutthroat perception and intellect)

and illegal (extorting and/or bribing individuals for insider information) to successfully beat the

market.  Chuck, who grew up in a privileged New York family, is the United States Attorney of

the Southern District of New York ("U.S. Attorney") known for his perfect record prosecuting

financial crimes – but he also has a flexible moral compass.  The showdown between Axe and

Chuck arises when Chuck begins prosecuting Axe for his alleged illegal activities.

Complicating the battle between Axe and Chuck is Wendy.  Wendy is married to Chuck

but has worked with Axe for the past fifteen years as an in-house psychiatrist and performance

coach.  Wendy and Chuck have two children and live in a multi-million dollar townhouse in

Brooklyn.  It is Wendy's career that supports their lifestyle as she earns eight times as much as

Chuck.  The power dynamics between Chuck and Wendy are defined by Wendy's first

introduction to viewers – through their sadomasochistic sex lives with Wendy as the dominatrix

and Chuck as the submissive.

Further complicating Chuck and Wendy's relationship is Wendy's close relationship with

---

[3] Plaintiffs' Complaint focuses almost entirely on alleged similarities that are revealed in Season One of *Billions*. *See* Compl. ¶¶ 42-45.  Accordingly, Defendants' motion to dismiss focuses on Season One.

Axe, whom she has worked with longer than she has been married to Chuck.  Wendy served as Axe's main support when the partners at his former firm were killed on 9/11.  Wendy is also Axe's biggest defender, a role Axe recognizes, telling his wife only Wendy can "fix" him.  In Wendy's role as in-house performance coach, she works with Axe Capital employees in one-on-one intimate sessions, most often with Axe himself.  Here, too, Wendy comes off as the dominant one, going toe to toe with each of the two male titans in her life.

Despite Wendy's dedication to both men, Chuck and Axe consistently question Wendy's loyalty to them.  Season One ends with Wendy leaving them both – throwing Chuck out of their family townhouse after he steals her session notes to use against Axe, and quitting Axe Capital after Axe threatens to publicize the fact that she is a dominatrix because he thinks Wendy gave Chuck the incriminating evidence.

### 2.    Plaintiffs' Book: *Market Mind Games*

*Market Mind Games* explains the basics of neuroscience and provides the reader with a trading system that Shull claims is designed to take full advantage of your emotional assets.  *See* McNamara Decl. Ex. B.  Shull's theories are based on the academic disciplines of neuroeconomics, modern psychoanalysis, and neuropsychoanalysis.  According to Shull, it is an individual's ability to decipher his or her feelings and emotions – not mathematical formulas – that will help him or her outperform the market.  As part of this theory, Shull discusses in great detail the idea of the collective "*fCs*," which she defines as the "context of feelings we bring to each and every perception we have, judgment we make, and decision we act on," and contends that this *fC* "offers . . . something much more useful than attempting to find the missing natural mathematic law" in trading.  *Id.* at Prologue xiv.

*Market Mind Games* presents Shull's academic concepts through a series of lectures, workshops, and seminars given by a non-fictional representation of Shull based on the "typical

lectures, workshops and consulting programs" Shull gives in real life.  *Id.* at Prologue xvi.  Shull

then incorporates some fictional elements in the book as a way to transition the book through her

typical academic-based lectures.  Only approximately 20% of *Market Mind Games* – 47 pages

out of the 236-page book – discusses the fictionalized characters, while the rest of the book

focuses on Shull's theories and the academic research supporting them.  *Market Mind Games* at

3-7, 45-52, 103-111, 171-173, 205-222, 231-234.

Specifically, Shull uses the character Michael Kelley ("Michael"), "an academic about to

get a real shot at running money," as the main fictional subject of her lectures.  *Id.* at Prologue

xvi.  At first, one of Michael's professors from his PhD program invites Michael to attend a

three-day lecture by Shull, which operates to introduce Shull's trading theories to the reader.  As

the book's chapter and subheadings indicate, this lecture series focuses on the "difficult question

of how investors do (or should) form their probability beliefs," addressing topics such as

*Numbers Look You in the Eye and Lie* and *Mis-Remembering the Caveats of the Early Quants.*

*Id.* at 9-44.

The next time Michael and Shull interact is when Michael attends another set of lectures

by Shull, this time as part of a four-day new-hire trading program at a fictional Wall Street bank

where he is employed after graduate school.  As before, Shull lectures to a full audience and her

focus is on high-minded academic topics including *Ambient, Circumstantial, and Contingent*

*Reality*; *A Coherent Theory Proposal for Behavioral Economics*; and *Perception's Labyrinth.*

*Id.* at 53-100.  Portions of these lectures describe available research showing that the human

brain responds differently to uncertain risk compared to quantifiable risk.  *Id.* at 77-78.

When Michael is laid off from the bank, he goes skiing and meets up with his former

classmate Renee Smith's ("Renee") father, Christopher Smith ("Chris"), and his "trading

buddies."  Chris and his friends provide Michael with capital to start his own hedge fund, after which Michael and Renee attend The Rethink Group's (Shull's real life consulting firm) three-day "advanced workshop" covering topics such as *Regret Theory – 'Greed Misleads'* and *Fractal Geometry*. *Id.* at 111-167.  According to Shull, "the fractals of our early feelings repeat themselves out" during trading decisions, meaning that the feelings an individual experiences when trading are the same feelings experienced during an event in his or her childhood, such as not making the football team, but once an individual is aware of these fractal patterns, he or she can make better, more informed trading decisions.  *Id.* at 148-164.

After Michael's newly created hedge fund hires Shull as its coach, she provides three separate group seminars to the fund's employees covering topics such as *The Physical Game of Risk Decisions:  Body-Brain-Mind Reality*. *Id.* at 175-202.  These seminars focus on the idea that trading is a "physical game" that requires individuals to take care of themselves physically, as well as mentally, and separately how to identify and accept their feelings instead of fighting them.  *Id.*

When Michael makes a set of bad trades (falling into various pitfalls identified by Shull's earlier lectures), and in the only scene where Shull and Michael have a one-on-one session, Shull dissects these trades using the academic theories introduced earlier.  *See id.* at 217-222.  The book ends with a chapter from the hedge fund's Trader Training Manual entitled *A Note on the Psychology of Dealing with Uncertainty* where Shull theorizes that the best way to move beyond a bad trade is to "let yourself feel disgusted" and "bad."  *Id.* at 223-230.  Michael then successfully applies these theories to overcome his losing trades.

## C.    The Complaint

Plaintiffs claim that Defendants' *Billions* is an "unauthorized" use and "derivative work" of Plaintiffs' *Market Mind Games*, based solely on the purported similarities arising out of the

inclusion of a character that works as an in-house performance coach at a hedge fund and the alleged use of Shull's "unique" approach to the psychology of trading in financial markets. Compl. ¶¶ 2, 25, 42-45.  Plaintiffs also contend that Defendants had access to Plaintiffs' book because, back in 2012, Defendant Sorkin invited Shull on his show *Squawk Box*, where they discussed her book.  *Id*. ¶¶ 26-27.  Plaintiffs allege that three years later Sorkin emailed Shull and "introduced" her via email to the actress playing Wendy in order to discuss Wendy's character – *after* the Wendy performance coach character had already been created and cast.  *Id.* ¶¶ 31-32.  Plaintiffs then allege Shull had an "initial" meeting with Defendants Koppelman and Levien during which Shull was informed that they had also met with another performance coach, Tony Robbins, but that they were looking for "additional insights."  *Id.* ¶¶ 35-36, 39.  As the Complaint makes clear, this "initial" meeting "was the beginning of the[ir] relationship," and while Shull expected the "terms [of Shull's alleged involvement] would be negotiated subsequently," Plaintiffs expressly concede that terms were never agreed upon.  *Id.* ¶ 39.

Plaintiffs bring claims for direct, contributory, and vicarious copyright infringement against all Defendants based on the idea of a female financial performance coach who explains how a trader's emotions can affect trading decisions.  *Id.* ¶¶ 47-62.  Plaintiffs also bring claims against all Defendants for (i) unjust enrichment under Section 350 of New York General Business law ("GBL") (*id. ¶¶* 85-91) and against all Defendants except Nevins for (ii) unauthorized use of Shull's persona in violation of Section 51 of New York Civil Rights Law ("Section 51") (*id.* ¶¶ 63-78); (iii) injury to business reputation, dilution, and unfair competition in violation of GBL Section 360-L (*id.* ¶¶ 79-81); (iv) deceptive trade practices in violation of GBL Section 349 and under common law (*id.* ¶¶ 82-84); (v) implied in fact contract (*id.* ¶¶ 92-97); (vi) misappropriation of ideas (*id.* ¶¶ 98-102); and (vii) accounting (*id.* ¶¶ 103-111).

