UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENISE K. SHULL and THE RETHINK
GROUP, INC.,

              Plaintiffs,

      v.

ANDREW ROSS SORKIN, BRIAN
KOPPELMAN, DAVID LEVIEN, DAVID
NEVINS, TBTF PRODUCTIONS INC.,
SHOWTIME NETWORKS INC., and CBS
CORPORATION,

              Defendants.

Civil Action No. 18 Civ. 12400 (GPD)

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

CKR LAW LLP
1330 Avenue of the Americas
14th Floor
New York, New York 10019
Tel. (212) 259-7300

*Attorneys for Plaintiffs Denise K. Shull &*
*The Rethink Group, Inc.*

Of counsel:   Rosanne Elena Felicello
                Michael James Maloney

{00215068.3 / 3051.005}

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

    A.    *Market Mind Games* is a Fictional Account of the Character "Denise Shull" Applying Neuropsychoanalysis, Neuroeconomics, and Modern Psychoanalysis as an In-House Hedge Fund Performance Coach ................................................................................... 5

    B.    After its Publication, Defendant Sorkin Reads *Market Mind Games*, Interviews Ms. Shull, and Includes an Article About the Book in *Dealbook* ........................................... 6

    C.    Defendant Sorkin subsequently develops the pilot episode of *Billions*. .......................... 7

    D.    Defendant Sorkin requests that Ms. Shull help the *Billions* team to develop and bring to life the character of the female hedge fund performance coach. .................................... 7

    E.    Defendant Koppelman realizes that there may be a copyright infringement problem..... 9

    F.    Showtime suggests that Ms. Shull participate in the marketing of *Billions*.................... 9

    G.    Ms. Shull is led to believe that she will be compensated for her contributions to the marketing of *Billions* and to the show itself. ................................................................. 9

    H.    *Billions* airs in January 2016 and the public is introduced to "Wendy," a female hedge fund performance coach........................................................................................... 10

**ARGUMENT**..................................................................................................................... 12

POINT I.      PLAINTIFFS HAVE STATED A CLAIM FOR COPYRIGHT INFRINGEMENT........................................................................................... 12

    A.    Plaintiffs have sufficiently alleged that Defendants have "actually copied" Plaintiffs' work ......................................................................................................................... 12

    B.    Plaintiffs have sufficiently alleged a "substantial similarity" between Defendants' work and the protectable elements of Plaintiffs' work.......................................................... 13

    C.    Plaintiffs have also alleged infringement on the basis of fragmented literal similarity 15

POINT II.     PLAINTIFFS HAVE STATED A CLAIM FOR COPYRIGHT INFRINGEMENT OF THE CHARACTER OF "DENISE SHULL"................................................. 16

    A.    The character of "Denise Shull" in *Market Mind Games* is protectable expression..... 16

    B.    The minor differences between "Denise" and "Wendy" are insufficient to avoid Plaintiffs' claim of infringement ................................................................................. 19

    C.    *Billions* is a derivative work featuring the character created by Ms. Shull in *Market Mind Games* .............................................................................................................. 20

    D.    Defendants have engaged in fragmented literal copyright infringement ...................... 21

E.    Even under a "ordinary observer" test, the character, themes, and settings of the works are similar .................................................................................................. 22

F.    Plaintiffs have stated claims of contributory and vicarious copyright infringement. .... 22

POINT III.    PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY THE COPYRIGHT ACT ........................................................................................... 23

A.    Plaintiffs' state law claims do not address the exclusive rights provided by the Copyright Act ............................................................................................................. 23

B.    Plaintiffs state a claim for a violation of N.Y. Civil Rights Law §§ 50 & 51 ............... 24

C.    Plaintiffs' state a claim for injury to business reputation and unfair competition ......... 25

D.    Plaintiffs state a claim for deceptive trade practices ..................................................... 25

E.    Plaintiffs state a claim for unjust enrichment ................................................................ 27

F.    Plaintiffs state a claim for implied in fact contract ....................................................... 28

G.    Plaintiffs state a claim for misappropriation ................................................................. 29

H.    Plaintiffs state a claim for accounting .......................................................................... 30

CONCLUSION ............................................................................................................................. 30

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Scholastic, Inc.*, 739 F.Supp.2d 642, 664 (S.D.N.Y. 2011) ............................................ 17

*Aschroft v. Iqbal,* 556 U.S. 662 (2009) ............................................................................ 12

*Banff Ltd v. Limited, Inc.*, 869 F.Supp. 1103 (S.D.N.Y. 1994) ...................................... 23

*Bell Atl. v. Twombly*, 550 U.S. 544 (2007) .................................................................... 12

*Bement v. N.Y.P. Holdings, Inc.*, 307 A.D.2d 86, 760 N.Y.S.2d 133, 136 (1st Dep't 2003) ......... 24

*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198, 210 (E.D.N.Y. 2001) ............................................................................................................ 26

*Boule v. Hutton*, 328 F.3d 84, 88, 94 (2d Cir. 2003) .................................................... 26

*Briarpatch Ltd., L.P v Phoenix Pictures, Inc.*, 373 F3d 296, 305 (2d Cir 2004) ......................... 24

*Broughel v. Battery Conservancy*, No. 07 CV 7755 (GBD), 2010 WL 102817, at *4 (S.D.N.Y. Mar. 16, 2010) .............................................................................................................. 30

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998) ....... 4, 13, 14, 15

*Corsello v. Verizon New York, Inc.*, 18 NY3d 777, 790 (2012) .................................... 27

*Eliya, Inc. v. Kohl's Dept. Stores*, 20007 WL 2645196, *6 (S.D.N.Y. Sept. 13, 2006) ............... 25

*Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*, 419 F Supp 2d 225, 238 (N.D.N.Y. 2005) ............................................................................................................................ 25

*Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 432 (2d Cir. 2012) ... 28

*Gal v. Viacom Int'l Inc.*, 403 F. Supp. 2d 294 (S.D.N.Y. 2005) .................................... 13

*Gaste v. Kaiserman*, 863 F.2d 1061 (2d Cir. 1988) ...................................................... 13

*Hallford v. Fox Entm't Grp., Inc.*, No. 12 Civ. 1806(WHP), 2013 WL 541370 (S.D.N.Y. Feb. 13, 2013), *aff'd*, 556 Fed.Appx. 48 (2d Cir. 2014) .......................................................... 13

*Hamil Am., Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999) ...................................................... 12

*Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir. 1980), *cert. denied*, 449 U.S. 841 (1980) ............................................................................................................................ 18

*Horgan v. Macmillan, Inc.*, 789 F.2d 157 (2d Cir. 1986) .............................................. 15

*Horizon Comics Prods., Inc. v Marvel Entm't, LLC*, 246 F.Supp.3d 937 (S.D.N.Y. 2017) ......... 12

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (2d Cir.1995)....................... 25

*Kaminsky v Kahn*, 259 N.Y.S.2d 716, 724 (App. Div. 1st Dept 1965) ......................................... 30

*Khreativity Unlimited, Inc. v. Mattel, Inc.* is misplaced. 101 F. Supp. 2d 177, 185 (S.D.N.Y. 2000), *aff'd sub nom. Khreativity Unlimited, Inc. v. Mattel, Inc.,* 242 F.3d 366 (2d Cir. 2000)29

*Nadel v Play-By-Play Toys & Novelties, Inc.,* 208 F3d 368, 376 (2d Cir 2000) ......................... 28

*Nihon Keizai Shimbun, Inc. v Comline Bus. Data, Inc.,* 166 F3d 65, 71 (2d Cir 1999) .............. 14

*Perry v. Mary Ann Liebert, Inc.*, No. 17-CV-5600 (CS), 2018 WL 2561029 (S.D.N.Y. June 4, 2018) ................................................................................................................................... 18

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57 (2d Cir. 2010) .................. 12

*Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70 (2d Cir. 1997)...................... 13, 15

*Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992) ...................................................................... 17, 19

*Rose v. Hewson*, No. 17 cv 1471 (DLC), 2018 WL 626350 (S.D.N.Y. Jan. 30, 2018)................ 16

*Samara Bros. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000)........................................................ 27

*Songbird Jet Ltd. v. Amax, Inc.*, 581 F.Supp. 912, 926 (S.D.N.Y. 1984) ..................................... 27

*Stanacard, LLC v. Rubard, LLC*, No. 12 Civ. 5176, 2016 WL 462508 (S.D.N.Y. Feb. 3, 2016) 22, 23

*Stewart v World Wrestling Fedn. Entertainment, Inc.*, 2005 WL 66890, *5, 2005 Copr. L. Dec. P. 28942 (S.D.N.Y. Jan. 11, 2005) ................................................................................................ 30

*Stewart v. Abend*, 495 U.S. 207 (1990)................................................................................. 20, 21

*TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588 (S.D.N.Y. 2013) .................................... 16, 21

*Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366 (2d Cir.1993) ........................................ 15

*Warner Bros. Entertainment Inc. v RDR Books*, 575 F Supp 2d 513, 534-35 (S.D.N.Y. 2008) ... 14

*Warner Bros. Inc. v. Am. Broadcasting Cos., Inc.*, 720 F.2d 231 (2d Cir. 1983) ......................... 20

*Williams v. Broadus*, No. 99 Civ. 10957 MBM, 2001 WL 984714 (S.D.N.Y. Aug. 27, 2001)..... 15

*Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) .............................................................. 17

*Wolo Mfg. Corp. v. ABC Corp.*, 349 F. Supp. 3d 176, 210 (E.D.N.Y. 2018) ................................ 25

**Statutes**

17 U.S.C. § 101 .............................................................................................................. 1, 20

17 U.S.C. § 106 ................................................................................................................ 20

N.Y. Civil Rights Law §§ 50 & 51 .................................................................................. 24

N.Y. Gen. Bus. Law § 349 .............................................................................................. 25

N.Y. General Business Law § 350 ................................................................................... 27

Plaintiffs Denise K. Shull and The Rethink Group, Inc. (together, "Plaintiffs"), by and through their undersigned attorneys, hereby respectfully submit this memorandum of law in opposition to the motion to dismiss submitted by defendants Andrew Ross Sorkin ("Sorkin"), Brian Koppelman ("Koppelman"), David Levien ("Levien"), David Nevins ("Nevins"), TBTF Productions Inc. ("TBTF"), Showtime Networks Inc., ("Showtime"), and CBS Corporation ("CBS" and together with Sorkin, Koppelman, Levien, Nevins, TBTF, and Showtime, the "Defendants").

## PRELIMINARY STATEMENT

In all of contemporary media, when have you last read of or watched a female performance coach teaching Wall Street "masters of the universe" to explore and weaponize their emotions to gain a competitive edge in the financial markets? First, there was "Denise Shull" in the book *Market Mind Games: A Radical Psychology of Investing, Trading, and Risk* ("*Market Mind Games*"). Then – but only after the Defendants read Plaintiffs' original work – there was "Wendy Rhoades" in the television series *Billions*. Defendants' 35 pages of obfuscation cannot camouflage their infringement of Plaintiffs' copyrighted work. As defined in 17 U.S.C. § 101, "a 'derivative work' is a work based upon one or more preexisting works, such as a . . . motion picture version . . . or any other form in which a work may be recast, transformed, or adapted. . . ." Defendants have adapted a substantial part of Plaintiffs' written work into the television series *Billions*.

Specifically, Plaintiffs' Complaint states valid causes of action for three forms of copyright infringement by Defendants:[1]

---

[1] Plaintiffs agree that the Court should review the works in their entirety to discern Defendants' copyright infringement. Given that Defendants have only submitted Season 1 of *Billions* with their motion to dismiss, Plaintiffs attach a true and correct copy of Seasons 2 and 3 of *Billions* to the Declaration of Rosanne E. Felicello, dated March 29, 2019 ("Felicello Decl.") at Ex. 2. Plaintiffs have prepared a summary of some examples of dialogue from *Billions* as compared to text and dialogue from Plaintiffs' work. (*See* Felicello Decl. at Ex. 3.)

First, Plaintiffs have stated a claim for direct, copyright infringement of the character of "Denise," guised in *Billions* as "Wendy." Plaintiffs' book, *Market Mind Games* protrays a fictional account of "Denise," a Wall Street consultant, giving lectures, consults, and eventually taking on the role of an in-house performance coach at a fictional hedge fund. The lectures, consults, and in-house coaching performed by "Denise" in *Market Mind Games* are all fictional accounts through which the "Denise" character employs the psychology of risk, uncertainty, and decision-making to coach her finance professional clients to weaponize their emotions in the pursuit of financial profits. In *Billions*, Defendants adapted "Denise" into a substantially similar character, "Wendy," who performs substantially the same coaching of finance professionals at "Axe Capital," a fictional hedge fund, also to weaponize their emotions in the pursuit of a competitive edge.

Second, Plaintiffs have stated a claim for derivative copyright infringement of the character of "Denise," because Plaintiffs have taken the written character from *Market Mind Games* and adapted her for the television screen.

Third, by describing certain key exchanges that were directly copied from *Market Mind Games* and used as dialogue in *Billions*, Plaintiffs have stated a claim for fragmented, literal infringement.

Apparently, recognizing the merits of Plaintiffs' claims, Defendants do not address directly the substantial similarity of the "Denise" and "Wendy" characters. Instead, Defendants pejoratively refer to Plaintiffs' claims as a mere "parlor game," in keeping with Defendants' argument that "Denise" and "Wendy," both female performance coaches that go toe-to-toe with male hedge fund traders in advising them how to explore and apply their emotions for fun and profit, are nothing more than stock characters and the consults such characters provide to male

masters of the universe are scènes à faire that the public has consumed for ages. This argument is false.

The fact is that the female hedge fund performance coach who teaches male Wall Street traders to utilize emotions to outfox competitors, an original character authored by Plaintiff Ms. Shull in her original work, *Market Mind Games*, cannot be found, as a matter of law, to be a stock character. Plaintiffs' original work, "Wendy," was unlawfully used by Defendants in their development of *Billions*, making only minor changes as to the character's name and sexual proclivities. Defendants not only copied Plaintiffs' original work, they then invited Plaintiff Shull to advise the actor Maggie Siff as to how best to play the role of "Wendy" and to join Koppelman and Levien in the writers' room to discuss in more detail the techniques expressed through the "Denise" character in *Market Mind Games*.

Defendants cannot avoid Plaintiffs' copyright claim on the basis that "Wendy" is a dominatrix and "Denise" is not. Just as Superman would still be identifiable as Superman, even if an enterprising infringer decided to give him a new sexual proclivity and change his name, Ms. Shull's strong hedge fund performance coach remains identifiable throughout the *Billions* series. Defendants' belated attempts to reduce the "Wendy" character to her sex life is no better than a showman's sleight of hand. The Court should not be fooled by Defendants' attempted trickery.

In their attempt to obfuscate the issues, Defendants set up a strawman, pretending that Plaintiffs claim that the whole of *Billions* is copied directly from *Market Mind Games*. This is not Plaintiffs' claim. As set forth in Plaintiffs' Complaint, Defendants have copied the character of "Wendy" from *Market Mind Games* and have used her in a derivative work, infringing Plaintiffs' copyright. In addition, Defendants have copied certain, particular phrasing and themes from Plaintiffs' work, also infringing Plaintiffs' copyright.

In addition to attempting to change the nature of Plaintiffs' claim, Defendants also ignore the allegations of the Complaint and the work itself, that *Market Mind Games*, exclusive of the Prologue, is a *fictional* story told by fictional characters. Instead, Defendants' analysis relies on the false narrative that *Market Mind Games* is "primarily an academic work of nonfiction." Defendants' efforts to mislead the Court in this regard should be ignored.