## **ARGUMENT**

**I.    DISMISSAL OF PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIM IS REQUIRED AS THE  WORKS ARE NOT SUBSTANTIALLY SIMILAR**

The dismissal of Plaintiffs' copyright infringement claim turns on a single issue:  a lack of substantial similarity of protected expression between *Billions* and *Market Mind Games*.  The application of well-settled Second Circuit law dictates the dismissal of this action.  By simply reviewing the respective works – which is routinely done on a motion to dismiss – it is evident that any similarity that exists is entirely superficial, constructed out of nothing more than abstract ideas and the stock elements that necessarily flow from such ideas.

"Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying."  *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  As the Second Circuit has explained, "[t]here are two main components of [a] *prima facie* case of infringement:  'a plaintiff must first show that his work was actually copied . . . . [and] then must show that the copying amounts to an improper or unlawful appropriation.'"  *Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 139-40 (2d Cir. 1992)).  In the absence of direct evidence of copying, a copyright plaintiff must first allege facts to show that defendant had "a reasonable possibility of access" to the preexisting work and that there are similarities in the allegedly infringing work that are probative of copying.  *Jorgensen v. Epic/Sony*, 351 F.3d 46, 54 (2d Cir. 2003); *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988).  Even assuming solely for purposes of this motion that Defendants had access to *Market Mind Games*, Plaintiffs' copyright claim fails as a matter of law because a side-by-side review of the works reveals that they are not substantially similar in their protected expression.

**A.      Copyright Infringement Requires Substantial Similarity of Protectible Expression and Cannot be Premised on Similar Ideas or Stock Elements**

In determining whether two works are substantially similar, courts in this Circuit apply the "ordinary observer test," asking "whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590.  Where, as here, the works in question contain both protectible and unprotectible elements, the court must apply a "discerning ordinary observer test" and "take care to inquire only whether 'the protectible elements, standing alone, are substantially similar.'" *Id.* (quoting *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999).  In performing its gatekeeper function, there are several fundamental principles which the Court must apply.

First, "[i]t is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea." *Williams*, 84 F.3d at 587 (internal quotations and citations omitted).  "It has long been recognized that all fictional plots, when abstracted to a sufficient level of generalization, can be described as similar to other plots." *Jones v. CBS, Inc.*, 733 F. Supp. 748, 753 (S.D.N.Y. 1990).  As Judge Learned Hand explained:

> Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. . . . [T]here is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930).

Second, the Second Circuit has repeatedly held that stock scenes and stock themes, often termed *scenes à faire*, cannot form the basis of a copyright claim.  These are defined as "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Hoehling v. Universal City Studios, Inc.*, 618 F.2d

972, 979 (2d Cir. 1980), or as "thematic concepts . . . which necessarily must follow from certain

plot situations." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976).[4]

 <u>Third</u>, purported "similarities" isolated from the context in which they appear, like the

ones identified by Plaintiffs in paragraphs 42 to 45 of the Complaint, are "inherently subjective

and unreliable." *Williams*, 84 F.3d at 590.[5]  This is particularly true where, as here, the

similarities are not copyrightable.

 Thus, the standard for establishing substantial similarity is a demanding one. "'Copyright

protection is not available for ideas or procedures for doing, making or building things; scientific

or technical methods or discoveries; business operations or procedures; mathematical principles;

formulas, algorithms; or any concept, process or method of operation.'"  *Perry v. Mary Ann*

*Liebert, Inc.*, No. 17-CV-5600 (CS), 2018 WL 2561029, at *6 (S.D.N.Y. June 4, 2018) (quoting

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 71 n.22 (2d Cir. 1994));

*see also Alexander v. Irving Tr. Co.*, 132 F. Supp. 364, 366, 368 (S.D.N.Y. 1955) (dismissal of

copyright action based on two academic works based on "the idea or theory that Holmes' novels

showed an understanding of psychiatry that was a half century ahead of his time" because "[t]he

author of a scientific article published in a professional journal is certainly not entitled to a

monopoly of the ideas presented therein"), *aff'd*, 228 F.2d 221 (2d Cir. 1955).  To the extent

Plaintiffs rely on the few fictional elements contained in *Market Mind Games*, the standard is

equally stringent because "the essence of infringement lies in taking not a general theme but its

---

[4] *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (in a police story set in the Bronx "[e]lements such as drunks, prostitutes, vermin and derelict cars", "[f]oot chases[,] . . . the morale problems of policemen . . . [and] the Irish cop" are unprotectible *scenes à faire*); *Hoehling*, 618 F.2d at 979 (revelry in German beer hall, common greetings of that time and German national anthem were *scenes à faire* in works about Hindenburg).
[5] *See also Starobin v. King*, 137 F. Supp. 2d 93 (N.D.N.Y. 2001) (dismissal of copyright lawsuit regarding Stephen King's book, *Desperation*, based on a 16-page list of non-contextual incidental similarities); *Beal v. Paramount Pictures*, 806 F. Supp. 963, 967 & n.2 (N.D. Ga. 1992) (noting lists of similarities are "inherently subjective and unreliable" since "many such similarities could be found in dissimilar works").

particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher*, 533 F.2d at 91.  The works must share similarities in "such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams*, 84 F.3d at 588.  And, while differences alone may not excuse actual infringement, "the Second Circuit has observed that 'numerous differences tend to undercut substantial similarity.'" *Adsani v. Miller*, No. 94 Civ. 9131, 1996 WL 194326, at *3 (S.D.N.Y. Apr. 22, 1996).

## B. The Court May Dismiss Plaintiffs' Claim as a Matter of Law Without Discovery Based on the Lack of Substantial Similarity of the Works

Courts across the country routinely dismiss – at the pleading stage – meritless copyright infringement claims regarding entertainment works where, as here, the alleged similarity "concerns only noncopyrightable elements of plaintiff's work or no reasonable trier of fact could find the works substantially similar." *Williams*, 84 F.2d at 587.[6]  The Second Circuit has explained that where the works in question are incorporated into a plaintiff's complaint, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).

Unsurprisingly, popular movies and television series are common targets for baseless copyright claims in which plaintiffs contend that successful series were somehow derived from plaintiffs' works.  And in case after case, these claims are dismissed because, inevitably, no

---

[6] *See, e.g., Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005) ("[T]here is ample authority for the proposition that a district court may make [a determination as to substantial similarity] on a motion to dismiss for failure to state a claim under Rule 12(b)(6)"); *see also Green v. Harbach*, No. 17 Civ. 6984 (AKH), 2018 WL 3350329, at *1 (S.D.N.Y. July 9, 2018), *aff'd*, 750 F. App'x 57 (2d Cir. 2019); *Brown v. Time Warner, Inc.*, 287 F. Supp. 3d 380, 385 (S.D.N.Y. 2017); *Hallford v. Fox Entm't Grp., Inc.*, No. 12 Civ. 1806 (WHP), 2013 WL 541370, at *6 (S.D.N.Y. Feb. 13, 2013), *aff'd*, 556 F. App'x 48 (2d Cir. 2014); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 673 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012); *Tanksley v. Daniels*, 902 F.3d 165, 175, 177 (3d Cir. 2018); *Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1184 (C.D. Cal. 2016).

similarity exists beyond abstract ideas, facts or random words or phrases – much less the substantial similarity that the law requires.  *See*, *e.g.*, *Brown v. Perdue*, No. 04 Civ. 7417 (GBD), 2005 WL 1863673, at *9, 13 (S.D.N.Y. Aug. 4, 2005) (Daniels, J) (no substantial similarity between defendants' book *The Da Vinci Code* and another thriller that "incorporates religious themes" and also included a murder, questions of the divine feminine, and secret religious organizations), *aff'd*, 177 F. App'x 121 (2d Cir. 2006); *see also Nobile v. Watts*, 289 F. Supp. 3d 527, 537 (S.D.N.Y. 2017) (no substantial similarity between defendants' book and movie *The Light Between Oceans* where both works involved couples coping with the moral complexities surrounding "the providential arrival of a baby in a boat to a childless couple"), *aff'd,* 747 F. App'x 879 (2d Cir. 2018); *Hord v. Jackson*, 281 F. Supp. 3d 417, 425 (S.D.N.Y. 2017) (dismissal of copyright action arising out of defendant's television show *Power* where both "works involve an African–American protagonist who deals drugs and engages in violence" because "such a story line is extremely common in television and movies"); *DiTocco*, 815 F. Supp. 2d at 672  (dismissal of copyright action arising out of defendant's *Percy Jackson* books and films, where both "feature a contemporary teenage hero named after Perseus who fights battles from Greek mythology" and must "navigate the world of Greek mythology in order to solve the mystery of Zeus' missing lightning bolt" where the villains, setting, and plot develop differently); *Tanksley v. Daniels*, 902 F.3d 165, 175, 177 (3d Cir. 2018) (dismissal of copyright action against defendant's television series *Empire* where both works include African-American, male record executives diagnosed with incurable diseases).