Similarly, Defendants urge that this Court apply the wrong test for discerning substantial similarity. Specifically, ignoring Second Circuit precedent, Defendants urge the Court to apply a "discerning ordinary observer test" and find no infringement on a motion to dismiss based on a supposed lack of similarity in "plot, characters, settings, themes, and total concept and feel." Def. Brief at 14; *Contrast, Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 139 (2d Cir. 1998) (holding that a qualitative/quantitative analysis is more appropriate than the "ordinary observer test" when comparing works of different genres and mediums). Because the two works here are expressions in different genres (fictionalized story intended to educate using entertainment versus drama meant simply to entertain) and in different mediums (written book versus television series), the "ordinary observer test" is not appropriate or particularly helpful. Instead, the Court should analyze the works using the quantitative/qualitative approach.

## STATEMENT OF FACTS

Plaintiffs refer the Court to the factual allegations set forth in Plaintiffs' Complaint, which must be accepted as true when considering a motion to dismiss. Plaintiffs also refer the Court to those documents incorporated into the Complaint by reference to them in the Complaint. For ease of reference, Plaintiffs summarize the facts relevant to this motion as follows:

A. ***Market Mind Games*** **is a Fictional Account of the Character "Denise Shull" Applying Neuropsychoanalysis, Neuroeconomics, and Modern Psychoanalysis as an In-House Hedge Fund Performance Coach**

In real life, Ms. Shull is a female hedge fund performance coach who applies neuropsychoanalysis, neuroeconomics, and modern psychoanalysis in coaching hedge fund and other financial industry professionals to obtain peak performance. (Compl. ¶ 19.) In an industry perceived to be dominated by male, and a prevailing belief that success depends on emotions being "controlled" or disregarded, Ms. Shull instead coaches her clients not only to recognize and explore their emotions but to affirmatively harness them for the purpose of improving performance and profits. (*Id.* ¶ 28.)

Ms. Shull developed her techniques and theories based on academic research showing that human decision-making is necessarily based on emotions and cannot be reduced to a numerical analysis of risk and reward. (*Id.*) When Ms. Shull decided to write a book about her work, however, she faced a dilemma. In an academic work, Ms. Shull would be able to describe in minute detail the nuances of her techniques but, like most academic work, such a book would fail to capture the human element that arises in the application of such techniques and that is so essential to Ms. Shull's work. An academic work also would be too dry to capture the attention of the ordinary member of the financial industry. How could an author convey in a written work the nuanced interactions between a female performance coach who advised grown men who compete every day on Wall Street to explore their emotions and deploy them for profit?

Ms. Shull's creative answer to this question was to create a *fictional* account of the character "Denise," modeled on herself. (*Id.* ¶¶ 3, 21.) In *Market Mind Games,* the fictional "Denise" recounts fictional lectures and consults, both to private clients and as an in-house performance coach to a fictional hedge fund. (*Id.* ¶ 22.) During a fictional lecture, "Denise" meets a client, "Michael" and an associated cast of characters in various roles at the fictional hedge fund,

named "Coup d'État Capital." The fictional Michael ultimately retains Ms. Shull to coach him with respect to the application of neuropsychoanalysis, neuroeconomics, and modern psychoanalysis to create specific, unique techniques that she uses to coach "Michael" to explore and understand his emotions for the purpose of attaining peak financial performance. (*Id.* ¶ 23.)

*Market Mind Games* is necessarily a work of fiction because "Michael" does not exist, "Denise's" interactions with "Michael" never occurred, and the lectures described in the book never happened. Yet by way of her fictional account of herself and interactions with "Michael" and other fictional characters in the book, Ms. Shull has created a unique work that permits her to express her ideas as to the nuanced relationship between a female performance coach, who applying neuropsychoanalysis, neuroeconomics, and modern psychoanalysis, in coaching a male member of the highly-competitive financial industry to set aside the prevailing view that emotions must be controlled, ignored, or stamped out altogether and, instead, to affirmatively explore and harness his emotions to attain better outcomes.

By casting her story in the fictional format of *Market Mind Games*, Ms. Shull found a way to express the nuances of this subject matter that could not be expressed in an academic format.

**B. After its Publication, Defendant Sorkin Reads *Market Mind Games*, Interviews Ms. Shull, and Includes an Article About the Book in *Dealbook***

Defendant Andrew Ross Sorkin is a journalist and writer, well known for co-hosting a popular television show, "*Squawk Box*," on the television network CNBC, which regularly features authors and columnists pertinent to the finance industry. Sorkin is known for the book, *Too Big to Fail: The Inside Story of How Wall Street and Washington Fought to Save the Financial System—and Themselves*, published in 2009. In 2011, Sorkin co-wrote and co-produced the movie, *Too Big to Fail*, which is based on the book of the same name. (Compl. ¶ 7.)

In and around July 2012, Mr. Sorkin and his staff invited Ms. Shull to appear on his television show, "*Squawk Box*." (*Id.* ¶ 26.) In August 9, 2012, Ms. Shull appeared on the show and was interviewed by Sorkin, who was surprised to hear that there is such a thing as a hedge fund performance coach.

Subsequently, in November 2013, in connection with the annual *Dealbook* conference, Defendant Sorkin edited and published an article describing Ms. Shull's work as a hedge fund performance coach focusing on helping clients to optimize their trading performance by exposing how their subconscious, emotional baggage, influences their market decisions. (*Id.* ¶ 28; Felicello Decl. Ex. 4.) A photo of Ms. Shull in her office, with the caption "THE COACH Denise Shull," appeared with the article.

### C. Defendant Sorkin subsequently develops the pilot episode of *Billions*.

Contemporaneously with he interview of Ms. Shull and the publication of the *Dealbook* article, but unbeknownst to Ms. Shull at the time, Defendant Sorkin began developing a pilot for a television series based in part on *Market Mind Games* and the character, created by Ms. Shull, of a female performance coach to men operating in the modern financial industry. (*Id.* ¶ 29.) In or about February or March 2014, Defendant Sorkin, along with fellow Defendants Koppelman and Levien, sold the idea for this new television series, titled *Billions*, to Defendant Showtime. (*Id.* ¶ 30.)

### D. Defendant Sorkin requests that Ms. Shull help the *Billions* team to develop and bring to life the character of the female hedge fund performance coach.

On or about August 26, 2015, Defendant Sorkin emailed Ms. Shull about the series *Billions* and requested her assistance with the development of the female lead character, Dr. Wendy Rhoades, a female hedge fund performance coach who helps financial professionals improve their performance by dealing with their own emotional baggage. (Felicello Decl. Ex. 5.) The next day,

via email, Sorkin introduced Ms. Shull to Maggie Siff, the actor cast to play the role of "Wendy."

In making the introduction, Sorkin noted that Ms. Shull is "one of the leading hedge fund

performance coaches in the country."  (Felicello Decl. Ex. 6.)

Ms. Siff responded the next day via email and requested a meeting with Ms. Shull. (*Id.*)

Later that night, August 28, 2015, Ms. Shull also received an email from Defendant Koppelman,

stating that he was "excited" to read an article written by Ms. Shull and meet her and that his

assistant would be in touch. (*Id.*)

On September 2, 2015, Ms. Shull arrived at the agreed location, which she learned was the

writers' room. Initially, Ms. Siff was not there. For the first 30-40 minutes, Ms. Shull met with

Defendants Koppelman and Levien. They told Ms. Shull that they had met with Tony Robbins, but

that they were looking for additional insights about the field of hedge fund performance coaches.

Ms. Shull explained to them how her approach differed from that of Mr. Robbins and provided

some examples about how she used different settings (such as out of office sessions) to trigger her

clients' subconscious. Ms. Siff eventually joined the meeting and actively participated in the

discussion, which continued for about one more hour. Defendants Koppelman and Levien and Ms.