Here, by simply reading Plaintiffs' work and comparing it with *Billions* only one conclusion can reasonably be reached:  there is no similarity between the protectible elements of the works, and therefore, Plaintiffs' claims of copyright infringement should be rejected.

## II.   THE WORKS ARE COMPLETELY DISSIMILAR

*Market Mind Games* and *Billions* are not remotely similar.  *Market Mind Games* is

primarily an academic work of nonfiction meant as a guide to help traders trade better, while

*Billions* is a richly realized fictional television series that deals with age-old themes of power,

sex, and money.  This is not a case about the copying of actual sentences or content from a work.

Instead, Plaintiffs' Complaint strains to conjure similarities between the two works where none

exist, relying almost exclusively on the inclusion in both works of a character who works as an

in-house performance coach at a hedge fund.  Compl. ¶¶ 2, 42-45.  An analysis of the actual

works – instead of Plaintiffs' allegations – demonstrates that the works are radically distinct in

their plot, characters, settings, themes, and total concept and feel.

### A.   The Plots of the Works are Not Similar

To the extent *Market Mind Games* even has a plot, the story it tells with its fictional

characters is to follow an already fairly well-to-do man as he makes his way through a PhD

program to a Wall Street firm before starting his own fund, and participating in group lectures

from Shull that help him learn how to trade better.  This "plot" is primarily a vehicle to explain

how to apply the academic disciplines of neuroeconomics, modern psychoanalysis, and

neuropsychoanalysis in order to assess risk and improve performance in financial markets.

Indeed, Plaintiffs concede that the characters are nothing more than a device used to deliver

Shull's academic theories to the reader.  *See id.* at Prologue xvi ("I've drafted fictional characters

to help out. . . . you will be joining them as they attend fictional versions of my typical lectures,

workshops, and consulting programs.").

*Billions*, by contrast, is a fictional hour-long serial drama that is a far cry from any notion

of training in the academic disciplines of neuroeconomics, modern psychoanalysis, or

neuropsychoanalysis.  Rather, *Billions* tells the story of the high stakes battle between two New

York titans – Chuck, the U.S. Attorney, and Axe, the billionaire hedge fund founder.  The plot of *Billions* centers on the illegal activities employed by Axe to maintain his success and his attempt to outsmart Chuck, who wants to prosecute Axe.  *Billions* portrays both men as doing whatever is necessary to win, including crossing various legal and moral lines.  Wendy, a powerful woman in both men's lives, is stuck in the middle of Axe and Chuck's battle.

Despite the works being radically different, Plaintiffs claim that the two works are substantially similar based on the inclusion in both works of a female performance coach who works at a hedge fund and counsels clients using a "unique" approach to trading and investing psychology.  Compl. ¶¶ 2, 42.  Uniqueness, however, has nothing to do with substantial similarity.  Even if Shull were the first person to come up with this allegedly unique approach or the first in-house performance coach, copyright law does not give Shull a monopoly over those ideas because "[m]ere commonality in subject-matter cannot establish infringement."  *Allen v. Scholastic, Inc.*, 739 F. Supp. 2d 642, 664 (S.D.N.Y. 2011); *see also Williams,* 84 F.3d at 589 (concept of a dinosaur-zoo setting (however novel) was an "uncopyrightable concept"); *Perry*, 2018 WL 2561029, at *8 ("If the claim is that Plaintiff and Dr. Pierce wrote about the same scientific discovery or principle but in different manners, Plaintiff's copyright claim will fail because . . . a scientific discovery is not entitled to copyright protection").  In short, these concepts are nothing more than unprotectible ideas.[7]

Nor do Plaintiffs transform these abstract ideas to protectible expression by asserting that Shull's purported "unique approach" to trading advice is evident in *Billions* because Wendy is a hedge fund performance coach who "focus[es] on the physical well-being" and "alpha voice" of

---

[7] And Plaintiffs concede that they are not actually unique.  *See,* Compl. ¶¶ 32 (acknowledging the characterization of "Ms. Shull as *one of* the leading hedge fund performance coaches in the country." (emphasis added)); *id.* ¶ 35 (acknowledging that certain Individual Defendants met with famous performance coach, Tony Robbins *before* meeting with Shull).

a trader during a session.  Compl. ¶ 42.[8]  Even the article cited by Plaintiffs at Paragraph 28 of

their Complaint shows that not only are performance coaches common in the industry but also

that Shull's purported "unique approach" to trading advice is also common:

> The idea [of performance coaches for traders] is not new . . . . In the
> early 1990s, Steven A. Cohen, the founder of SAC Capital Advisors,
> hired Ari Kiev, a psychiatrist who had previously worked with
> athletes, to coach SAC's traders.  Two decades on, aided by the
> growing popularity of literature on the behavioral science of
> decision making, the idea that self-awareness can lead to better
> decisions in business and finance is beginning to be accepted on
> Wall Street.  Borrowing from books like Daniel Kahneman's
> "Thinking, Fast and Slow," trading coaches talk about the systemic,
> recurrent and predictable mistakes to which humans are prone.

*For Better Performance, Hedge Funds Seek The Inner Trader*, *The New York Times*, F14,

November 12, 2013, *available at* https://dealbook.nytimes.com/2013/11/11/for-better-

performance-hedge-funds-seek-the-inner-trader/ ("*The New York Times* Article").  Further, the

concept that physical wellbeing – eating, sleeping, exercising (Compl. ¶ 42) – is something a

"coach" should consider remains an unprotectible idea.  Indeed, Shull admits as much in her

book:

> These points are so obvious, and yet so many of us don't take them
> seriously.  We know we should eat better, get more exercise, and get
> to bed earlier . . . . In fact, back in the 1990's, when I actually hired
> a psychological trading coach [ ] she told me the same thing. . .

*Market Mind Games* at 115; *see also The New York Times* Article ("Trading coaches focus on

---

[8] While Plaintiffs contend that Wendy "makes multiple statements and observations that are nearly identical to those made by Ms. Shull in *Market Mind Games*[,]" and "[o]ther episodes of *Billions* contain substantially [sic] similarities to statements, observations, and fictionalized accounts set forth in *Market Mind Games*[,]" the Complaint fails to identify any statements beyond those discussed above – "focusing on the well-being of the trader" and "alpha voice."  Compl. ¶¶ 42, 46.  Moreover, because substantial similarity is determined by a review of the actual works, not a plaintiff's characterization of the works, no amount of repleading can change the inevitable conclusion that even a cursory review of *Billions* and *Market Mind Games* reveals that the two works are entirely different.  *See Alexander v. Murdoch*, No. 10 Civ. 5613(PAC)(JCF), 2011 WL 2802923, at *10 (S.D.N.Y. July 14, 2011) (granting motion to dismiss with prejudice where the works were not substantially similar), *aff'd*, 502 F. App'x 107 (2d Cir. 2012), *cert. denied*, 569 U.S. 1036 (2013); *see also Silas*, 201 F. Supp. 3d at 1184 (granting defendant's motion to dismiss with prejudice where the works "are not extrinsically similar and no amendment could possibly cure that defect in Plaintiffs' case"), *aff'd*, 713 F. App'x 626 (9th Cir. 2018).

the same areas as athletes do — rest, patience, mental outlook, intuition and personal obstacles.").[9]

Indeed, the only scene in *Billions* that Plaintiffs allege is actually similar to a sequence in the book underscores just how substantially different the works are.   Specifically, Plaintiffs base their infringement claim on a scene where Shull walks Michael through a bad trade in *Market Mind Games* and claims it is substantially similar to a scene where Wendy and Axe discuss a bad trade in *Billions*.   Compl. ¶¶ 43-45.   First, the alleged similarities are nothing more than unprotectible ideas or *scenes à faire*.   Of course, works that deal with Wall Street will include hedge fund managers and traders, and (now) performance coaches.   And, an inevitable by-product of trading is that bad trades will happen and, when they do, the trades will be assessed in order to try to avoid similar mistakes in the future.