Siff inquired about all aspects of Ms. Shull's work as a performance coach to hedge funds and

other financial firms and Ms. Shull's unique approach to trading and investing psychology. Ms.

Shull actively participated in the meeting, responding to these inquiries. Defendants Koppelman

and Levien and Ms. Siff took notes during the meeting. Defendant Levien asked Ms. Shull if she

could continue to work with Ms. Siff and invited Ms. Shull to visit the set where Ms. Siff's office

was filmed – apologizing that it was located far from the city. (Compl. ¶ 35.)

Ms. Siff stated that she was reading *Market Mind Games,* and that it was great, "super

helpful," and interesting. Ms. Siff stated that she looked forward to learning more from Ms. Shull.

Defendant Koppelman then asked if there was an audio version of the book and stated his intention to download it. (*Id.*)

**E. Defendant Koppelman realizes that there may be a copyright infringement problem.**

During the meeting in the writers' room, Ms. Shull mentioned that *Market Mind Games* was written as a fictional account of a hedge fund with Ms. Shull's own persona as the in-house performance coach. (Compl. ¶ 36.) As soon as he heard this, Defendant Koppelman's demeanor changed and he appeared uncomfortable. (*Id.*) He asked Ms. Shull multiple times what she meant by her statement, "I play myself in the story."

**F. Showtime suggests that Ms. Shull participate in the marketing of *Billions*.**

The day after the meeting in the writers' room, Alphonzo Terrell, Senior Manager of Showtime's Senior Manager of Showtime's Digital Media Group, contacted Ms. Shull to discuss involving Ms. Shull in promoting *Billions.* (Compl. ¶ 37; Felicello Decl. Ex. 7.) On September 9, 2015, Ms. Shull and her business partner had a conference call with Mr. Terrell and other senior members of Showtime's creative, marketing and promotional departments to discuss joint promotional initiatives relating to *Billions* and *Market Mind Games*. (Compl. ¶ 38.) After the call, Showtime's team asked for the contact information of Ms. Shull's attorney and said they would send a nondisclosure agreement, but never did so. No joint marketing efforts ever occurred.

**G. Ms. Shull is led to believe that she will be compensated for her contributions to the marketing of *Billions* and to the show itself.**

Ms. Shull understood that the initial phone conference and in-person meeting was the beginning of the relationship and terms would be negotiated subsequently in concert with marketing of the series. (Compl. ¶ 39.) Plaintiffs never authorized any of the Defendants to create a derivative work from *Market Mind Games*. Rather, at all relevant times, Plaintiffs and Defendants understood and agreed that Ms. Shull would receive credit and compensation for her contributions

and the derivative status of *Billions*. Ms. Shull never granted authorization, in any form, to any of the Defendants to use her persona for commercial purposes without compensation. (*Id.* ¶ 40.)

**H. *Billions* airs in January 2016 and the public is introduced to "Wendy," a female hedge fund performance coach.**

In January 2016, Defendant Showtime released the pilot episode of the television series *Billions*. (Compl. ¶ 41.) The pilot episode of *Billions* not only portrays "Wendy" as substantially the same as Ms. Shull portrays her own character in *Market Mind Games*, but in the pilot, "Wendy" makes multiple statements and observations that are nearly identical to those made by Ms. Shull in *Market Mind Games*. For instance, "Denise's" first in-house seminar at the fictional Coup d'État Capital is an explanation that "[t]rading is actually a *physical* game," "[s]leep is an edge," "eating properly . . . adds to that physical-psychological edge," and that "exercise . . . counts as psychological capital." (McNamara Decl. Ex. B, *Market Mind Games*, p. 176-77.) In the first coaching session depicted in *Billions*, the very first question Wendy asks is, "Have you been eating, sleeping, exercising?" (*Billions*, S1:E1.)

Further, "Denise" explains at a workshop that "[j]udgment calls must be made to fill in the gap between where the numbers leave off and 'alpha' – or exceptional performance – begins." (McNamara Decl. Ex. B, *Market Mind Games*, p. 112.) At another workshop, "Denise" explains that overconfidence can lead to giving back "lots of our hard earned 'alpha'." (*Id.* at p. 132.) "Wendy" uses this same concept in her first coaching session of show, telling "Danzig" that he's "ignoring the quiet [voice] inside telling you where the alpha is. Now that's the voice that got you here. And it's still there if you are willing to listen." (*Id.* ¶ 42; *Billions* S1:E:1.) Despite Defendants' mischaracterization, the "alpha" discussed by "Denise" is not "clinical" and the "alpha" described by "Wendy" is not dominance and overt confidence. It is not overt confidence that will lead

"Danzig" to better results, but listening to the quiet voice inside, described by "Denise" as

"experiential knowledge." (McNamara Decl. Ex. B, *Market Mind Games*, p. 200-201.)

The similarities between *Billions* and *Market Mind Games* continue through subsequent

episodes. For instance, in Chapter 20 of Ms. Shull's book, "The 'What Was I Thinking Rehash,'"

"Denise" and "Michael" sit in a conference room at Coup d'État Capital, discussing a trade that

went bad. Denise says:

> Haven't you told me in the past that one of the problems you would
> like to solve is getting stubborn? You can be assured that that trait,
> if you want to call it that, isn't *just* being stubborn. There is a fractal-
> emotional context that has been with you for a long time.
> Undoubtedly, it served you well in getting through challenging
> moments in school or fighting for the bank job or even being willing
> to take on this hedge fund challenge. In fact, when the pattern first
> starting [*sic*] coming together, I am sure it served you well. It is
> acting out anger, and if we do that consciously and intentionally, it
> can be our best ally. But when we are doing so without really
> knowing who or what we are trying to retaliate against, it tends
> neither to serve our best interests nor to make us money.

(*Id.* ¶ 44; McNamara Decl. Ex. B, *Market Mind Games*, at p. 221.)

This fictionalized account is eerily similar to Episode 11 from Season 1 of *Billions* (titled

"Magical Thinking"), in which "Wendy" and "Bobby 'Axe' Axelrod" rehash, at night after

business hours, what caused him to make a bad trade. (*Id.* ¶ 43.) "Wendy" says:

> Look, you want me to fix the part of you that makes money. But it
> is attached to the rest, so... Like I said, this is gonna take a little
> while. . . .
>
> Maybe your self-image is creating... a blind spot. . . .  Well, let's
> assume your blind spot usually works for you. It's fairly essential if
> you don't feel indestructible like Superman. How are you gonna risk
> billions every morning? But it's not working for you now. So you
> need to figure out what part of your self-image is false. And then
> you either need to live up to it or lose it.

(Compl. ¶ 45; McNamara Decl. Ex. A.)

Other episodes of *Billions* contain substantial similarities to statements, observations, and fictionalized accounts set forth in *Market Mind Games*. For the Court's convenience, Plaintiffs have compiled a summary of examples of substantially similar dialogue and protected expression. (Felicello Decl. Ex. 3.)

## ARGUMENT

## POINT I.

## PLAINTIFFS HAVE STATED A CLAIM FOR COPYRIGHT INFRINGEMENT

To state a claim for relief, Plaintiffs' complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Aschroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Thus, in a copyright matter, Plaintiffs' allegations must "allow[] the court to draw the reasonable inference" that Plaintiffs' copyright was infringed by demonstrating that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's.'" *Horizon Comics Prods., Inc. v Marvel Entm't, LLC*, 246 F.Supp.3d 937, 940 (S.D.N.Y. 2017), *quoting Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (*quoting Hamil Am., Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999)).