More importantly, the manner in which these ideas are expressed in the two works is entirely distinct.   In *Market Mind Games*, Michael makes a bad trade by adding to a losing trading position after his brother is critically injured and Michael has to deal with his overbearing judgmental father.   *Market Mind Games* at 217-221.   In the resulting session with Michael, Shull determines that Michael's bad trades were the result of sleep deprivation, fear of missing out on a chance to outperform the market, an attempt to regain control, and the result of a fractal pattern of stubbornness.   *Id.* at 221.   The session between Michael and Shull is professional and clinical.

Conversely, in *Billions* the bad trade discussed by Wendy and Axe occurred the day after their colleague Donnie (who Axe was using to feed false information to the FBI and Wendy's

---

[9] The ubiquitous concept of "the alpha voice" (Compl. ¶ 42) is also not protectible and, in any event, is expressed entirely differently in the two works.   In *Billions*, alpha comes up during a single session where Wendy refers to "alpha" as shorthand for the usually male-associated characteristics of dominance and overt confidence explaining to a trader that he is listening to the voice telling him that he's "[explicative] stupid" and ignoring the one "telling [him] where the alpha is."   *Billions* S:1 E:1.   Wendy then has the trader stand up and repeat that he made $7.2 million last year while thumping his chest with his fist.   *Id.*   Conversely, *Market Mind Games* discusses "alpha" in a clinical context as "exceptional performance."   *Market Mind Games* at 112, 120, 132.

U.S. Attorney husband) died from cancer.  *Billions* S:1 E:11.  Wendy concludes that Axe made

the bad trade to punish himself because he intentionally withheld life-extending care from

Donnie so that Donnie could not testify against him.  *Id.*  The session between Axe and Wendy,

like many others in the series, is casual and intimate.  The scene underscores Wendy and Axe's

close personal relationship and Axe's immoral behavior, a radically different context from

Plaintiffs' dry academic discussion.  In short, the actual scenes in the respective works share

nothing in common and the comparison aptly demonstrates that Plaintiffs' claim rests on nothing

more than unprotectible stock elements and ideas, not on substantial similarity in the expression

in the two works.

### B.    The Characters in the Works are Not Similar

The fictional character Wendy in *Billions* and the non-fiction representation of Shull in

*Market Mind Games*—the only alleged overlap in characters—could not be more dramatically

distinct.  Any similarity between Wendy and Shull begins and ends with them being women

employed as in-house performance coaches at hedge funds, which is wholly insufficient to

establish substantial similarity.  *See, e.g., Tanksley*, 902 F.3d at 174 ("the share[d] premise of the

show – an African-American, male recording executive – is unprotectible.  These characters fit

squarely within the class of 'prototypes' to which copyright protection has never extended.").

"In determining whether characters are similar, a court looks at the 'totality of [the

characters'] attributes and traits as well as the extent to which the defendants' characters capture

the 'total concept and feel' figures in [plaintiff's work]."  *Hogan*, 48 F. Supp. 2d at 309–10

(citing *Walker*, 784 F.2d at 50).  "The bar for substantial similarity in a character is quite high."

*Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).  A

character is not subject to copyright protection separate from the work in which he or she

appears, unless they are sufficiently delineated and widely recognizable (such as Rocky, James

Bond or Godzilla).  *See Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003); *CK Co. v. Burger King Corp.*, No. 92 Civ. 1488, 1994 WL 533253, at *4 (S.D.N.Y. Sept. 30, 1994) ("[C]opyright law does not protect stock characters . . . standard in the treatment of a given topic."), *aff'd*, 122 F.3d 1055, 1055 (2d Cir. 1995).  In keeping with this high bar, where characters sharing much more specific characteristics, such as both being half-vampires and half-humans named Nicholas Gaunt, *Hogan*, 48 F. Supp. 2d at 311, minority artists with the ability to paint the future, *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250(DLC), 2007 WL 4258196, at *7 (S.D.N.Y. Dec. 3, 2007), or two "famous male wizards, initiated late into wizarding (in pre/early adolescence), who receive formal education in wizarding and are chosen to compete in year-long wizard competitions," *Allen*, 739 F. Supp. 2d at 659, courts have found no substantial similarity as such shared traits are nothing more than general prototypes too indistinct to merit protection.

In *Market Mind Games*, as in real life, Shull (who, significantly, is not a medical doctor actually or in the book) runs a Wall Street consulting firm and gives lectures and workshops on the "new philosophy of risk, uncertainty, and decision making."  Conducting therapy in a one-on-one session – Wendy's main approach – is hardly depicted in Shull's work.  And only in a brief section at the very end of *Market Mind Games* does Shull even become an in-house performance coach at a newly created hedge fund.  Even in that context, Shull and the hedge fund founder, Michael, have a strictly professional relationship and the reader is told nothing about Shull's personal life or her sex life.  The reader is not provided any information concerning how Shull looks, her age, if she is married, if she has kids, or where her personal loyalties lie.

In striking contrast, Wendy is a completely fictitious character whose personal life (not her professional abilities as either a medical doctor or a coach) is at the center of her role in

19

*Billions*.  Wendy and Chuck's sadomasochistic sexual role playing (with Wendy as the dominatrix) is an important part of her character and the show and it is Wendy's marriage to Chuck while working at Axe Capital that propels the conflict between Chuck and Axe forward.  Wendy's intimate (close to inappropriate) friendship with Axe is on full display throughout Season One.  Wendy works almost exclusively with traders one-on one.  As a medical doctor, Wendy is described as the second wealthiest person in her medical school class, and is depicted as such through her cars and home.  In short, Wendy and Shull have nothing in common – except the generalized idea of working as a financial performance coach.[10]

## C.    The Settings of the Works are Not Similar

The settings of *Billions* and *Market Minds Games* are distinct, and Plaintiffs make no allegation otherwise.  The majority of Season One is spent at Axe Capital and the U.S. Attorney's office in Manhattan, Axe's mansion in Connecticut, and Wendy and Chuck's townhouse in Brooklyn.  Conversely, *Market Mind Games* is set primarily in various lecture halls and conference rooms in Chicago while Michael is in graduate school and again when he starts his hedge fund.

## D.    The Themes of the Works Are Not Similar

The two works' themes are also strikingly different.  *Billions* tackles such themes as morality, justice, power, the corruption of that power, and loyalty.  The theme of *Market Mind Games* is simply to explain Shull's academic theories.  To claim that the works share thematic similarities merely because they involve financial markets "would be as irrational as saying the

---

[10] Plaintiffs do not allege that any other characters in *Market Mind Games* are comparable to characters in *Billions*. Indeed, the Complaint completely ignores all other characters in the two works.  *Billions* has a large cast of well-developed characters, including the main characters Chuck and Axe and other supporting characters including Axe's wife Lara and two assistant U.S. Attorneys (Bryan Connerty and Kate Sacker) that work for Chuck.  Because *Market Mind Games* uses the fictional characters merely as a plot device to inform the reader of Shull's academic theories, her characters are not developed beyond thin renderings of a hedge fund manager, colleague, and fathers that are needed to explain her theories.  None of the characters in the two works are remotely similar.

movie 'Animal House' is substantially similar to 'Rudy' or 'Good Will Hunting' because the movies all focus on college life." *Blakeman v. The Walt Disney Co.a*, 613 F. Supp. 2d 288,  307 (E.D.N.Y. 2009) (no substantial similarity where the themes of the movies shared "nothing in common other than the backdrop of a Presidential election").  The themes of these works could not be more dissimilar.