A. **Plaintiffs have sufficiently alleged that Defendants have "actually copied" Plaintiffs' work**

Plaintiffs can demonstrate copying by "either direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150

F.3d 132, 137 (2d Cir. 1998) (citation omitted) . Plaintiffs allege that *Market Mind Games* was published by McGraw Hill Education and, thus, was generally available to the public. (*See* Compl. ¶ 21.) Further, Plaintiffs allege that Defendant Sorkin read *Market Mind Games* before writing the pilot episode of *Billions* and that Defendant Koppelman was planning to read it. (Compl. ¶¶ 26, 34.) Thus, Plaintiffs adequately allege that Defendants had "a reasonable possibility of access." *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir. 1988) (holding that the court could not "say as a matter of law that the jury could not conclude" access even though plaintiff's "theory of access relies on a somewhat attenuated chain of events extending over a long period of time and distance"). Moreover, on a motion to dismiss courts "generally assume" that plaintiffs have sufficiently alleged actual copying. *Hallford v. Fox Entm't Grp., Inc.*, No. 12 Civ. 1806(WHP), 2013 WL 541370, at *3 (S.D.N.Y. Feb. 13, 2013), *aff'd*, 556 Fed.Appx. 48 (2d Cir. 2014), citing *Gal v. Viacom Int'l Inc.*, 403 F. Supp. 2d 294, 299 (S.D.N.Y. 2005) (internal citation omitted). Indeed, Defendants assume "solely for this motion that Defendants had access to *Market Mind Games*." (Def. Brief at p. 9.)

## B. Plaintiffs have sufficiently alleged a "substantial similarity" between Defendants' work and the protectable elements of Plaintiffs' work

In the Second Circuit, "substantial similarity" requires that the copying be "quantitatively *and* qualitatively sufficient to support the legal conclusion that infringement (*actionable* copying) has occurred." *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 138 (1998), *citing, with emphasis added, Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997).

Defendants efforts to use a different test here fail. First, contrary to the arguments made in Defendants' brief, the "ordinary observer test" is not the only test applied in this Circuit to determine whether there is "substantial similarity" between two works. Rather, where, as here,

"the original works are of different genres and to a lesser extent because they are in different media, tests for substantial similarity other than the quantitative/qualitative approach are not particularly helpful to [the] analysis." *Castle Rock Entm't*, 150 F.3d at 139 (rejecting the "ordinary observer" test as inapplicable to determining whether a trivia quiz infringed on the copyright of a television series). Second, the "total concept and feel test," also urged by Defendants, is "not helpful in analyzing works that, because of their different genres and media, must necessarily have a different concept and feel." *Id.* at 140 (noting that "many 'derivative' works of different genres, in which copyright owners have exclusive rights, *see* 17 U.S.C. § 106, may have a different total concept and feel from the original work").

Here, the Court is called upon to compare a written story of fiction in a book, and specifically a character within that story, to a television series broadcast around the planet. These are two different genres of storytelling and two different media. Thus, as the Second Circuit has held, the Court should use the quantitative/qualitative approach to determine substantial similarity. *See Castle Rock Entm't*, at 139.

"In evaluating the quantitative extent of copying in the substantial similarity analysis, the Court 'considers the amount of copying not only of direct quotations and close paraphrasing, but also of all other protectable expression in the original work.'" *Warner Bros. Entertainment Inc. v RDR Books*, 575 F Supp 2d 513, 534-35 (S.D.N.Y. 2008), *quoting Castle Rock*, 150 F.3d at 140 n. 6. The quantitative analysis is not a mere word count but "must always occur in the shadow of their qualitative nature." *Id., quoting, Nihon Keizai*, 166 F.3d at 71. That is, "different quantities of use may be required to support a finding of substantial similarity depending on whether the use is a direct quotation of a fictional work, or a paraphrase of a factual compilation." *Nihon Keizai Shimbun, Inc. v Comline Bus. Data, Inc.*, 166 F3d 65, 71 (2d Cir 1999). In the instant case,

Defendants' infringement consists of both direct, or almost direct, quotations of a fictional work and infringement of the main character of Plaintiffs' work. Thus, Defendants' copying meets the threshold of quantitatively significant and the Court may find sufficient, substantial similarity.

As to the qualitative component, the analysis turns on whether the infringer has copied the "fictitious expression" of the copyrighted work. *Id.* at 139. The standard for finding infringement "is not whether the original could be recreated from the allegedly infringing copy, but whether the latter is substantially similar to the former." *Id.*, *quoting Horgan v. Macmillan, Inc.*, 789 F.2d 157, 163 (2d Cir. 1986). As described further below and alleged in the Complaint, here the character of "Wendy" in *Billions* is substantially similar to the character of "Denise" from *Market Mind Games.* Defendants' attempt to differentiate the characters by reducing "Wendy" to her sexual proclivities ignores the substantially similar traits that they share. As presented in *Market Mind Games* and as described further below, the character of "Denise Shull" is protectable creative expression. *See Castle Rock Entm't* at 138.

### C. Plaintiffs have also alleged infringement on the basis of fragmented literal similarity

"[E]xact copying of a portion of a work [is known] as 'fragmented literal similarity,' in contrast to 'comprehensive nonliteral similarity,' which refers to an alleged copy that is qualitatively but not exactly similar to a copyrighted work." *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75 n.3 (2d Cir. 1997) (internal citations omitted) (noting also that the Second Circuit has "endorsed th[is] taxonomy") (citing *Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1372 n. 1 (2d Cir.1993)); *see also Williams v. Broadus*, No. 99 Civ. 10957 MBM, 2001 WL 984714, at *3 (S.D.N.Y. Aug. 27, 2001) ("Fragmented literal similarity exists where ... parts of the pre-existing work are copied ... note for note ..., [t]he similarity, although literal, is not comprehensive") (internal citations and quotation marks omitted)); *TufAmerica, Inc. v. Diamond*,

968 F. Supp. 2d 588, 597 (S.D.N.Y. 2013). "Even when there is no substantial similarity between two works when they are considered as a whole, liability may exist when a fragment of a copyrighted work has been copied." *Rose v. Hewson*, No. 17 cv 1471 (DLC), 2018 WL 626350, at *4 (S.D.N.Y. Jan. 30, 2018). Under the fragmented literal similarity test for determining whether there has been a copyright infringement, "the question of substantial similarity is determined by an analysis of whether the copying goes to trivial or substantial elements of the original work. … the question of [s]ubstantiality is measured by considering the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole." *TufAmerica*, 968 F.Supp.2d at 598 (internal citations and quotation marks omitted).

"Because they involve literal copying, in cases of fragmented literal similarity, more so than under the ordinary observer test, the copying of even a relatively small quantitative portion of the pre-existing work may be substantial if it is of great qualitative importance to the [pre-existing] work as a whole." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 598 (S.D.N.Y. 2013) (internal citations and quotation marks omitted).

## POINT II.

### PLAINTIFFS HAVE STATED A CLAIM FOR COPYRIGHT INFRINGEMENT OF THE CHARACTER OF "DENISE SHULL"

#### A.  The character of "Denise Shull" in *Market Mind Games* is protectable expression

The character of "Denise" in *Market Mind Games* is more than merely a woman who gives lectures and who is employed as an in-house performance coach at a hedge fund. She is an original character who has a specific style and employs unconventional and unique techniques derived from combining teachings from neuropsychoanalysis, neuroeconomics, and modern psychoanalysis.

Defendants' unsupported contention that "[u]niqueness, however, has nothing to do with

substantial similarity" is entirely wrong. (Def. Br. at p. 15.) Copyright law protects "the original or unique way that an author expresses [her] ideas, concepts, principles or processes. Hence, in looking at these two works of art to determine whether they are substantially similar, focus must be on the similarity of the expression of an idea or fact . . ." *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992). Thus, the unique expression of Plaintiffs' ideas, concepts, and principles in the form of the character of "Denise" and the coaching of male traders in the utilization of their emotions for profit is protectable expression. And the uniqueness and originality of the "Denise" character makes the substantial similarity to "Wendy" all the more obvious.