### E.    The Total Concept and Feel of the Works Are Not Similar

The total concept and feel of a work refers to the way the author selected, coordinated and arranged the elements of the work, taking into consideration similarities in "mood, details or characterization."  *Reyher*, 533 F.2d at 91-92.  In comparing the total concept and feel of the works, courts consider the works as a whole.  *See Jones*, 733 F. Supp. at 754.

Here, the total concept and feel of the works differ completely.  *Market Mind Games* is an academic book that painstakingly explains "the basics of neuroscience and how to rethink your thinking about market risk," while *Billions* is a dramatic, fictional televised series.  *Billions* is a fast paced wholly fictionalized drama, while *Market Mind Games* is a detailed academic work where only 20 percent of the book focuses on the fictional characters.   The total concept and feel of the two works are not close to substantially similar.  *See Crane v. Poetic Productions, Ltd.*, 593 F. Supp. 2d 585, 597 (S.D.N.Y. 2009) ("Due to these substantial differences in plot and theme, as well as the different mediums each author uses (non-fiction book versus fictional play), the two works cannot be said to be substantially similar in total concept and feel to support a finding of copyright infringement"), *aff'd,* 351 F. App'x 516 (2d Cir. 2009).

In the end, when one considers the actual protectible expression of the respective works, only one conclusion can be reached:  Plaintiffs' academic book, *Market Mind Games*, is not substantially similar to Defendants' fictional television drama, *Billions*.  Thus, Plaintiffs cannot

sustain a copyright claim and the motion to dismiss should be granted.[11]

## III.   THE MAJORITY OF PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT

All of Plaintiffs' state law claims are preempted by the Copyright Act – with the exception of their Section 51 claim which independently fails (*see* below).   Section 301 of the Copyright Act precludes any non-copyright claims that are "equivalent to any of the exclusive rights within the general scope of copyright."  17 U.S.C. § 301(a).  Courts employ a two-pronged test to determine whether Section 301 preempts a claim.  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004).  First, the court decides whether the work to which the claim relates falls within the subject matter of copyright.  Second, the court determines whether the rights protected by the asserted claim are equivalent to any of the exclusive rights granted by the Copyright Act, *e.g.*, the rights to make copies, create derivative works, or to distribute or display the work.  *Id.*; *see also* 17 U.S.C. § 106 (listing exclusive rights of copyright owner).  Regarding the second prong of the preemption test, a work will not be preempted only if the asserted state law claim has an "extra element that makes [the claim] qualitatively different from a copyright infringement claim."  *Briarpatch*, 373 F.3d at 305.  To determine whether a claim contains that "extra element," courts consider "what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced."  *Id.* at 306.  In doing so, the court "take[s] a *restrictive view* of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement

---

[11] Because Plaintiffs have not plausibly alleged a claim of direct copyright infringement, their claims of contributory and vicarious copyright infringement must also be dismissed.  *See Williams v. A & E Television Networks*, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015); *Abbey House Media, Inc. v. Apple Inc.*, 66 F. Supp. 3d 413, 419 (S.D.N.Y. 2014).  The contributory and vicarious copyright infringement claims against CBS and Nevins also fail for the independent reason that the only potential basis for such claims are CBS' status as the parent company of and Nevins' status as a corporate officer of the alleged direct infringer (Showtime) and its parent company (CBS), which are insufficient.  *See Stanacard, LLC v. Rubard, LLC*, No. 12 Civ. 5176, 2016 WL 462508, at *14 (S.D.N.Y. Feb. 3, 2016); *Banff Ltd. v. Ltd., Inc.*, 869 F. Supp. 1103, 1110 (S.D.N.Y. 1994).

claim." *Id*. (emphasis added).  Moreover, even where a cause of action technically includes an element not present in a copyright infringement claim, where that element "limits the scope of the claim but leaves its fundamental nature unaltered," that claim is not qualitatively different from one for copyright infringement and is thus preempted.  *See id.*  If the claim satisfies both of the above prongs, then federal copyright law preempts that claim.

Here, it is undisputed that Plaintiffs' book falls within the subject matter of copyright. Thus, the only question is whether the rights that Plaintiffs seek to vindicate through their tagalong claims are equivalent to the rights granted by the Copyright Act.  They are.

Other than Plaintiffs' Section 51 claim, all of Plaintiffs' state law claims seek to vindicate the same rights they claim they are entitled to under the Copyright Act.  The crux of Plaintiffs' state law claims is that – long before she talked to any of the Defendants about *Billions* – Defendant Sorkin interviewed her and around that time "unbeknownst to Shull," he was developing a pilot for *Billions* "in part based on [her book] and Shull's persona."  Compl. ¶¶ 27-29.  Thus, her own allegations make it clear that she believes Defendants were taking her work and persona from the book without her permission, and that this was well underway before she was called to meet with the actress playing Wendy.  And, even after her meeting with the producers of *Billions*, Shull underscores that she believes her "book [was] an integral part of developing" the Wendy character and she seeks credit and compensation "for the derivative status of *Billions*."  *Id.* ¶ 40.  This is precisely the alleged conduct at issue in her copyright claim – the "exclusive right to control distribution and reproduction of the copyright protected material and to create works deriving therefrom."  Compl. ¶ 52.  And any and all harms alleged by such state law claims arise from Defendants' purported unauthorized use of Plaintiffs' work.[12]

---

[12] *See* Fourth Cause of Action for Injury to Business Reputation, Dilution, and Unfair Competition under Section 360-L at Compl. ¶¶ 79-81 (alleging "Defendants' conduct" – alleged unauthorized copying of Plaintiffs' work –

Shull is not the first plaintiff who has attempted to repackage a copyright claim as causes of action under various state law theories. But, where, as here, state law claims are not qualitatively different from a copyright claim, they are preempted and subject to dismissal. Unsurprisingly then, courts consistently hold that the same state law claims asserted by Plaintiffs – (i) unjust enrichment under GBL Section 350; (ii) injury to business reputation, dilution, and unfair competition under GBL Section 360-L; (iii) deceptive trade practices under GBL Section 349 and common law;[13] (iv) implied-in-fact contract; (v) misappropriation; and (vi) accounting – are preempted. *See Briarpatch*, 373 F.3d at 306 (unjust enrichment claim preempted as it is not "qualitatively different from a copyright infringement claim"); *Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154, 165-66 (S.D.N.Y. 2017) (unjust enrichment, unfair competition, and likely implied-in-fact contract claims preempted where they were based on defendants' distribution and reproduction of plaintiff's copyrighted work); *Wolstenholme v. Hirst*, 271 F. Supp. 3d 625, 644–

---

"constitutes a likelihood of injury to the business reputation of Plaintiffs and dilution of the distinctive quality of Plaintiff The ReThink Group's copyrighted work in violation of section 360-L."); Fifth Cause of Action for Deceptive Trade Practices under Section 349 and common law at *id.* ¶¶ 82-84 (alleging "Defendants' wrongful actions" – alleged unauthorized copying of Plaintiffs' work – resulted in the "passing off and creating likelihood of confusion" between *Billions* and *Market Mind Games*); Sixth Cause of Action for Unjust Enrichment at *id.* ¶¶ 86 (alleging Defendants were unjustly enriched by taking portions of Plaintiffs' copyrighted work without compensating or obtaining Plaintiffs' permission to do so: "Plaintiffs at their own expense and without attribution, provided Defendants with content for *Billions*"); Seventh Cause of Action for Implied-In-Fact Contract *id.* at ¶ 93 (alleging Plaintiffs "provided Defendants with novel ideas, information and insight relating to modern psychoanalysis, neuropsychoanalysis, neuroeconomics [all discussed at length in *Market Mind Games*] and the subject matter that eventually became the focus of the *Billions* series."); Eighth Cause of Action for Misappropriation at *id.* ¶ 99 (alleging "Defendants have misappropriated, copied and used, and continue to misappropriate copy and use, Plaintiffs['] original ideas and their copyrighted materials."); Ninth Cause of Action for Accounting at *id.* ¶¶ 103-111 (request for accounting based on Defendants' alleged copying of Plaintiffs' copyrighted work).