This is not a case, like *Allen v. Scholastic, Inc.*, relied on by Defendants, in which Plaintiffs have merely described an in-house hedge fund performance coach in one sentence and, on that basis, seek to assert copyright infringement over Defendants' performance coach character. 739 F.Supp.2d 642, 664 (S.D.N.Y. 2011). Plaintiffs' "Denise" character is fully formed. (*See Market Mind Games, passim.*) She acts as both an outside consultant to financial players and, eventually, as in-house performance coach. (*Id.*) She expresses many concepts about trading and performance, many of which, as explained *supra* at p. 9-11, have been improperly taken by Defendants, virtually word for word. (*Id.*)

Nor is Plaintiffs' claim similar to the one addressed by the Court in *Williams v. Crichton*, where the Court found that the mere idea of a dinosaur zoo, no matter how original, as part of the total concept and feel of the work was an "uncopyrightable concept" and not a protectable expression of an idea. 84 F.3d 581, 589 (2d Cir. 1996). "Denise" is not a mere idea of a hedge fund performance coach, but is a full expression of one implementing certain, unique ideas about market performance and risk analysis.

Nor is Plaintiffs' claim that Defendants are barred from writing about the concepts of

neuropsychoanalysis, neuroeconomics, and modern psychoanalysis. *Perry v. Mary Ann Liebert, Inc.*, No. 17-CV-5600 (CS), 2018 WL 2561029 (S.D.N.Y. June 4, 2018), cited by Defendants, is inapposite. It is Plaintiffs' expression of those concepts, via the character of "Denise," a fictional account of a female performance coach lecturing and coaching male hedge fund traders to weaponize their emotions for profit, that is protected expression.

Moreover, the character of "Denise" in Plaintiffs' *Market Mind Games* is not a stock character that is "indispensable or standard in the treatment of a given topic." *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980), *cert. denied*, 449 U.S. 841 (1980). Indeed, the suggestion that a female in-house performance coach who teaches equity traders to use their emotions to out-compete the market falls into the category of a stock character is nearly laughable. A stock character is one "easily recognized by readers or audiences from recurrent appearances in literary or folk tradition usually within a specific genre such as comedy or fairy tale." Oxford Reference.[2]

Female characters playing the roles of the jilted wife of a hedge fund guy, a receptionist, or a call-girl would all be stock characters in a television series about Wall Street. But not a female character like "Denise." Pop culture does not elevate female main characters at all in financial settings. The particular uniqueness of expressing the idea of emotions as an advantage to competitive decision-making through the story of a female performance coach going toe-to-toe with Wall Street traders renders absurd Defendants' argument that "Denise" and "Wendy" are mere stock characters. The fictional expression of female performance coach in a financial setting is not a character that has had "recurrent appearances" in popular culture. Indeed, the only recent appearance of such a character is that of "Denise" in *Market Mind Games*.

---

[2]       *Available at* www.oxfordreference.com/view/10.1093/oi/authority.20110803100533855.

**B.  The minor differences between "Denise" and "Wendy" are insufficient to avoid Plaintiffs' claim of infringement**

Defendants try to amplify minor differences between "Denise" and "Wendy" to avoid Plaintiffs' infringement claims. This does not work.

> [N]o copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated. *See Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.) (L. Hand, J.), *cert. denied,* 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Thus, where substantial similarity is found, small changes here and there made by the copier are unavailing. It is only where the points of dissimilarity exceed those that are similar and those similar are— when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate. *See* 3 Nimmer § 13.03[B][1][a].

*Rogers v Koons*, 960 F.2d 301, 308 (2d Cir 1992).

In their attempt to accentuate the differences between the characters, Defendants claim that it is "Wendy's" "personal life (not her professional abilities as either a psychiatrist or a performance coach) [that] is at the center of her role" and the fact that Wendy acts as a dominatrix when engaged in sadomasochistic sexual role playing with her fictional husband is "an important part of her character." (Def. Brief at pp.19-20.) Reducing their female lead to her sex life is not only offensive but inaccurate. Even a casual viewer of *Billions* would note that Wendy's role as a dominatrix is merely additive and is an extension (and, perhaps, cartoonish exaggeration) of her day job of controlling the emotions of the power players in her midst. Indeed, even the stylized description of the "Wendy" character that appears on the DVD for Season 1 fails to mention her sexual proclivities, but instead focuses on her role as a performance coach at Axe Capital. (*See* the Felicello Decl., Ex. 8.)

Defendants also cite to "Denise's" supposed lack of a backstory in *Market Mind Games* as a means of distinguishing the character from "Wendy" of *Billions*, but at least through Season 3 of *Billions*, viewers are not told where "Wendy" is from, her age, or "where her personal loyalties

lie." (*Compare* Def. Brief at p. 19 with *Billions*.) Such minor differences do not alter the substantial similarity between "Denise" in *Market Mind Games* and "Wendy" in *Billions* – that of a female performance coach advising highly competitive men how to use their emotions to out-compete others. *See Warner Bros. Inc. v. Am. Broadcasting Cos., Inc.*, 720 F.2d 231, 242 (2d Cir. 1983) (noting that a substantially similar character may be infringing despite "slight differences in appearance, behavior, or traits"). We have not located, and Defendants have not pointed to even one other expression of a female in-house performance coach at a hedge fund other than the characters of "Denise" in *Market Mind Games* and then "Wendy" from *Billions*.

## C. *Billions* is a derivative work featuring the character created by Ms. Shull in *Market Mind Games*

Defendants fail to even address, let alone refute, Plaintiffs' claim that Defendants have "prepared, displayed, distributed and offered for sale the unauthorized derivative work *Billions.*" (Compl. ¶ 51.) The right to prepare or authorize the preparation of a derivative work is the exclusive right of the copyright owner. 17 U.S.C. § 106; *see Stewart v. Abend*, 495 U.S. 207, 220 (1990). "A 'derivative work' is a work based upon one or more preexisting works, such as a . . . dramatization, fictionalization, motion picture version, . . . or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work." 17 U.S.C. § 101.

By dramatizing and transforming characters and scenes from *Market Mind Games* from a literary device to a television series as detailed above, Defendants have infringed on Plaintiff The ReThink Group's exclusive right to prepare or authorize the preparation of a derivative work based on *Market Mind Games*. Because *Market Mind Games* and the character of "Denise" "remains out of the public domain, [their] use is infringing if one who employs the work does not have a valid

license or assignment for use of the pre-existing work. . . . It is irrelevant whether the pre-existing work is inseparably intertwined with the derivative work." *Stewart*, 495 U.S. at 223 (internal citations omitted).

### D. Defendants have engaged in fragmented literal copyright infringement

"Fragmented literal similarity" may be shown by demonstrating "the copying of even a relatively small quantitative portion of the pre-existing work . . . if it is of great qualitative importance to the [pre-existing] work as a whole." *TufAmerica, Inc. v. Diamond*, 968 F. Supp.2d 588, 598 (S.D.N.Y. 2013) (internal citations and quotation marks omitted). A comparison of *Market Mind Games* to the *Billions* series demonstrates a number of occurrences of "fragmented literal copyright infringement." Defendants do not address their literal copying directly, but rather claim that the similarities are merely unprotectible scènes à faire and discount the similarities as "unprotectible stock elements." (Def. Brief at 18.)

Defendants cannot escape that, as described above at p. 10-11, the scene in which "Denise" walks "Michael" through a bad trade is copied almost word-for-word in a scene in Episode 11 of Season 1 of *Billions*. And their footnoted conclusion that the "alpha voice" concept is used differently in both works shows either a lack of comprehension or intentional misleading. As described in *Market Mind Games*, frustration and anger resulting from bad trades can cause a trader to lose the connection to the alpha voice, exactly the concept dramatized in *Billions*. (Def. Brief at p. 17, n. 9.)

Further exemplar evidence of Defendants' literal copying is summarized for the Court in Exhibit 3 to the Felicello Decl.