[13] To the extent that Plaintiffs are claiming that "passing off" alleged in their claim for deceptive trade practices (Compl. ¶¶ 82-84) provides the "extra element" required to avoid preemption, they are incorrect. First, Plaintiffs' claim is not one for passing off, which occurs "when a producer misrepresents his own goods or services as someone else's." *Shepard v. European Pressphoto Agency*, 291 F. Supp. 3d 465, 475–76 (S.D.N.Y. 2017). Plaintiffs do not allege that Defendants misrepresented *Billions* as Plaintiffs' work. They allege that Defendants misrepresented *Billions* as their own, a claim known as "reverse passing off." *Id.* It is, however, "well-settled that a claim for reverse passing off predicated on the theory that defendant's product replicates plaintiff's expressions contains no extra element and is therefore preempted." *Id.*

45 (S.D.N.Y. 2017) (Section 360-L claim preempted "[w]here a plaintiff can only plead facts to

allege harm from copying"); *Baiul v. NBC Sports*, No. 15 Civ. 9920 (KBF), 2016 WL 1587250,

at \*10 (S.D.N.Y. Apr. 19, 2016) ("claims for accounting based on the defendant's alleged

misappropriation and exploitation of a copyrighted work are preempted by the Copyright Act");

*Eyal R.D. Corp. v. Jewelex New York, Ltd.*, 784 F. Supp. 2d 441, 449 (S.D.N.Y. 2011) (Section

349 claim preempted because plaintiff "alleged harms arising only from [defendant's] alleged

copying . . .  and thus asserts only a harm squarely covered by federal copyright law.); *Am.

Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 933 (S.D.N.Y. 1996) (courts in the

Second Circuit "have consistently" found misappropriation claims to be preempted).

   Out of these six state law claims, only Plaintiffs' claim for implied-in-fact contract

requires any discussion.  The Second Circuit has determined that an implied-in-fact contract

claim may survive copyright preemption where the alleged contract includes a promise to pay for

the use of a plaintiff's ideas.  *See Forest Park Pictures v Universal Tel. Network, Inc.*, 683 F3d

424, 432 (2d Cir. 2012).  The Second Circuit also made clear, however, that "preemption cannot

be avoided simply by labeling a claim breach of contract."  *Id.*  Instead, to avoid preemption, the

complaint in *Forest Park* "specifically alleges that the contract includes by implication a promise

to pay."  *Id.*  There, plaintiffs alleged that the meeting between the parties was for the express

purpose of plaintiffs "pitching ideas" for defendants to develop and that defendants "voluntarily

accepted Plaintiffs' ideas knowing full well that Plaintiffs had submitted those ideas in

confidence and for economic gain, and with the clear expectation of payment in the event those

ideas were utilized."  *Id*.

   The allegations at issue here are readily distinct from the allegations in *Forest Park.*

Here, Plaintiffs did not "pitch" anything to Defendants.  According to Plaintiffs, Defendants

were already developing *Billions* using (without authorization) ideas in "*Market Mind Games* and Ms. Shull's persona" based on her book, her appearance with Sorkin on *Squawk Box* in 2012, and the write-up in *The New York Times* in 2013.  Compl. ¶¶ 27-29.  And the later contact between Shull and certain Individual Defendants—an alleged "initial" meeting, emails, and a phone call (*id.* ¶ 35)—was initiated by the Individual Defendants to gain "additional insights" as they did from others, like Tony Robbins.  No terms or payment were discussed, let alone agreed upon.  *Id*. ¶ 39.  These allegations are far removed from those in *Forest Park* where the plaintiff was specifically "pitching" or looking to "sell" her idea for a show, with specific allegations that she only did so based on an expectation of payment in keeping with alleged industry practice.  *Forest Park,* 683 F.3d at 432-33.   And Plaintiffs' conclusory allegation that "Plaintiffs and Defendants understood and agreed that Ms. Shull would receive credit and compensation for her contributions and the derivative status of *Billions*" (Compl. ¶ 40) is belied by their allegations conceding that neither party had discussed, let alone agreed on, any terms.  *Id.* ¶ 39.  No purported contract, let alone a specific promise (implied or otherwise) to pay, can be plausibly understood based on Plaintiffs' allegations here.[14]  Because Plaintiffs have not alleged that Defendants did anything other than purportedly use her ideas in Shull's book and her persona from the Book, these state law claims are preempted and should be dismissed.

## IV.   PLAINTIFFS FAIL TO PLAUSIBLY STATE THE NECESSARY ELEMENTS FOR THE STATE LAW CLAIMS UNDER NEW YORK LAW

Even if this Court were to find that some or all of Plaintiffs' state law claims are not

---

[14] In *Betty*, 283 F. Supp. 3d at 166, this Court found plaintiff's implied-in-fact contract claim was likely preempted even though, like *Forest Park*, plaintiffs "pitched" defendants on concepts for a Super Bowl halftime commercial because the court found the purported breach of an agreement to "enter into a Statement of Work [] as to any advertising storyline which [Defendants] wanted to use or otherwise acquire rights" from the pitch did not amount to an expectation of payment arising from the pitch.  As here, the *Betty* court also noted that while labeled an "implied-in-fact" contract claim, "the thrust of Plaintiff's Complaint is that Defendant reproduced and distributed copyrighted material without Plaintiff's permission."  *Id.*

preempted (which, as discussed above, they are), these state law claims are subject to dismissal on the independent grounds that Plaintiffs do not – and cannot – plead their required elements.

### A.      Plaintiffs Fail to State a Claim for Implied-In-Fact Contract

Plaintiffs fail to allege the most basic element of their implied-in-fact contract claim – the existence of a contract.  Under New York law, the required elements for a breach of contract claim are the same whether the alleged contract is implied-in-fact or express:  a plaintiff must allege "the existence of a contract, the plaintiffs' performance under the contract, the defendants' breach of that contract, and resulting damages."  *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 355 (S.D.N.Y. 2012) (citing *JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2d Dep't 2010)); *see also Forest Park.*, 683 F.3d at 432 (noting plaintiffs cannot avoid preemption by merely labeling a claim "breach of contract" but must "actually allege the elements of an enforceable contract (whether express or implied-in-fact) including offer, acceptance, and consideration, in addition to adequately alleging the defendant's breach of the contract.").

"It is settled law that before a plaintiff may secure redress for breach of an agreement, the promise made by the defendant must be sufficiently certain and specific so that the parties' intentions are ascertainable" and that "[c]onclusory allegations that a contract existed or that it was breached do not suffice."  *Betty*, 283 F. Supp. 3d at 167.  Importantly, "[i]t is . . . well settled . . . that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable."  *KJ Roberts & Co. v. MDC Partners Inc.*, No. 12-CV-5779, 2014 WL 1013828, at *9 (S.D.N.Y. Mar. 14, 2014); *see also Wilson v. Ledger*, 97 A.D.3d 1028, 1029, 949 N.Y.S.2d 515, 517 (3d Dep't 2012) ("The parties, however, left these material terms for future negotiation and agreement and failed to set forth in the documents any objective method for supplying those missing terms, resulting in only an unenforceable agreement to agree.").

Here, Plaintiffs' allegations amount to nothing more than a non-actionable agreement to agree.  Plaintiffs base their implied-in-fact contract claim on an alleged "initial" meeting, emails, and phone call between Ms. Shull and certain Defendants, but Plaintiffs concede that no terms of any contract were ever negotiated.  Compl. ¶ 39.  In fact, Plaintiffs specifically allege that they understood that the "terms would be negotiated subsequently."  *Id.*  Plaintiffs' allegations here mirror the allegations in *Betty* where there was an alleged "agreement between the [P]arties that a Statement of Work *would be* negotiated, prepared and executed if [Defendant] liked a presented storyline."  *Betty*, 283 F. Supp. 3d at 167 (emphasis added).[15]  In both cases, the allegations amount to an "agreement to agree," and should be dismissed.