### E.   Even under a "ordinary observer" test, the character, themes, and settings of the works are similar

As explained above at p. 13-14, the "Wendy" character of *Billions* is substantially similar to the character of "Denise" in Plaintiffs' work. In addition, the character of "Michael" in Plaintiffs' work is substantially similar to "Bobby 'Axe' Axelrod" and the character of "Richard Kelley," Michael's austere and judgmental father[3] in Plaintiffs' work, is substantially similar to Chuck Rhoades' father, "Charles Rhoades," in *Billions*.

The themes explored in both works include the fear of missing out, becoming hyper-confident, rejection and love, unconscious meanings, and learning to use one's emotions to achieve better trading outcomes.

In addition, the settings of both works are similar. "Denise" gives lectures, as does "Wendy." (*See Billions*, season 2, episode 1, at 9 min. 7 sec. to 11 min. 48 sec., Felicello Decl. Ex. 2.) "Denise" begins to work exclusively in-house at one hedge fund, which is substantially similar to "Wendy." In Season 2, "Wendy" sets up an office separate from Axe Capital, which is substantially similar to the setting described at the beginning of *Market Mind Games*. And both "Denise" and "Wendy" use unconventional methods of conducting coaching sessions out of the office and at late hours. Compare (*Market Mind Games*, p. 217 ("No one else was around at this late hour") to *Billions*, season 1, episode 11, at 21 min 40 sec.)

### F.   Plaintiffs have stated claims of contributory and vicarious copyright infringement.

The cases cited by Defendants in support of dismissal of the contributory and vicarious copyright infringement claims as against CBS and Nevins are distinguishable. In *Stanacard, LLC v. Rubard, LLC*, the Court declined to dismiss on summary judgment a contributory infringement claim against a chief operating officer in light of evidence that he provided financial support to the

---

[3] *Market Mind Games*, Prologue, p. xvi.

alleged primary infringer. No. 12 Civ. 5176, 2016 WL 462508, at *15 (S.D.N.Y. Feb. 3, 2016). The Court dismissed, on a full summary judgment record, the vicarious copyright infringement claims against the chief operating officer, who only had financial responsibilities and another defendant who was merely a passive investor, on the basis that neither had the "right and ability to control or supervise the infringing activity" and thus could not be liable for vicarious copyright infringement. *Id.* at *14-15.

The other case cited by Defendants on this point, *Banff Ltd v. Limited, Inc.*, also arose at the summary judgment stage. 869 F.Supp. 1103 (S.D.N.Y. 1994). In that case, the Court dismissed a vicarious infringement claim against a parent corporation based on the absence of any evidence that the parent corporation had the "right and ability" to supervise the infringing activity where the day to day decisions were made by subsidiary employees only and the subsidiary merely had an obligation to provide monthly financial reports to the parent. Additionally, in *Banff*, the plaintiff did not allege defendant's knowledge of the infringing activity and thus, the Court did not consider the contributory infringement doctrine. *Id.* at 1106 n.1.

In contrast to *Stanacard* and *Banff*, this case is at the motion to dismiss stage, and Plaintiffs have sufficiently alleged CBS's and Nevins's contribution, financial interest in and "right and ability to control or supervise the infringing activity." Prior to any discovery on these issues, the contributory and vicarious infringement claims should not be dismissed.

### POINT III.

### PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY THE COPYRIGHT ACT

**A. Plaintiffs' state law claims do not address the exclusive rights provided by the Copyright Act**

"The Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17

U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." *Briarpatch Ltd., L.P v Phoenix Pictures, Inc.*, 373 F3d 296, 305 (2d Cir 2004) (citations omitted). "In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution or display." *Id.* (citations omitted). Moreover, a state law claim is not pre-empted if it contains "extra elements," such as breach of fiduciary duty, that make it qualitatively different from a copyright infringement claim.

Plaintiffs' state law claims are not pre-empted because they do not address the exclusive rights within the scope of copyright law. In claiming that the "harms alleged by [Plaintiffs'] state law claims arise from Defendants' purported unauthorized use of Plaintiffs' work," Defendants misread and misrepresent Plaintiffs' claims. Independent of, and distinct from, their copyright claims, Plaintiffs' claim that Defendants sought to misrepresent Plaintiffs' contributions to *Billions*, causing harm to their business reputation, and failed to compensate Plaintiffs for the time that they spent consulting with the *Billions'* writers and Ms. Siff.

### B. Plaintiffs state a claim for a violation of N.Y. Civil Rights Law §§ 50 & 51

It was unlawful for Defendants to use Ms. Shull's "'name, portrait or picture' for advertising or trade purposes without first obtaining . . . her written authorization." *Bement v. N.Y.P. Holdings, Inc.*, 307 A.D.2d 86, 760 N.Y.S.2d 133, 136 (1st Dep't 2003). Although there is an exception for "newsworthy" use, the exception does not apply where "the article is found to be an advertisement in disguise."

Plaintiffs' allegations, as stated in the Complaint, are that Defendants intended to, and did, benefit from articles concerning Ms. Shull and her unique role as a performance coach to hedge funds because these articles piqued interest in *Billions* and made the story all the more believable.

Thus, the articles about Ms. Shull, including the one edited by Defendant Sorkin and included in his *Dealbook* column, were more akin to advertisements for the pilot he was attempting to sell. Defendants chose not to compensate Ms. Shull for the attention she garnered for this unique job role.

### C. Plaintiffs' state a claim for injury to business reputation and unfair competition

"To prevail in a common law unfair competition claim under New York law, 'the plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief,' and, additionally, 'there must be some showing of bad faith.'"[4] *Fibermark, Inc. v. Brownville Specialty Paper Products, Inc.*, 419 F Supp 2d 225, 238 (N.D.N.Y. 2005), quoting, *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (2d Cir.1995) (internal citations omitted). Because an unfair competition claim under New York law requires the "extra element" of "likelihood of confusion," it is not pre-empted by federal copyright law. *Eliya, Inc. v. Kohl's Dept. Stores*, 20007 WL 2645196, *6 (S.D.N.Y. Sept. 13, 2006). Plaintiffs did allege that Defendants acted in bad faith in making her believe that she was going to be compensated for her consultations and be involved in joint marketing efforts. Plaintiffs should have the opportunity for discovery to determine if they can show actual confusion between "Wendy" and "Denise."

### D. Plaintiffs state a claim for deceptive trade practices

Contrary to Defendants' contention, allegations as to trade practices that cause "confusion" amongst the public or consumers can adequately state a claim under N.Y. Gen. Bus. Law § 349. *See*, *e.g.*, *Wolo Mfg. Corp. v. ABC Corp.*, 349 F. Supp. 3d 176, 210 (E.D.N.Y. 2018)("tendency . . . to influence such customers' purchasing decisions. . . ."); *Blue Cross & Blue Shield of New Jersey,*

---

[4] As was understood by Defendants, Plaintiffs do allege a claim for common law unfair competition. (*See* Def. Br. at fn. 16.)

*Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198, 210 (E.D.N.Y. 2001), *rev'd in part, question certified sub nom. Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*, 344 F.3d 211 (2d Cir. 2003), *certified question accepted*, 100 N.Y.2d 636, 801 N.E.2d 417 (2003), *and certified question answered sub nom. Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 818 N.E.2d 1140 (2004), *and rev'd sub nom. Empire Healthchoice, Inc. v. Philip Morris USA, Inc.*, 393 F.3d 312 (2d Cir. 2004)(finding violation of Section 349 based on "successful scheme to distort the body of public knowledge. . . .").

For example, in *Boule v. Hutton*, an artist brought, *inter alia*, a claim under Section 349 against another artist on the grounds that the second artist has deceived consumers by falsely stating that certain works of art were not the work of the plaintiff. *See Boule v. Hutton*, 328 F.3d 84, 88, 94 (2d Cir. 2003). The district court dismissed the Section 349 claim on the grounds that plaintiff was not himself a consumer. The Second Circuit reversed and remanded a trial court's dismissal of a Section 349 claim.