Plaintiffs' implied-in-fact contract claim may also be dismissed on the independent ground that the ideas Shull claims she shared with Defendants were not original or novel.  Under New York law, an implied-in-fact breach of contract claim based on the unauthorized use of an idea must allege that the ideas shared were novel as to the defendants.  *See Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 380 (2d Cir. 2000).  Where an idea is "so unoriginal or lacking in novelty that its obviousness bespeaks widespread and public knowledge of the idea, and such knowledge is therefore imputed to the buyer . . . . a court may conclude, as a matter of law, that the idea lacks . . . the novelty to the buyer necessary to support a contract claim."  *Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp. 2d 177, 185 (S.D.N.Y. 2000) (quoting *Nadel*, 208 F.3d at 378-79), *aff'd sub nom. Khreativity Unlimited, Inc. v. Mattel, Inc.*, 242 F.3d 366 (2d Cir. 2000).  As is clear from *The New York Times* Article cited in Plaintiffs' Complaint, Plaintiffs' own book, and common sense, the ideas that Plaintiffs purportedly provided to

---

[15] The implied-in-fact contract claim in *Forest Park* was decided under California, not New York law, and is thus inapplicable.  *See Forest Park*, 683 F.3d at 433-34.

Defendants, were not original but were already known to Defendants and in wide use in the industry.  *See supra* at Section II.A, III.  Put simply, Plaintiffs do not allege, nor could they prove, that the "ideas" at issue are sufficiently original or novel to state an implied-in-fact contract claim.

### B.   Plaintiffs Fail to State a Claim for Misappropriation

Plaintiffs' misappropriation claim is subject to dismissal for the same reason the implied-in-fact contract claim fails, namely the ideas purportedly shared with Defendants by Shull were not original, novel, or concrete.  *See Broughel v. Battery Conservancy*, No. 07 CV 7755 (GBD), 2010 WL 1028171, at *4 (S.D.N.Y. Mar. 16, 2010) (Daniels, J.) ("In order for an idea to be susceptible to a claim of misappropriation . . . the idea must be novel and concrete"); *see also Khreativity Unlimited*, 101 F. Supp. 2d at 185 ("a court may conclude, as a matter of law, that the idea lacks [] the originality necessary to support a misappropriation claim").  For a misappropriation claim, "a plaintiff may not claim that an idea is novel if the idea was already in use in the industry at the time of plaintiffs['] submission." *Broughel*, 2010 WL 1028171, at *4.  Plaintiffs cannot meet this test and thus, their misappropriation claim fails.

### C.   Plaintiffs Fail to State a Claim for Injury to Business Reputation, Dilution and Unfair Competition in Violation of Section 360-L[16]

To state a claim for dilution or injury to business reputation under Section 360–L, a plaintiff must allege: "(1) that the trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution either as a result of 'blurring' or tarnishment.'" *Eyal*,

---

[16] Section 360-L does not provide a cause of action for unfair competition.  To the extent Plaintiffs intend to bring a claim for unfair competition, any such claim fails under New York law.  To state a claim for unfair competition in New York, a plaintiff must show confusion and bad faith.  *Eyal*, 784 F. Supp. 2d at 449; *Jeffrey Milstein v. Greger, Lawlor, Roth Inc.,* 58 F.3d 27, 34–35 (2d Cir.1995) ("the essence of unfair competition . . . is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods.").  Here, Plaintiffs do not allege bad faith and provide no support for the conclusory allegation of confusion.  Thus, any unfair competition claim fails as a matter of law.

784 F. Supp. 2d at 449; *FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 493 F. Supp. 2d 545, 547 n.1 (E.D.N.Y. 2007) ("A claim of injury to business reputation and a claim of dilution are essentially equivalent . . . and require the same elements of proof.").  A dilution claim is only permitted under New York law if the marks are substantially similar.  *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 111 (2d Cir. 2010).  Here, Plaintiffs do not allege the existence of *any* trademark, let alone a trademark that would be sufficiently strong to support this claim.  Even if they had, for the reasons already discussed, Defendants' *Billions* is not substantially similar to Plaintiffs' *Market Mind Games* and thus, Plaintiffs' dilution claim should be dismissed.[17]  Plaintiffs' claim for injury to business reputation is similarly without foundation.  Not only do Plaintiffs rely solely on conclusory allegations of injury but any such claim is completely belied by Shull's own statements touting her alleged relationship with *Billions* as a means of self-promotion and thus should also be dismissed.[18]

### D.   Plaintiffs Fail to State a Claim for Deceptive Trade Practices in Violation of Section 349 and Common Law

Plaintiffs cannot allege the basic elements of a deceptive trade practices claim – that the alleged deceptive practices caused "consumer injury or harm to the public interest."  *See Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (to state a claim for deceptive trade practices plaintiffs must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as

---

[17] Moreover, any alleged use of Plaintiffs' (as yet unidentified) mark(s) fails under the First Amendment and the Second Circuit's *Rogers*' test.  *See Rogers v. Grimaldi*, 875 F.2d 994 at 999 (2d Cir.1989) (construing the Lanham Act "to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression"); *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 172, 184 (S.D.N.Y. 2012) ("[T]he same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law." (quoting *Yankee Publ'g Inc. v. News America Publ'g Inc.*, 809 F.Supp. 267, 282 (S.D.N.Y.1992)).

[18] *See* https://therethinkgroup.net/about-us/our-people/denise-shull/; https://www.forbes.com/sites/alisacohn/2018/02/05/meet-denise-shull-the-real-life-performance-coach-from-billions/#d0561cf28e3f.

a result.").  As Section 349 is a consumer protection statute, "the gravamen of [the claim] must be consumer injury or harm to the public interest."  *Eyal*, 784 F. Supp. 2d at 449.  Plaintiffs' claim is based solely on the alleged "likelihood of confusion" between *Billions* and *Market Mind Games.  See* Compl. ¶ 83.  But a likelihood of confusion is generally not considered a "sufficient consumer harm" under Section 349.  *See Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 324 (S.D.N.Y. 2010); *Maurizio*, 230 F.3d at 521 (Plaintiff's claim that she was "denied credit and profits" as an alleged co-author of *The First Wives Club* does not allege the requisite "direct impact on the body of consumers").  Where, as here, a deceptive trade practices claim is based on "injury to plaintiffs' self . . .  as opposed to harm to customers," it is subject to dismissal.  *See Eyal*, 784 F. Supp. 2d at 449–50 (dismissing Section 349 claim where plaintiff pled "only an injury to itself, and not to the public harm.").

### E.     Plaintiffs Fail to State a Claim for Unjust Enrichment under Section 350

Plaintiffs' unjust enrichment claim under Section 350, which prohibits "false advertising," fails for the same reason that Plaintiffs' Section 349 claim fails – Plaintiff does not allege that that there was any deceptive *advertising*, let alone that the deception was aimed at consumers.  *Maurizio*, 230 F.3d at 522 (dismissing Sections 349 and 350 claims because the alleged injury – failure to give plaintiff proper credit and compensation for her work on the novel *The First Wives Club* – was "private . . . and without direct impact on the body of consumers").

To the extent that Plaintiffs intend to bring a common law unjust enrichment claim, it also fails for the independent reason that Plaintiffs cannot plead that any alleged benefit to Defendants was unjust.  *Touch Air Inc. v. Launch 3 Commc'ns Inc.*, 7 Misc. 3d 1014(A), at *1, 801 N.Y.S.2d 243 (Sup. Ct. Nassau Cty. 2005) ("To sustain a claim for unjust enrichment, Plaintiff[] must prove that it performed services at the request or behest of Defendants that resulted in Defendants receiving an unjust benefit."); *see also Briarpatch*; 373 F.3d at 306.  That

Shull and certain Individual Defendants allegedly had "beginning" conversations that never developed as Shull would have liked does not plausibly constitute an allegation that Defendants obtained an unjust benefit.  *See Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 926 (S.D.N.Y. 1984) ("Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement.").  Plaintiffs merely pled that she spoke with certain Individual Defendants and others involved in *Billions* without any agreement in place – this does not amount to an unjust benefit and to allow such claims to go forward would prevent producers from conducting background research without fear of frivolous litigation.  Accordingly, Plaintiffs' unjust enrichment claim should be dismissed.

### F.      Plaintiffs Fail to State a Claim for Accounting

Under New York law, "[t]he right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest."  *Baiul*, 2016 WL 1587250, at *14.  Because Plaintiffs do not and cannot allege any fiduciary or confidential relationship with Defendants, their claim for accounting fails and should be dismissed.