Plaintiffs here have alleged that Defendants have intentionally deceived consumers generally, and consumers of performance coaching services specifically, by knowingly misrepresenting to consumers that Defendants are the creators of the protectable aspects of Plaintiffs' work. Such a misrepresentation results in confusion amongst consumers generally, and consumers of performance coaching specifically, by cause consumers to believe that the concept of a female performance who advises men to harness their emotions is a mere fiction created solely for television and entertainment, not something to be seriously considered. Such confusion in the market distorts the public knowledge about the merits of the work performed by Ms. Shull and the value of her services.

Plaintiffs' claims under Section 349 are not preempted under the Copyright Act because the Section 349 claims necessarily involve the element of intentional deception. *See*, *e.g.*, *Samara Bros. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205, 120 S. Ct. 1339, 146 L. Ed. 2d 182 (2000).

### E. Plaintiffs state a claim for unjust enrichment

As explained above, Plaintiffs do allege deceptive advertising that has harmed consumers generally, and, thus, have stated a claim for a violation of N.Y. General Business Law § 350. *Maurizio*, 230 F.3d at 522.

Further, Plaintiffs have stated a common law unjust enrichment claim. "The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff.'" *Corsello v. Verizon New York, Inc.*, 18 NY3d 777, 790 (2012). As alleged in the Complaint and discussed above, Ms. Shull met with Ms. Siff and the writers' of *Billions* and provided them with valuable insights and examples about her unique practice. Defendants, except Defendant Nevins, led Ms. Shull to believe she would be compensated for her time and insights. Thus, this is not a case like *Songbird Jet Ltd. v. Amax, Inc.*, 581 F.Supp. 912, 926 (S.D.N.Y. 1984), where Plaintiffs seek compensation for time and effort spent negotiating a failed transaction. Rather, in the instant case, Defendants received the benefit of consulting with Ms. Shull and improperly withheld compensation.

Defendants' claim that allowing Plaintiffs' unjust enrichment claim to go forward with "prevent producers from conducting background research without fear of frivolous litigation" is unfounded. If producers are meeting with experts and others to conduct research for television shows that go on to earn substantial sums, they should be willing and able to pay with such professionals for their time.

**F.  Plaintiffs state a claim for implied in fact contract**

Plaintiffs state a claim for implied contract by alleging that the parties understood that Ms. Shull was meeting with Defendants based on the understanding that she would be compensated for her time and in exchange for her original ideas and information. In a similar case, where plaintiff submitted a written idea for a television series to a network and alleged an implied promise by the network to pay reasonable compensation if the idea was used, the Second Circuit found that plaintiff had stated a claim for a breach of an implied contract, which was not pre-empted by copyright law. *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 432 (2d Cir. 2012). Thus, like the plaintiff in *Forest Park Picture.*, Plaintiffs have stated a claim for breach of an implied contract that is "qualitatively different" from a copyright claim and not subject to preemption. 683 F.3d 424, 432 (2d Cir. 2012).

In a strained effort to avoid liability for stealing Plaintiffs' ideas, Defendants argue that the ideas shared by Ms. Shull were not novel or original. In making this argument, Defendants again misstate the law. Second Circuit precedent makes clear that "[f]or contract-based claims in submission-of-idea cases, a showing of novelty to the buyer will supply sufficient consideration to support a contract." *Nadel v Play-By-Play Toys & Novelties, Inc.*, 208 F3d 368, 376 (2d Cir 2000). "While an idea may be unoriginal or non-novel in a general sense, it may have substantial value to a particular buyer who is unaware of it and therefore willing to enter into contract to acquire and exploit it." *Nadel v Play-By-Play Toys & Novelties, Inc.*, 208 F3d 368, 377 (2d Cir 2000). The clear allegations of the Complaint show that Ms. Shull's ideas were novel to Defendants. Specifically, Ms. Shull's ideas were so interesting and novel to Defendants and Ms. Siff that the writers took notes and asked Ms. Shull to continue to work with Ms. Siff to provide guidance.

Defendants' reliance on *Khreativity Unlimited, Inc. v. Mattel, Inc.* is misplaced. 101 F. Supp. 2d 177, 185 (S.D.N.Y. 2000), *aff'd sub nom. Khreativity Unlimited, Inc. v. Mattel, Inc*., 242 F.3d 366 (2d Cir. 2000). In *Khreativity*, defendant proffered evidence on summary judgment that the idea submitted by plaintiff was "nothing more than a variation on concepts already employed by [defendant]." *Id.* at 185.

Here Plaintiffs allege (1) that Ms. Shull is the only expert to combine neuropsychoanalysis, neuroeconomics, and modern psychoanalysis and to apply them to risk decision-making and performance coaching for hedge funds (Compl. at ¶ 20); (2) that Defendants Koppelman and Levien told her they were looking for additional insights about the field of hedge fund performance coaches (Compl. at ¶ 35); (3) that she explained to them how her approach differed from Tony Robbins and provided examples, including the use of different settings to trigger her cient's subconscious (*Id.*); (4) that Ms. Shull provided Ms. Siff and Defendants Koppelman and Levien with information about all aspects of Ms. Shull's work and her unique approach to trading and investing psychology; and (5) that Ms. Siff and Defendants Koppelman and Levien took notes during the meeting. These allegations must be accepted as true in analyzing a motion to dismiss. *See* also, *Khreativity* at *185 (noting that the "novel to the buyer" standard involves a "fact specific inquiry that focuses on the perspective of the particular buyer"). Thus, the ideas provided by Ms. Shull were not mere variations of concepts already known by Defendants and Plaintiffs have stated a claim for breach of implied contract.

### G. Plaintiffs state a claim for misappropriation

"To properly allege a claim for misappropriation, plaintiff must show: (1) the existence of a confidential or fiduciary relationship between the parties; and (2) that the idea is novel and concrete." *Stewart v World Wrestling Fedn. Entertainment, Inc.*, 2005 WL 66890, *5, 2005 Copr.

L. Dec. P. 28942 (S.D.N.Y. Jan. 11, 2005). Where, as here, Plaintiffs allege these "extra elements," a claim for misappropriation is not pre-empted by copyright law. *Id.*

As detailed above, Plaintiffs have alleged that they had a confidential relationship and that Plaintiffs have shared original, novel, and concrete ideas with Defendants. Thus, Plaintiffs have stated a claim for misappropriation. *See Broughel v. Battery Conservancy*, No. 07 CV 7755 (GBD), 2010 WL 102817, at *4 (S.D.N.Y. Mar. 16, 2010).

### H.  Plaintiffs state a claim for accounting

Plaintiffs are entitled to an accounting. "It is generally held that '[e]quity has jurisdiction to compel an accounting whenever one party has profits in which another is entitled to share regardless of the relationship between the parties at the time the profits were earned * * * if the remedy at law is inadequate.'" *Kaminsky v Kahn*, 259 N.Y.S.2d 716, 724 (App. Div. 1st Dept 1965). Where, as here, Defendants have benefited improperly from the ideas they took from Plaintiffs without providing proper compensation, the Court may exercise its equitable powers to "compel the defendant to account for the moneys which he has received for plaintiff's benefit." *Id.*

## CONCLUSION

For all the foregoing reasons, the Court should enter an Order denying Defendants' motion to dismiss in its entirety, and granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        March 29, 2019

Respectfully submitted,

CKR LAW LLP

By:   */s/ Rosanne E. Felicello*
        Rosanne E. Felicello
        Michael James Maloney
1330 Avenue of the Americas
14th Floor
New York, New York 10019
Tel. (212) 259-7300

rfelicello@ckrlaw.com
mmaloney@ckrlaw.com
*Attorneys for Plaintiffs*