### G.      Plaintiffs Fail to State a Claim Under Section 51

New York Civil Rights Law Section 51 "provide[s] a limited statutory right of privacy" by prohibiting the use of the plaintiff's "name, portrait, picture or voice . . . for advertising purposes or for the purposes of trade without the written consent first obtained." NY Civ. Rights Law §§ 50, 51; *see also Messenger ex. rel. Messenger v. Gruner + Jahr Printing & Publ'g.*, 94 N.Y.2d 436, 441, 706 N.Y.S.2d 52, 54 (2000), *cert. denied,* 531 U.S. 818 (2000) (citations

omitted).[19]  To state a claim "a plaintiff must show that the defendant (1) used his name, portrait, picture, or voice, (2) for advertising or trade purposes, (3) without his written consent."  *Burck v. Mars, Inc.*, 571 F.Supp.2d 446, 451 (S.D.N.Y. 2008).  Section 51 must be "narrowly construed" and "strictly limited to nonconsensual commercial appropriations of the name, portrait [voice], or picture of a living person."  *Messenger*, 94 N.Y.2d at 441, 706 N.Y.S.2d at 54.  Here, Plaintiffs' claim fails for two independent reasons.

First, Plaintiffs do not, and cannot, claim that Shull's name, portrait, picture or voice was used by Defendants.  Instead, Plaintiffs claim that Defendants used Shull's "persona in the form of Dr. Wendy Rhoades."  Compl. ¶¶ 65-68.  But even assuming Defendants used certain personality traits of Shull (which they did not, *see supra* at Section II.B), "[i]t is well settled . . . '[m]erely suggesting certain characteristics of the plaintiff, without *literally* using his or her name, portrait, or picture, is not actionable under the statute."  *Greene v. Paramount Pictures Corp.*, 138 F. Supp. 3d 226, 233 (E.D.N.Y. 2015) (emphasis added).  New York courts consistently dismiss Section 51 claims based on the alleged use of a person's persona, even where the depiction at issue evokes some characteristics of the person, including similar occupations.  *See*, *e.g., id.* at 233 (dismissing Section 51 claim where plaintiff alleged that a character in defendants' movie *The Wolf of Wall Street* used his "likeness, image, and characterization" based on the fact that both plaintiff and the character wore a distinct toupee and were executives at the trading firm Stratton Oakmont); *Harding v. Paramount Pictures*, No. 12 Civ. 66 (DAB)(HBP), 2013 WL 174401 (S.D.N.Y. Jan. 16, 2013), *report accepted,* No. 12 Civ. 66(DAB), 2013 WL 1285423 (S.D.N.Y. Mar. 28, 2013) (dismissing Section 51 claim that a videogame made use of plaintiff's likeness from the film *Warriors* because there was no

---

[19] Plaintiffs label their claim as a violation of Section 50 and 51 of the New York Civil Rights Law, but by its own terms, Section 50 only provides a criminal remedy and is not applicable here.

resemblance between plaintiff as he appeared in the film and the videogame character); *Burck*, 571 F. Supp. 2d at 452-453 (dismissing plaintiff's Section 51 claim that his "Naked Cowboy" persona was used by defendant dressing an "M&M precisely like the plaintiff's costume—white underwear, white cowboy hat, white cowboy boots and white guitar" because it constituted "mere[] personifications that do not fall within the literal meaning of portrait or picture of a person."). Take for example the play *Six Degrees of Separation*, which was inspired by the plaintiff's widely reported scamming of wealthy New Yorkers. But the First Department dismissed plaintiff's Section 51 claim because "plaintiff's name, portrait or picture was not used in the play." *Hampton v. Guare*, 195 A.D.2d 366, 366, 600 N.Y.S.2d 57, 58 (1st Dep't 1993). Here, the character at issue, Wendy in *Billions*, uses neither Shull's name nor her likeness. For this simple reason, Plaintiffs' claim fails as a matter of law.

Second, and in the alternative, Plaintiffs' Section 51 claim must be dismissed because *Billions* is a television series and is an expressive work that does not fall within the narrow confines of the statute's definition of "advertising or trade." Courts have repeatedly made clear that even actual uses of a person's image or likeness in entertainment works, like the work at issue here, *do not* amount to uses for "advertising purposes, or for the purposes of trade" under Section 51. *See Lemerond v. Twentieth Century Fox Film Corp.*, No. 07 Civ. 4635 (LAP), 2008 WL 918579, at *3 & n.1 (S.D.N.Y. Mar. 31, 2008) (finding use of plaintiff's image in satirical and comedic movie not purely commercial, even though there is a "profit motive"); *Costanza v. Seinfeld*, 279 A.D.2d 255, 255, 719 N.Y.S.2d 29, 30 (1st Dep't 2001) (affirming dismissal of plaintiff's Section 51 claim for misappropriation of his likeness for the "'character of George Costanza from the Seinfeld television program" because "works of fiction do not fall within the narrow scope of the statutory definitions of 'advertising' or 'trade'"). Even if Defendants used

Plaintiffs' exact image or likeness in *Billions* (which they did not), the television series *Billions*

is manifestly an expressive work and it is clearly not within the scope of a work created for

"advertising purposes, or for the purposes of trade" within the meaning Section 51.[20]

Accordingly, because Plaintiffs cannot as a matter of law establish that the alleged use of

Shull's persona in *Billions* was for purposes of advertising or trade, Plaintiffs' Section 50 and 51

claims should be dismissed.[21]

## CONCLUSION

Defendants respectfully request that the Court grant their motion to dismiss the

Complaint under Rule 12(b)(6) with prejudice and award Defendants their attorneys' fees.

Dated: March 8, 2019
      New York, New York

                    Respectfully submitted,

                    DAVIS WRIGHT TREMAINE LLP

                    By: */s/ Elizabeth A. McNamara*
                    Elizabeth A. McNamara
                    Rachel F. Strom

---

[20] Plaintiffs' conclusory allegation that the alleged use was "for advertising purposes or for purposes of trade" is insufficient.  Compl. ¶ 66.  Moreover, it is a fundamental principle that the fact that "books, newspapers and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."  *Lohan v. Perez*, 924 F.Supp.2d 447, 455 (E.D.N.Y. 2013) (quoting *Time, Inc. v. Hill*, 385 U.S. 374, 397 (1967)); s*ee also Stephano v. News Group Publ'ns Inc.,* 64 N.Y.2d 174, 184-85, 485 N.Y.S.2d 220, 225 (1984) ("The fact that defendants may have included this item in its column solely or primarily to increase the circulation of its magazine and therefore its profits …does not mean that the defendant has used the plaintiff's picture for trade purposes….").  Should Plaintiffs contend that any use of Wendy in promotions or advertisements for *Billions* violates Section 51, any such use would fall within the incidental use exemption and thus be non-actionable.  *See Groden v. Random House, Inc.,* 61 F.3d 1045, 1049 (2d Cir. 1995) (recognizing exception to Section 51 for "use in ads or other promotional items of material that 'prove [the] worth and illustrates [the] content' of the works being advertised." (quoting *Booth v. Curtis Publ'g Co.,* 15 A.D.2d 343, 349, 223 N.Y.S.2d 737, 743 (1st Dep't  1962), *aff'd,* 228 N.Y.S.2d 468 (1962)).  Indeed, in *Kane v. Comedy Partners*, No. 00 CIV. 158 (GBD), 2003 WL 22383387, at *8 (S.D.N.Y. Oct. 16, 2003) (Daniels, J.), this Court dismissed the Section 51 claim because "the use of [plaintiff's] image and name in the commercial was clearly designed to illustrate the type of humor an audience member could expect from 'The Daily Show' and was, therefore, an incidental use"), *aff'd*, 98 F. App'x 73 (2d Cir. 2004).

[21] Plaintiffs' right of publicity claim also fails because the claims were brought almost three years after the first episode of *Billions* aired.  *See* N.Y. C.P.L.R. 215(3); *Nussenzweig v. diCorcia*, 9 N.Y.3d 184, 187, 848 N.Y.S.2d 7, 8 (2007) (one-year statute of limitations to 51 claims runs from the date that the offending material is first published).

Jamie S. Raghu
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone (212) 489-8230
Fax (212) 489-8340
Email:    lizmcnamara@dwt.com
             rachelstrom@dwt.com
             jamieraghu@dwt.com

*Attorneys for Defendants Andrew Ross Sorkin, Brian Koppelman, David Levien, David Nevins, TBTF Productions Inc., Showtime Networks Inc., and CBS Corporation*

36