**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 04 2019

DENISE K. SHULL and THE RETHINK GROUP,  :
INC.,

                       Plaintiffs,    :

             -against-          :

TBTF PRODUCTIONS INC., SHOWTIME    :
NETWORKS INC, CBS CORPORATION, BRIAN :
KOPPELMAN, DAVID LEVIEN, DAVID    :
NEVINS, and ANDREW ROSS SORKIN,   :

                      Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

18 Civ. 12400 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Plaintiffs Denise K. Shull and The ReThink Group, Inc. bring this copyright infringement suit against Defendants Andrew Ross Sorkin, Brian Koppelman, David Levien, David Nevins, TBTF Productions Inc. ("TBTF"), Showtime Networks Inc ("Showtime"), and CBS Corporation ("CBS"). (Compl., ECF No. 4.) Plaintiffs allege that Defendants improperly appropriated, copied, prepared, distributed, displayed, and offered for sale Plaintiffs' copyrighted work, *Market Mind Games*, as well as Shull's style and persona without permission, compensation, or remuneration, in violation of the Copyright Act, 17 U.S.C. §§ 101–1401; Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Sections 50 and 51 of the New York Civil Rights Law; Section 349 of the New York General Business Law; and an implied-in-fact contract between Plaintiffs and Defendants. Plaintiffs also claim that Defendants were unjustly enriched by Shull's consulting on their popular television show *Billions*. (*Id.* ¶ 1.)

      Defendants move to dismiss Plaintiffs' complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Notice of Mot. to Dismiss Pls.' Compl.,

ECF No. 56; *see also* Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Compl. ("Defs.' Mem."), ECF No. 57, at 2–3.) Defendants' motion is GRANTED as to the copyright infringement and state law claims, and DENIED as to Defendants' request for attorneys'' fees and costs.

## I.   FACTUAL BACKGROUND

### A. The Literary Work: *Market Mind Games.*

Shull is an author and professional performance coach who "draws on her expertise in neuropsychoanalysis, neuroeconomics, and modern psychoanalysis to coach her hedge fund portfolio manager clients." (Compl. ¶ 19.) The complaint alleges that Shull is the only expert combining these three areas to assess risk decision-making in the context of performance coaching for hedge funds. (*Id.* ¶ 20.) Plaintiffs also allege that Shull's "book, *Market Mind Games*, is the only book known to combine all three fields of study and apply them in the world of finance." (*Id.*)

*Market Mind Games*, published in January of 2012, describes Shull's "experience advising financial professionals, hedge fund managers, and Wall Street employers" based on her "insights into the psychology of hedge fund traders." (*Id.* ¶ 21.) In the book, to assist with explaining her fields of study, Shull occasionally "uses the setting of a fictional hedge fund and [her] own persona" to portray "fictionalized accounts from [her] own experience." (*Id.*) For example, "[i]n *Market Mind Games*, Ms. Shull uses fictional characters attending fictional versions of her typical lectures, workshops, consulting programs and one-on-one performance coaching meetings as they set up and run a fictional hedge fund." (*Id.* ¶ 22.) *Market Mind Games* opens, in fact, with the explanation that Shull "takes this approach because it is easier to process new ideas and information when it is presented in social or human terms." (*Id.*; *see also* Denise Shull, *Market Mind Games: A Radical Psychology of Investing, Trading, and Risk*, at xvi (2012).) The four

characters used to help the reader better understand Shull's technical theories are "Michael Kelley, her fictional hedge fund manager; Richard Kelley, Michael's judgmental father; Renee Smith, the daughter of a former floor trader; and Christopher Smith, Renee's father." (Compl. ¶ 23.) Michael and Renee eventually "attend a number of Ms. Shull's workshops[, and] Michael moves from academia to running a hedge fund that hires Ms. Shull as their in-house performance coach." (*Id.*)

Shull wrote *Market Mind Games* on behalf of The ReThink Group. (*Id.* ¶ 24.) The ReThink Group thus "holds all rights to any and all derivative works from the book," which was registered "with the United States Copyright Office on January 31, 2012." (*Id.*)

**B. Shull's Appearance on *Squawk Box* and Dealbook Feature.**

Defendant "Sorkin is a journalist and writer" and is also known for co-hosting the television show, *Squawk Box*, on CNBC, which features authors and columnists in the finance industry. (*Id.* ¶ 7.) Sorkin invited Shull to appear on the show in 2012, around which time she "learned that Mr. Sorkin had read *Market Mind Games* and was aware of" Shull's popularity in the field of performance coaching and trading psychology. (*Id.* ¶ 26.)

Plaintiffs assert that Sorkin founded an annual conference by the name of Dealbook. (*Id.* ¶ 28.) The Dealbook conference is an event in which Sorkin, a "celebrated *Times* journalist," fosters a discussion with a group of business leaders to "explore the most newsworthy topics of the day." About, *DealBook: Playing for the Long Term*, The New York Times Deal Book, https://www.nytdealbookconference.com/db2019/247437. In addition to hosting the Dealbook conference, Sorkin also serves as founder and editor of the New York Times section by the same name. (*See* Compl. ¶ 28.) Plaintiffs claim that on November 11, 2013, Sorkin published an article with an accompanying "photo of Ms. Shull in her office with the title 'THE COACH Denise Shull'" and described her "work as a hedge fund performance coach focusing on helping clients

optimize performance by dealing with their emotional baggage and exposing how their subconscious influences their market decisions." (*Id.*; Decl. of Rosanne Elena Felicello ("Felicello Decl.") Ex. 4 (For Better Performance, Hedge Funds Seek the Inner Trader ("*Dealbook Article*")), ECF No. 62-4.)

### C. Shull's Communications with Defendants During the Early Stages of *Billions*.

#### 1. Shull's Email Correspondence with Koppelman and Levien About Coming to the Set of *Billions*.

Plaintiffs allege that "in or about February or March 2014, Defendant Sorkin, along with fellow Defendants Koppelman and Levien," sold to Showtime the idea for a new television series titled *Billions*.[1] (Compl. ¶ 30.) On August 26, 2015, Sorkin emailed Shull about the series, allegedly requesting "her assistance with the development of the female lead character, Dr. Wendy Rhoades, a female hedge fund performance coach who helps financial professionals improve their performance by dealing with their own emotional baggage." (*Id.* ¶ 31; Felicello Decl. Ex. 5 (Sorkin Email), ECF No. 62-5.) Sorkin then introduced Shull to Maggie Siff—the actress cast to play the role of Dr. Wendy Rhoades—via email the next day, purportedly calling Shull "one of the leading hedge fund performance coaches in the country." (Compl. ¶ 32.) Siff followed up on August 28, 2015, looping in executive producers Koppelman and Levien to request a meeting with Shull. (*Id.* ¶ 33; Felicello Decl. Ex. 6 (Siff and Koppelman Emails), ECF No. 62-6.) "Shull also received an email from Defendant Koppelman inviting her into the writers' room, stating that he was 'excited' to read her book and meet[.]" (Compl. ¶ 34.)

---

[1] In their memorandum of law in support of their motion to dismiss, Defendants explain that "Showtime is a wholly-owned subsidiary of CBS" and Defendant "Nevins is the Chief Executive Officer ('CEO') of Showtime and Chief Creative Officer of CBS." (Defs.' Mem. at 3 (citing Compl. ¶¶ 10, 12).) "Sorkin, Koppelman, and Levien . . . are the creators of Billions" and TBTF is the production company. (*Id.* (citing Compl. ¶¶ 7–9, 11).)

**2. Shull's Alleged On-Set Communications with Koppelman, Levien, and the Actress Who Portrays "Dr. Wendy Rhoades" About Shull's Approach to On-Set Performance Coaching.**

"On September 2, 2015, Ms. Shull arrived at the agreed location," and initially "met with Defendants Koppelman and Levien," who told her that they had already met with Tony Robbins, one of the world's most famous performance coaches. (*Id.* ¶ 35; *see also* Richard Feloni, *How Wall Street Psychologists and Tony Robbins Inspired One of the Main Characters on Showtime's 'Billions'*, Business Insider (Feb. 19, 2017), https://www.businessinsider.com/wendy-rhoades-billions-tony-robbins-wall-street-psychology-2017-2.)   Plaintiffs allege that Koppelman and Levien reached out to her "for additional insights about the field of hedge fund performance coaches." (Compl. ¶ 35.) Plaintiffs also claim that Shull "explained to them how her approach differed from that of Mr. Robbins and provided some examples about how she used different settings (such as out of office sessions) to trigger her client's subconscious." (*Id.*) Siff later joined Shull's meeting with Koppelman and Levien, and Plaintiffs allege that Koppelman, Levien, and Siff all proceeded to inquire about all aspects of "Shull's work as a performance coach to hedge funds and other financial firms," as well as her approach to trading and investing psychology. (*Id.* ¶ 35.) Plaintiffs further claim that Levien invited Shull to visit the set when filming began, and that "Siff stated that she was reading *Market Mind Games*, and believed that the book would be an integral part of developing the character of Dr. Wendy Rhoades for" *Billions*. (*Id.*) Koppelman allegedly "asked if there was an audio version of the book and stated his intention to download it." (*Id.*) At this point, Plaintiffs claim that "Shull mentioned that *Market Mind Games* was written as a fictional account of a hedge fund with Ms. Shull's own persona as the in-house performance coach" and that, "[a]s soon as he heard this, Defendant Koppelman's demeanor changed and he appeared uncomfortable." (*Id.* ¶ 36.)

### 3. Shull's Alleged Communications with Showtime Personnel Regarding Promotional Initiatives for *Billions*.

Shull claims that on September 30, 2015, the "Senior Manager of Showtime's Digital Media Group" contacted her to discuss including Shull in promotional efforts for *Billions*. (*Id.* ¶ 37; Felicello Decl. Ex. 7 (Promotional Emails), ECF No. 62-7.) Shortly thereafter, on September 9, 2015, Shull and her business partner had a conference call with the Senior Manager, as well as "other senior members of Showtime's creative, marketing[,] and promotional departments to discuss joint promotional initiatives" concerning *Billions* and *Market Mind Games*. (Compl. ¶ 38.) Shull claims that she "understood that the initial phone conference and in-person meeting was the beginning of the relationship and terms would be negotiated subsequently in concert with marketing the series." (*Id.* ¶ 39.) Plaintiffs allege that "Plaintiffs never authorized any of the Defendants to create a derivative work from *Market Mind Games*[, and] never granted authorization, in any form, to any of the Defendants to use [Shull's] persona for commercial purposes without compensation." (*Id.* ¶ 40.)

### D. The Airing of *Billions*.

The pilot episode of *Billions* aired in January of 2016. (*Id.* ¶ 41.) Plaintiffs maintain that "*Billions* portrays the experiences of 'Dr. Wendy Rhoades,'" an in-house performance coach at a fictionalized hedge fund. (*Id.* ¶ 42.) They also contend that key aspects of *Billions* and "Dr. Wendy Rhoades, in particular, are merely derivative works of Plaintiffs' book, *Market Mind Games*." (*Id.*) For example, Plaintiffs allege that the pilot episode portrays Dr. Wendy Rhoades in substantially the same way as Shull portrays herself in *Market Mind Games*. (*Id.*) Plaintiffs further claim that, in the pilot, "Dr. Rhoades makes multiple statements and observations that are nearly identical to those made by Ms. Shull in Market Mind Games, including focusing on the physical well-being of the trader client (i.e. eat, sleep, exercise) and tuning into the alpha voice."

(*Id.*)  Another instance of alleged copying relates to Chapter 20 of *Market Mind Games*, "The '*What Was I Thinking Rehash*,'" wherein Shull's "fictional persona walks her hedge fund manager client, 'Michael,' through" a bad trade, a scene Plaintiffs claim is "eerily similar" to Season One, Episode Eleven of *Billions*," in which Dr. Wendy Rhoades counsels one of the leading characters, Bobby "Axe" Axelrod on his bad trade.  (*Id.* ¶ 43.)

## II.    LEGAL STANDARDS

### A.  12(b)(6) Motion to Dismiss.

The 12(b)(6) pleading standard requires this Court to accept "all factual allegations in the complaint as true and draw[] all reasonable inferences in the [P]laintiff's favor." *Testa v. Becker*, 910 F.3d 677, 682 (2d Cir. 2018).  The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a 12(b)(6) motion, the complaint's factual allegations must "state a claim for relief that is plausible on its face." *Testa*, 910 F.3d at 682.  A court considers a number of factors in determining plausibility, including "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011).  In the context of a motion to dismiss, a court must only "assess the legal feasibility of the complaint, not . . . the weight of the evidence which might be offered in support thereof." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of New York,* 375 F.3d 168, 176 (2d Cir. 2004) (internal quotation marks omitted).  The court may also consider "any written instrument attached to the complaint as an exhibit, any statement or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir. 2013).

**B.  Copyright Infringement, 17 U.S.C. § 106.**

The Copyright Act provides the owner of a copyrighted work with "the exclusive right to . . . reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). A party who violates those exclusive rights is liable for damages. *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 616 (S.D.N.Y. 2013). To prevail on a claim for copyright infringement, the plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Arista Records*, 604 F.3d at 117 (quoting *Feist Publ'n, Inc. v. Rural Telephone Serv. Co.*, 499 U.S. 340, 361 (1991) (internal quotation marks omitted); *see also Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005); *Twin Peaks Prods., Inc. v. Publ'n Int'l, Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993).[2]

It is well settled that certificates of copyright registration constitute *prima facie* evidence of copyright ownership. *See Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997). To prove unauthorized copying, on the other hand, is a much more detailed inquiry. The plaintiff must show that the defendant "actually copied [their] work, and that such copying was illegal because a 'substantial similarity' exists between the allegedly infringing work . . . and the protectable elements of the copyrighted work." *Porto v. Guirgis*, 659 F. Supp. 2d 597, 608 (S.D.N.Y. 2009)

---

[2] Courts in this district have also laid a framework for determining copyright infringement at the motion to dismiss stage, identifying four elements that a complaint must allege: "(1) which original works are the subject of the copyright claim; (2) that the plaintiff owns the copyrights in those works; (3) that the copyrights have been registered in accordance with the statute; and (4) 'by what acts during what time' the defendant infringed the copyright." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 353 (S.D.N.Y. 2014) (quoting *Palatkevich v. Choupak*, Nos. 12 Civ. 1681 (CM), 12 Civ. 1682 (CM), 2014 WL 1509236, at *6 (S.D.N.Y. Jan. 24, 2014) (internal quotation marks omitted)). Regardless of the framework that is used, courts have thoroughly explained the two essential elements of a copyright infringement claim, that is, when a plaintiff owns a valid copyright, and when a defendant's work constitutes infringement.

(citing *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995)).  Substantial similarity may be established by showing "(i) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is 'more than *de minimis*.'"  *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 631 (S.D.N.Y. 2008) (quoting *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (internal quotation marks omitted).

Courts in this circuit "usually apply the 'ordinary observer' test and ask whether 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'"  *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014) (quoting *Laureyssens v. Idea Group, Inc.*, 964 F.2d at 131, 141 (2d Cir. 1992)).  Still, a work's aesthetic may "be due largely to unprotected elements," in which case the court "'must be more discerning, [and] ignor[e] those aspects of a work that are unprotectable' . . . lest we conflate mere copying with wrongful copying."  *Zalewski*, 754 F.3d at 102 (quoting *Laureyssens*, 964 F.2d at 141 (alterations in original); *see also Boisson v. Banian, Ltd*, 273 F.3d 262, 272 (2d Cir. 2001) (citing *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 101–02 (2d Cir. 1999) ("[W]here the plaintiff's work contains no material imported from the public domain, the 'more discerning' test is unnecessary.").

It is axiomatic that copyright protection is afforded to "original works of authorship," as defined in the Copyright Act itself.  *See* 17 U.S.C. § 102.  Therefore, "[e]verything else in the work, the history it describes, the facts it mentions, and the ideas it embraces, are in the public domain free for others to draw upon.  It is the peculiar expressions of that history, those facts, and those ideas that belong exclusively to their author."  *Zalewski*, 754 F.3d at 102.  Indeed, as the Second Circuit articulated in *Zalewski*, "any author may draw from the history of English-speaking

peoples, but no one may copy from *A History of the English–Speaking Peoples.* Any artist may portray the Spanish Civil War, but no one may paint another *Guernica.* . . . [A]nyone may draw a cartoon mouse, but there can be only one Mickey." *Id.* at 102.

The more discerning observer "test is guided by comparing the 'total concept and feel' of the contested works" to determine whether they are substantially similar. *Boisson v. Banian, Ltd*, 273 F.3d 262, 272 (2d Cir. 2001) (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir. 1995)). This "examination would encompass 'the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the [plaintiff's] books and the [defendants'] works.'" *Id.* at 273 (quoting *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)). A number of doctrines serve to isolate protectable expression from that which is in the public domain. *See Zalewski*, 754 F.3d at 102. "'Scènes-à-faire' teaches that elements of a work that are 'indispensable, or at least standard, in the treatment of a given topic'—like cowboys, bank robbers, and shootouts in stories of the American West—get no protection." *Id.* (quoting *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 979 (2d Cir. 1980)). In like vein, "the 'merger doctrine' instructs that some ideas can only be expressed in a limited number of ways—single words or colors for example. When expression is so limited, idea and expression 'merge.' Expressions merged with ideas cannot be protected, lest one author own the idea itself." *Id.* at 102–03 (citation omitted).

Yet another approach used to assess substantial similarity is the quantitative/qualitative approach. It is clear that "substantial similarity may be an issue even where . . . copying as a factual matter is established." *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 631 (S.D.N.Y. 2008). This is because "there is a difference between 'factual copying and actionable copying': [t]he former (probative similarity) requires only the fact that the infringing

work copies something from the copyrighted work; the latter . . . requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *Id.* Probative similarity turns on "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 304 (E.D.N.Y. 2009) (quoting *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 654 F.2d 204, 208 (2d Cir. 1981)). Absent proof of direct copying, a plaintiff "may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material and that there are similarities between the two works that are probative of copying." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (citations and internal quotation marks omitted).

"The legal maxim '*de minimis non curat lex*'—'the law does not concern itself with trifles'—applies in the copyright context. . . . For example, if the copying is *de minimis* and so 'trivial' as to fall below the quantitative threshold of substantial similarity, the copying is not actionable." *Gottlieb Dev. LLC*, 590 F. Supp. 2d at 632 (quoting *Ringgold v. Black Entm't T.V. Inc.*, 126 F.3d 70, 74–75 (2d Cir. 1997). "To determine whether the quantitative threshold of substantial similarity is met in cases involving visual works, courts consider the extent to which the copyrighted work is copied." *Id.* (citing *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998); *Ringgold*, 126 F.3d at 75). Moreover, "[t]he observability of the copyrighted work is critical, and courts will consider the length of time the copyrighted work is observable as well as factors such as focus, lighting, camera angles, and prominence," when applicable. *Id.* (citing *Sandoval*, 147 F.3d at 217; *Ringgold*, 126 F.3d at 75). Finally, "[w]hen similar works resemble each other only in unprotected aspects—for example, when similarities inhere in ideas,

which are by definition unprotected, or in expression that is not proprietary to plaintiff—the defendant prevails." *Id.* at 631 (S.D.N.Y. 2008) (quoting *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 390 (S.D.N.Y. 2005)). Although "*dissimilarity* between some aspects of the works will not automatically relieve the infringer of liability," *Williams*, 84 F.3d at 588, "numerous differences tend to undercut substantial similarity," *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*, 720 F.2d 231, 241 (2d Cir. 1983) (citation omitted).

### C. Implied-in-Fact Contract.

There are several differences between a claim for a contract implied in fact and an alleged infringement upon one's copyright. For example, "the Copyright Act does not provide an express right for the copyright owner to receive payment for the use of a work. It simply gives the copyright owner the right to prevent distribution, copying, or the creation of derivative works." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 431 (2d Cir. 2012) (citing 17 U.S.C. § 106). In addition, "a plaintiff suing for failure to pay under a contract must prove extra elements beyond use or copying, including mutual assent and valid consideration." *Id.* Finally, "a breach of contract claim asserts rights only against the contractual counterparty, not the public at large," or "the world." *Id.* (citation omitted). As a result, "a breach of contract action is not preempted by the Copyright Act." *Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154, 166 (S.D.N.Y. 2017) (quoting *BanxCorp v. Costco Wholesale Corp*, 723 F. Supp. 2d 596, 617 (S.D.N.Y. 2010) (internal quotation marks omitted)).

Courts in this circuit have provided that "[u]nder New York law, absent a written agreement between the parties, a contract may be implied where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Betty, Inc.*, 283 F. Supp. 3d at 166 (quoting *Bader v. Wells Fargo Home Mortg. Inc.*,

12

773 F. Supp. 2d 397, 413 (S.D.N.Y. 2011) (internal quotation marks omitted)). Contracts that are implied in fact are "just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by contract." *Id.* at 166–67 (quoting *Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 512 (S.D.N.Y. 2001) (internal quotation marks omitted)). A contract is not "implied in fact where the facts are inconsistent with its existence, or against the declaration of the party to be charged, or where there is an express contract covering the subject-matter involved, or against the intention or understanding of the parties; or where an express promise would be contrary to law." *Id.* at 167. Mutual assent "is necessary . . . unless [the accused] has conducted himself in such a manner that his assent may fairly be inferred." *Id.* (quoting *Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337, 339 (1916)). Indeed, "[i]t is settled law that before a plaintiff may secure redress for breach of an agreement, the promise made by the defendant must be sufficiently certain and specific so that the parties' intentions are ascertainable." *Id.* (quoting *Danton Constr. Corp. v. Bonner*, 571 N.Y.S.2d 299, 300 (1991)).

### III.   DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COPYRIGHT INFRINGEMENT CLAIM IS GRANTED.

#### A. Plaintiffs Have Established That They Own a Valid Copyright of the Literary Work, *Market Mind Games*.

Plaintiffs attached as an exhibit to their complaint The ReThink Group's certificate of registration for *Market Mind Games*, which Defendants do not contest. (*See* Compl., Ex. A (Certificate of Copyright Registration), ECF No. 4-1); *see also Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (reciting the "well settled" rule that "certificates of copyright registration constitute prima facie evidence of copyright ownership"). Accordingly, Plaintiffs have satisfied

the first element of the copyright infringement framework by establishing that The ReThink Group

owns a valid copyright of the book *Market Mind Games.*

### B. Explaining *Market Mind Games*: A Summary.

The next question, and certainly the central issue in this case, is whether the works are

substantially similar.   Plaintiffs characterize *Market Mind Games* as "a fictional account of

'Denise,' a Wall Street consultant, giving lectures, consults, and eventually taking on the role of

an in-house performance coach at a fictional hedge fund."  (Mem. of Law in Opp'n to Defs.' Mot.

to Dismiss Pls.' Compl. ("Opp'n"), ECF No. 61, at 2.)  Defendants, on the other hand, characterize

*Market Mind Games* as "a 236-page largely non-fiction academic book that, in Shull's words,

'combines [Shull's] years of study in neuroscience and how to rethink your thinking about market

risk.'"  (Defs.' Mem. at 1 (quoting *About: Market Mind Games: The Book*, The ReThink Group,

https://therethinkgroup.net/about-us/a-radical-psychology/).)

Literary works are undoubtedly afforded copyright protection.   *See* 17 U.S.C.A. §

102(a)(1).  This applies with equal force to nonfiction works.  In *Harper & Row Publishers, Inc.*

*v. Nation Enterprises*, the Supreme Court found that the "[c]reation of a nonfiction work, even a

compilation of pure fact, entails originality." 471 U.S. 539, 547 (1985); *see also New Era Publ'n*

*Int'l, ApS v. Carol Pub. Grp.*, 904 F.2d 152, 158 (2d Cir. 1990) (quoting *Maxtone–Graham v.*

*Burtchaell*, 803 F.2d 1253, 1262–63 (2d Cir.1986)) ("[T]here is no easy distinction between works

that are 'factual' on the one hand, and 'creative' or 'expressive' on the other, because '[c]reation

of a nonfiction work, even a compilation of pure fact, entails originality.'") (internal quotation

marks omitted).

It thus bears little mention whether *Market Mind Games* is a work of fiction or nonfiction,

fact or nonfact.  The initial inquiry is whether it is *original*.  "[I]t is entirely appropriate for a court

to consider the similarity between those works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010). Accordingly, this Court will assess the book *Market Mind Games*, and later the show *Billions*, to determine whether the works are substantially similar under either of the standards articulated by Plaintiffs and Defendants.[3] (*See* Decl. of Elizabeth A. McNamara in Supp. of Defs.' Mot. to Dismiss ("McNamara Decl."), ECF No. 58 (attaching Season One of *Billions* and a copy of *Market Mind Games* as Exhibits A and B, respectively).)

In the prologue of *Market Mind Games*, Shull explains, "*Market Mind Games* outlines my attempt to curate all that I have learned in trading, investing, neuroscience, and consulting into one coherent, logical, and usable structure." Shull, *Market Mind Games* at xii. Shull outlines the "big picture" of her book in the following way:

- Perception
- Beliefs as the foundation of judgment
- Judgment as the key to uncertainty
- The mind's recipe for making sense of "risk"
- The imperative of using emotions as data
- The natural law of contexts
- *fC* or feeling context—a physical state
- *eC* or emotional context—a type of *fC*
- The gargantuan role of the *F-eC* (or the factual-emotional context)
- Managing to psychological and emotional capital
- Creating and re-creating psychological leverage

---

[3] This Court does not purport to provide an entire rendition of *Market Mind Games* in this section. It only serves to aid the reader in understanding what exactly the book is about to assess the similarity of the works.

*Id.* Shull expounds on her more technical terms that are not readily discernible.  She provides that "*fC* refers to the feelings context or context of feelings we bring to each and every perception we have, judgment we make, and decision we act on." *Id.* at xiv.  To further explain the *eC*, Shull details a December 2010 report, released after "the Financial Crisis Inquiry Commission" reportedly broke down: "With a new context of confidence after the Republican rout of the November 2010 elections, a sub-group decided to release their own report and voted to ban from any final written report the words 'Wall Street' and 'shadow banking.'" *Id.* at xiv.  Shull uses this example to demonstrate that behind partisanship and political circuses are opposing parties holding dissimilar points of view.  *See id.*  Shull further states that one's confidence and feeling of "rightness" is characterized as "the emotional context." *Id.* at xiv–xv.

To close out the prologue, Shull explains that storytelling can be used to aid individuals in "more easily process[ing] information" because "it arrives in social or human terms." *Id.* at xvi.  Shull therefore states that in the pages to follow, she includes fictional characters who will attend fictional lectures, workshops, and consulting programs. *Id.*  Shull adds, "[h]opefully their learning curve will shorten yours." *Id.*  She then introduces the characters Michael Kelly, Richard Kelly, Renee Smith, and Christopher Smith, all described *supra*.  *See id.*  What follows is a four-part book spanning twenty-two chapters, which explains in detail the bulleted portion outlined above in concise order.  Shull begins nearly every chapter with a story of sorts—either a lecture, workshop, or program—to briefly place the reader in a setting that would make the text more comprehensible.  She then goes on to explain her ideas behind neuropsychoanalysis, neuroeconomics, and modern psychoanalysis, and sometimes weaves her characters into the scientific or mathematical framework of a particular section to clarify her assertions. *See, e.g., id.* at 17.  The characters are not only fixed in lecture halls.  Indeed, they have their own lives that

paint a picture of how the average Wall Street trader, as seen through Shull's eyes, can navigate the finance industry with the ideas and concepts that she explains.

Finally, in illustrating her ideas, Shull draws on other ideas that are historical in nature, and also references other literary works. For example, Shull refers to and draws from Peter Bernstein's market book, *Against the Gods: The Remarkable Story of Risk*, speaks generally of the stock market collapse of 2007 through 2009, references Benoît Mandelbrot's books on fractal geometry, relies on the neurological study of Albert Einstein's brain tissue, speaks of Harry Markowtiz's shared 1990 Nobel Prize, and references Antonio Damasio's book, *Descartes' Error. See, e.g., id.* at 12, 14, 18, 28, 38, 147–67.

This is not to say that drawing on these works and concepts takes away from the originality of Shull's own ideas. As previously stated, the "[c]reation of a nonfiction work, even a compilation of pure fact, entails originality." *Harper & Row Publishers*, 471 U.S. at 547. Still, in citing, quoting, and drawing on these sources, it becomes abundantly clear that not each and every word, concept, or idea expressed in *Market Mind Games* is in and of itself *original*. Others can draw on the recognized Einstein study and fractal geometry to explain their own concepts and ideas. This thus brings us to the question of the ordinary observer, who may not be able to readily discern that portions of the work at the center of this case are not themselves wholly original, and should therefore not be used to determine whether any copying took place. Therefore, Defendants did not err in utilizing the discerning observer test to determine the total concept and feel of *Market Mind Games* and *Billions* in relation to one another. (*See* Defs.' Mem. at 10.) Plaintiffs' own quantitative and qualitative approach may also be used, because, as courts have observed, determining substantial similarity requires a court to weigh numerous factors to determine whether a defendant's copying, if any, is substantial or *de minimis. See Gottlieb Dev. LLC*, 590 F. Supp.

2d at 632.  Thus, in assessing whether *Market Mind Games* and *Billions* are substantially similar,

both frameworks are to be employed.

## C.  Explaining Billions: A Summary.

While *Market Mind Games* explains Shull's teachings of neuroeconomics, modern

psychoanalysis, and neuropsychoanalysis with the use of fictionalized characters and events to

ease the reader's processing of her material, (Compl. ¶ 22), *Billions* is a wholly fictional series that

centers around Bobby "Axe" Axelrod, a self-made billionaire and hedge fund founder, and Charles

"Chuck" Roades, Jr., the United States Attorney for the Southern District of New York.  (*See*

Defs.' Mem. at 1–2.)  Nearly the entire series of *Billions* involves Chuck's repeated attempts to

prosecute Axe for insider trading, which is even more complicated by Chuck's wife Wendy, who

also serves as the in-house psychiatrist at Axe's hedge fund, Axe Capital.  (*See id.* at 2.)  Axe's

underdog story as "a folk hero who went from a working class background to billionaire founder

of" Axe Capital by use of means both legal and illegal, counterbalanced against Chuck's privileged

upbringing and own questionable tactics, makes for a battle in which both men try to overcome

one another to prove to themselves, each other, and even Wendy, that they have won.  (*Id.* at 4.)

Wendy, an in-house psychiatrist and performance coach, is the bread winner of her family

because of the lucrative salary that she receives from Axe Capital.  (*Id.*)  This power dynamic plays

even more into Chuck and Wendy's relationship, as they engage in sadomasochistic sex acts with

one another: Wendy being the dominatrix, and Chuck being the submissive.[4]  (*Id.*)  Still, Chuck's

security in his marriage is compromised by Wendy's relationship with Axe.  Though Wendy and

Axe's relationship seems to predate both of their marriages, their marriages are repeatedly put to

---

[4] Merriam Webster defines sadomasochism as "the derivation of sexual gratification from the infliction of
physical pain or humiliation either on another person or on oneself."  *Sadomasochism*, Merriam Webster,
https://www.merriam-webster.com/dictionary/sadomasochism.

the test because of their natural propensity to prioritize each other, even in the most damning of circumstances. "Wendy served as Axe's main support when the partners at his former firm were killed on 9/11" and almost always defends Axe throughout the series—even when she knows that it is not the most logical choice. Axe recognizes, and even admits to his own wife, that "only Wendy can 'fix' him," making abundantly clear her position of dominance in his life as well. (*Id.*)

### D. Plaintiffs' Book *Market Mind Games* and the Television Show *Billions* Are Not Similar Under Either of the Party's Frameworks.

#### 1. The Discerning Observer Test.

It bears restating that the more discerning observer test requires a court to "be more discerning, [and] ignor[e] those aspects of a work that are unprotectable . . . lest we conflate mere copying with wrongful copying." *Zalewski*, 754 F.3d at 102 (alterations in original). The test is guided by examining "the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the [plaintiff's] books and the [defendants'] works." *Boisson*, 273 F.3d at 273 (citation and internal quotation marks omitted).

The problem here, as Defendants aptly point out, is that these works do not seem to resemble each other in the least. And the issue does not lie in the fact that one is a book and one is a television show, but the fact that Plaintiffs' work is an academic work which interweaves fiction to better help the reader understand Shull's ideas, while Defendants' work is a television show, based in the Southern District of New York, to demonstrate the drama that lies in the age old trifecta of money, power, and sex.

The works are dissimilar even when looking to Shull's fictional characters. To take one example, beyond attending Shull's lectures, Michael is laid off from his bank and "goes skiing and meets up with his former classmate Renee Smith's . . . father, Christopher Smith[,] and his 'trading buddies.'" (Defs.' Mem. at 6–7.) Chris and his friends later "provide Michael with capital to start

his own hedge fund, after which Michael and Renee attend The ReThink Group's" workshop. (*Id.* at 7 (citing Shull, *Market Mind Games* at 111–64).) Michael's hedge fund hires Shull as its coach. (*Id.* (citing Shull, *Market Mind Games* at 217–22).) When he makes a set of bad trades, he and Shull have a one-on-one session to coach him through it. (*Id.*)

To the extent that *Market Mind Games* has a fictional plot, it surrounds "an already fairly well-to-do man as he makes his way through a PhD program to a Wall Street firm before starting his own fund, and participating in group lectures from Shull that help him learn how to trade better." (Defs.' Mem. at 14.) This fictional plot is used as a catalyst to explain Shull's theory of combining neuropsychoanalysis, neuroeconomics, and modern psychoanalysis to assist with coaching finance traders. (*See id.*) *Billions*, on the other hand, chronicles the lives of Axe and Chuck. Axe, in battling Chuck, must keep secret the illegal insider trading in which he engages to protect his prized business, money, family, and status, while Chuck uses legal and illegal means to garner information on Axe—and virtually anyone else of import or status—to benefit his reputation. Therefore, because *Market Mind Games* and *Billions* differ greatly in "total concept and feel, theme, characters, plot, sequence, pace, and setting," *see Boisson*, 273 F.3d at 273, Defendants did not infringe upon Plaintiffs' copyright under the discerning observer test.

### 2. The Quantitative/Qualitative Approach.

Plaintiffs assert that the quantitative/qualitative approach to determining substantial similarity should be used to conclude that Defendants infringed upon their copyrighted material, stating that this Court may consider "the amount of copying not only of direct quotations and close paraphrasing, but also of all other protectable expression in the original work." (Opp'n at 14 (quoting *Warner Bros. Entm't, Inc. v. RDR Books*, 575 F. Supp. 2d 513, 534–35 (S.D.N.Y. 2008).) As previously stated, "[t]o determine whether the quantitative threshold of substantial similarity is

met in cases involving visual works, courts consider the extent to which the copyrighted work is copied." *Gottlieb Dev. LLC*, 590 F. Supp. 2d at 632. "The observability of the copyrighted work is critical, and courts will consider the length of time the copyrighted work is observable" and other factors relevant to the respective works at issue. *Id.* Still, "[w]hen similar works resemble each other only in unprotected aspects—for example, when similarities inhere in ideas, which are by definition unprotected, or in expression that is not proprietary to plaintiff—the defendant prevails." *Id.* at 631.

### a. Denise vs. Wendy.

Plaintiffs argue that "Denise" in *Market Mind Games* and "Wendy" in *Billions* are "both female performance coaches that go toe-to-toe with male hedge fund traders in advising them how to explore and apply their emotions for fun and profit." (Opp'n at 2.) Plaintiffs argue that these are not stock characters as Defendants suggest, and Wendy's role as a dominatrix does not change that: "Just as Superman would still be identifiable as Superman, even if an enterprising infringer decided to give him a new sexual proclivity and change his name, Ms. Shull's strong hedge fund performance coach remains identifiable throughout" *Billions*. (*Id.* at 3.) Plaintiffs assert that their argument does not lie in the entirety of *Billions* being copied from *Market Mind Games*, but rather the character of Wendy Rhoades in particular. (*Id.*) Plaintiffs thus urge this Court to "not be fooled" by Defendants' alleged belated attempts to introduce further complexities that distinguish the character of Wendy from that of Shull. (*Id.*) Fooled, this Court is not.

The issue here is that this Court cannot identify any copying, not even copying that is said to be "fragmented." (*See id.* at 16, 21 (quoting *Rose v. Hewson*, No. 17 Civ. 1471 (DLC), 2018 WL 626350, at *4 (S.D.N.Y. 2018)); *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 597–98 (S.D.N.Y. 2013) ("Fragmented literal similarity" may be shown by demonstrating 'the copying of

even a relatively small quantitative portion of the pre-existing work . . . if it is of great qualitative importance to the [pre-existing] work as a whole.'")).  Denise lectures to individuals in the industry about Shull's ideas and eventually goes in house to work at a hedge fund, where she eventually counsels Michael.  Wendy begins *Billions* as an in-house performance coach at Axe Capital who meets with various employees throughout the series to coach them out of their fears and hindrances into success as traders.

As discussed above, "'[s]cènes-à-faire' teaches that elements of a work that are 'indispensable, or at least standard, in the treatment of a given topic'—like cowboys, bank robbers, and shootouts in stories of the American West—get no protection." *Zalewski*, 754 F.3d at 102.  An in-house psychiatrist may not be a "stock character," that is, one that is all-around familiar like the examples listed above, but the idea of an in-house psychiatrist, even in the context of a hedge fund, is certainly not one that was borne of Shull's own thinking.  Indeed, as was stated in the very *Dealbook* article that described Shull's work as a hedge fund performance coach:

> The idea [of performance coaches for traders] is not new . . . . In the early 1990s, Steven A. Cohen, the founder of SAC Capital Advisors, hired Ari Kiev, a psychiatrist who had previously worked with athletes, to coach SAC's traders.  Two decades on, aided by the growing popularity of literature on the behavioral science of decision making, the idea that self-awareness can lead to better decisions in business and finance is beginning to be accepted on Wall Street.  Borrowing from books like Daniel Kahneman's "Thinking, Fast and Slow," trading coaches talk about the systemic, recurrent and predictable mistakes to which humans are prone.

(Defs.' Mem. at 16 (citing Felicello Decl. Ex. 4 (*Dealbook* Article)); *see also* Richard Feloni, *How Wall Street Psychologists and Tony Robbins Inspired one of the Main Characters on Showtime's 'Billions,'* Business Insider (Feb. 19, 2017), https://www.businessinsider.com/wendy-rhoades-billions-tony-robbins-wall-street-psychology-2017-2 ("Steve Cohen started the trend in the early 1990s when he hired the late psychiatrist Ari Kiev for his hedge fund SAC Capital, and Tony Robbins, the world's most famous performance coach, entered the financial world around the same

time when he was hired by renowned investor Paul Tudor Jones.")).  Moreover, a quick internet search reveals that there are numerous in-house performance coaches who are currently on Wall Street.  *See* Claire Gorden, *Inside the Secretive World of Hedge Fund Psychiatrists and Performance Coaches*, Fortune (Feb. 4, 2016), https://fortune.com/2016/02/04/showtime-billions-performance-coaches-therapists/ (providing that the subject of the article, Alden Cass, "is one of a dozen or so performance coaches on Wall Street, many of whom are armed with doctorates or medical degrees" who work "as temporary in-house coaches, meeting with traders one-on-one on their employers' dime"); *Investment Coaching*, Essentia Analytics, https://www.essentia-analytics.com/good-investment-and-trading-coaches/ (providing that Denise Shull, Dr. Andrew Menaker, Steven Goldstein, Kenny Lissak, and Dr. Tara Swart are all performance coaches).

Although Shull is well known in the performance coaching world, it cannot be said that she can copyright the idea of a female in-house performance coach.  Inherent in a copyright is the grant of exclusivity.  Granting Plaintiffs exclusivity in this particular idea is precarious, as it would essentially grant Shull a monopoly on the entire subject matter of the female performance coach until the expiration of her copyright.  A finding of copyright infringement in this case would serve to be even more troubling, as the character of Denise and Wendy do not resemble one another in the slightest.  Plaintiffs argue that both Denise and Wendy "go toe-to-toe with male hedge fund traders in advising them how to explore and apply their emotions for fun and profit."  (Opp'n at 2.)  Such representation serves to mischaracterize both Denise and Wendy.  Denise explains her mathematical and scientific concepts through fictionalized lectures and workshops.  If her factual recitations and ultimate advising of Michael on his bad trade is seen as her going toe-to-toe from Plaintiffs' point of view, it is not similar to the depiction of Wendy's repeated dealings with the at times overly dominant Axe Capital employees and her own husband and overbearing father-in-

law at home. Denise may also experience these occurrences, but this is not the story that was told by Shull. Thus, such story may not receive copyright protection.

Nor can Plaintiffs liken Denise and Wendy to the scenario of Superman with "a new sexual proclivity and change [in] his name." (Opp'n at 3.) Though the character of Denise is a fictionalized version of Shull, because she is used to explain Shull's theories, she is not given much of a persona. Instead, Denise is placed in scenarios in which she can explain and demonstrate Shull's ideas. Her own identity—what she likes, her home life, friends, and family—are not developed. Superman's persona—indeed his transformation from Clark Kent the journalist to Superman the crime-fighter—on the other hand, is well known. Superman, however, is an entirely fictional being, who was created not to helpfully relay an idea or concept, but to entertain. All we know of Denise is that she is a female performance coach who transitions in-house to a hedge fund. Thus, Plaintiffs essentially argue that because Wendy is *also* a female in-house hedge fund performance coach, Defendants copied her fictionalized characterization of herself. This is not a copyrightable idea, especially in light of all the other in-house performance coaches listed above. Copyright protection is afforded to creativity, and Shull's book is that. However, her portrayal as a female performance coach who transitions in-house to a hedge fund is not.

### b. The "Alpha."

In further attempting to demonstrate that Defendants copied Shull's work, Plaintiffs state that *Billions* literally infringed on a term Shull uses in *Market Mind Games*: "alpha." (*See* Opp'n at 10.) Plaintiffs assert that "'Denise' explains at a workshop that '[j]udgment calls must be made to fill in the gap between where the numbers leave off and "alpha"—or exceptional performance—begins.' . . . . At another workshop, "Denise" explains that overconfidence can lead to giving back 'lots of our hard earned "alpha."' (*Id.* (citing Shull, *Market Mind Games* at 112, 132) (alteration in

original) (internal quotation marks omitted).)  Plaintiffs then allege that Wendy "uses this same concept in her first coaching session of the show, telling 'Danzig' that he's 'ignoring the quiet [voice] inside telling you where the alpha is.  Now that's the voice that got you here.  And it's still there if you are willing to listen.'"  (*Id.* (quoting *Billions* Season One, Episode One).)

In *Market Mind Games*, Shull defines "alpha" as a term of art to mean "exceptional performance."  (*See* Felicello Decl. Ex. 3 (Exemplary Infringement), ECF No. 62-3 at 1; Shull, *Market Mind Games* at 112.)  Used in a sentence, she says, "[w]e give back lots of our hard earned 'alpha' and sooner or later, land squarely back on the spectrum usually at the fear of losing or being [on the] wrong end."  (Felicello Decl., Ex. 3 (Exemplary Infringment) at 1; Shull, *Market Mind Games* at 132.)  When Wendy uses alpha, on the other hand, she states:

> You're just listening to the wrong voice. You're tuned in to the one yelling at you
> over the loud speaker that you're . . . stupid and your performance blows.  And
> you're ignoring the quiet one inside telling you where the alpha is now that's the
> voice that got you here. And it's still there [i]f you are willing to listen. What's that
> voice telling you?

(Felicello Decl., Ex. 3 (Exemplary Infringement) at 2; *Billions* Season 1 Episode 1.)  Even if looked at under the fragmented framework, this side-by-side comparison does not suffice to assert a claim for copyright infringement.

As an initial matter, the word "alpha" is quite common and regularly used generally, including in reference to men in finance, who are referred to as "alpha males."  Another issue is that Shull's definition of alpha, "exceptional performance," is general in nature, and closely aligns with the connotation of the word alpha as regularly used.  Put another way, if alpha males are confident, take-charge, and resilient, it only makes sense that they would "perform exceptionally."  Such is likely the reason why Shull chose to use the word "alpha" as her term of art, but one cannot take a word already in existence and make it theirs.  Further, even if Defendants did copy the word

"alpha as used by Shull, such copying is *de minimis*, especially in light of the common use of the word.  Accordingly, this alleged instance does not support Plaintiffs' copyright claim.

### c.  The Bad Trade.

Nor are the bad trades described in the respective works substantially similar.  Plaintiffs allege that "[i]n the fictional account created by Ms. Shull in *Market Mind Games*, Ms. Shull engages in a sequence with 'Michael' in which she analyzes a trait exhibited by Michael that served him well in the past, and informed his conscious image of himself, but has now created an unconscious obstacle that is costing him money":

> Haven't you told me in the past that one of the problems you would like to solve is getting stubborn?  You can be assured that that trait, if you want to call it that, isn't just being stubborn.  There is a fractal-emotional context that has been with you for a long time.  Undoubtedly, it served you well in getting through challenging moments in school or fighting for the bank job or even being willing to take on this hedge fund challenge.  In fact, when the pattern first starting [*sic*] coming together, I am sure it served you well.  It is acting out anger, and if we do that consciously and intentionally, it can be our best ally.  But when we are doing so without really knowing who or what we are trying to retaliate against, it tends neither to serve our best interests nor to make us money.

(Compl. ¶ 44 (citing Shull, *Market Mind Games* at 221).)  On the other hand, in Season One, Episode Eleven of *Billions*, Plaintiffs claim that "Defendants portrayed Dr. Wendy Rhoades conducting substantially the same sequence with Axe in substantially the same context, i.e., as an in-house performance coach to the head of a hedge fund who seeks to understand the cause of his bad trade:

> Look, you want me to fix the part of you that makes money.  But it is attached to the rest, so . . .  Like I said, this is gonna take a little while. . . .  Maybe your self-image is creating . . . a blind spot. . . .  Well, let's assume your blind spot usually works for you.  It's fairly essential if you don't feel indestructible like Superman.  How are you gonna risk billions every morning?  But it's not working for you now.  So you need to figure out what part of your self-image is false.  And then you either need to live up to it or lose it.

(*Id.*)

These are not "eerily similar" as Plaintiffs suggest. (Opp'n at 11.) Both Denise and Wendy coach their clients on a bad trade, but bad trades are surely conventional in the world of finance, and particularly hedge funds. The backdrop of Michael's bad trade is his brother, who was hospitalized after a biking accident that left him in critical condition. (Shull, *Market Mind Games* at 205–06.) Not only was Michael forced to engage with his father—with whom he did not have a good relationship—for the sake of his brother, but at the same time, Michael was busy with work, and was not sure of how he would handle it all:

> "This can't be happening," thought Michael. "Crap! I have so many positions on and I am the only one who understands them." Between the second ratings downgrade of US debt in a little over a year and China's severe recession, the perfect storm for global bond and gold markets had been brewing for weeks.

> "But I *have* to go," Michael thought. "This is serious and no one else can help. Surely Renee can help me manage the positions." She had been building an options hedge fund for them anyway.

(Shull, *Market Mind Games* at 206.) In *Billions*, "the bad trade discussed by Wendy and Axe occurred the day after their colleague Donnie (who Axe was using to feed false information to the FBI and Wendy's U.S. Attorney husband) died from cancer." (Defs.' Mem. at 17–18 (citing *Billions* Season One, Episode Eleven).) Wendy concluded "that Axe made the bad trade to punish himself because he intentionally withheld life-extending" cancer treatment from Donnie to facilitate the scheme. (*Id.* at 18.) Not only do Denise and Wendy's verbatim words differ when counseling Michael and Axe, respectively, but the backdrops of these bad trades are also different. Michael is overwhelmed by his brother's accident and the fact that he, and he alone, understands his positions at work. Axe has the ability to make a good trade, but consciously chooses not to in an effort to seek retribution against himself for his friend.

Ultimately, bad trades are common. Accidents and death are unfortunately common. The idea of a counseling session conducted by an in-house hedge fund performance coach, as explained

*supra*, is not novel.  Therefore, Plaintiffs may not claim that Defendants infringed upon *Market Mind Games*' copyright simply because the book excellently married common language with what is common in the finance industry in order to explain her theories.

### d.  Other Alleged Examples of Copying.

Plaintiffs also compare examples of Wendy's counseling sessions in *Billions* to Shull's rhetoric, told through the lens of Denise, in *Market Mind Games*.  (*See* Compl. ¶¶ 42–46; Felicello Decl. Ex. 3 (Exemplary Infringement), at 1–9.)  In the complaint, Plaintiffs claim that "Dr. Rhoades makes multiple statements and observations that are nearly identical to those made by Ms. Shull in *Market Mind Games*, including focusing on the physical well-being of the trader client (i.e. eat, sleep, exercise)."  (Compl. ¶ 42.)  The idea of eating, sleeping, and exercising to perform well is not a novel one.  Indeed, in the context of any high-risk and high-stress setting, all three are necessary to performing well, and are thus scènes-à-faire.  As Defendants point out, "Shull herself admits that this is nothing more than a ubiquitous idea: 'These points are so obvious. . . .  We know we should eat better, get more exercise, and get to bed earlier."  (Mem. of Law in Further Supp. of Defs.' Mot. to Dismiss the Compl. ("Reply"), ECF No. 64, at 6.)  Such is the case with many of the other instances that Plaintiffs allege.  The concepts that they allege Defendants to have infringed upon are either common in psychology or generally.

Accordingly, because Plaintiffs fail to allege that Defendants infringed upon their copyright, Plaintiffs' claims under the Copyright Act are dismissed, with prejudice.[5]

---

[5] Plaintiffs' vicarious and contributory copyright infringement claims are therefore dismissed as well.  In addition, because Defendants did not infringe upon Plaintiffs' copyright, Plaintiffs are not entitled to statutory damages. *See Shamir v. Anchor-Int'l Found., Inc.*, No. 10 Civ. 725 (PGG), 2013 WL 4008635, at *10 (S.D.N.Y. July 30, 2013) ("If the court finds willful infringement, . . . the award can be as high as $150,000; if the court finds that the infringement was 'innocent,' damages can be as low as $200."). Finally, Plaintiffs fail to plead the existence of any trademark, nor do they allege any facts which suggest that Defendants infringed on any trademark. (See Defs.' Mem. at 30.)  Therefore, Plaintiffs' Lanham Act claim is dismissed.

## IV.    DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' STATE LAW CLAIMS IS GRANTED.

### A. Plaintiffs' New York General Business Law and Accounting Claims.

Plaintiffs allege claims of unfair competition, deceptive business practices, and lack of accounting under New York common law, asserting that such claims arise from Defendants' unauthorized use of Plaintiffs' copyrighted material. (Compl. ¶ 1.) Because Plaintiffs' "state law claims . . . sound in misappropriation of copyright," in that, Plaintiffs plead no facts in support of the above-mentioned claims that are independent of those lending themselves to Plaintiffs' copyright claims, they are preempted by the Copyright Act. *Gottlieb Dev. LLC*, 590 F. Supp. 2d at 637 (citing 17 U.S.C. § 301(a); *Baiul v. NBC Sports*, No. 15 Civ. 9920 (KBF), 2016 WL 1587250, at *10 (S.D.N.Y. Apr. 19, 2016) ("[C]laims for accounting based on the defendant's alleged misappropriation and exploitation of a copyrighted work are preempted by the Copyright Act.") ;[6] *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.,* 155 F. Supp. 2d 1, 24–25 (S.D.N.Y. 2001) (dismissing plaintiff's claim of unfair competition under New York law as preempted by Copyright Act); *Am. Movie Classics Co. v. Turner Entm't Co.*, 922 F. Supp. 926, 933–34 (S.D.N.Y. 1996) (stating that claims of unfair competition and unjust enrichment under state law deriving from unauthorized use of material are preempted by copyright law).

### B. Plaintiffs' Implied-in-Fact Contract, New York Civil Rights Law Sections 50 and 51, and Unjust Enrichment Claims.

Plaintiffs' implied-in-fact contract, right of privacy, and unjust enrichment claims are the only claims that do not derive completely from their Copyright Act claims.  Still, these claims fail on the merits.

---

[6] Moreover, because Plaintiffs fail to establish that Shull and Defendants were in a fiduciary relationship, Plaintiffs' accounting claim is dismissed.  *See Baiul,* 2016 WL 1587250, at *14.  Plaintiffs' state law appropriation claim fails for the same reason.  *See Stewart v. World Wrestling Fed'n Entm't, Inc.*, No. 03 CV 2468 RLC, 2005 WL 66890, at *5 (S.D.N.Y. Jan. 11, 2005).

1. **Plaintiffs Have Not Adequately Pled Facts That Demonstrate That the Parties Entered Into an Implied-in-Fact Contract.**

As stated above, New York law provides recovery for a contract absent a written agreement where "inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Betty, Inc.*, 283 F. Supp. 3d at 166–67. A contract is not "implied in fact where the facts are inconsistent with its existence . . . or against the intention or understanding of the parties." *Id.* at 167. Mutual assent is therefore "necessary . . . unless [the accused] has conducted himself in such a manner that his assent may fairly be inferred." *Id.* (quoting *Miller v. Schloss*, 218 N.Y. 400 (1916)).

In support of their argument that there exists a contract implied in fact, Plaintiffs reference a Second Circuit case in which the "plaintiff submitted a written idea for a television series to a network and alleged an implied promise by the network to pay reasonable compensation if the idea was used." (Opp'n at 28 (citing *Forest Park Pictures*, 683 F.3d at 432.)  In that case, the court "found that plaintiff had stated a claim for a breach of an implied contract, which was not pre-empted by copyright law." (*Id.* (citing *Forest Park Pictures*, 683 F.3d at 432.)  But similar facts are not alleged here. Shull did not submit a written idea for *Billions*. She was consulted because of her work which Sorkin had already admitted to observing on *Squawk Box* and in his *Dealbook* publication. The facts as alleged in the complaint, however, do not suggest that there was a mutual understanding between the parties that Shull would be brought on in any official capacity for *Billions*. In the complaint, in fact, Plaintiffs state that Shull herself "understood that the initial phone conference and in-person meeting was the beginning of the relationship and terms would be negotiated subsequently in concert with marketing the series." (Compl. ¶ 39; *see also* Opp'n at 9.)  Plaintiffs do not plead that *both* parties understood that there was an agreement. Indeed, this

is required for any contract, either written or implied in fact.[7]   When this Court inquired into the question of Plaintiffs' implied-in-fact contract claim at oral argument, Plaintiffs' counsel's own explanation was not indicative of any contract:

> **THE COURT**: I assume before she goes and provides consulting services, she has some agreement with the other party that they are going to pay her for those services.
>
> **MS. FELICELLO**: *Yes and no.* In the business where she is on Wall Street, people don't ever expect a free lunch. So there is a basic understanding that you're going to be compensated when you provide services.
>
> **THE COURT**: Where does it say that in this complaint?
>
> **MS. FELICELLO**: The expectation that she was going to be paid?
>
> **THE COURT**: Yes. For what she provided at this meeting, for, as you say, providing the content for *Billions*. . . . [Y]ou're arguing it's an alternative theory, . . . [that] she didn't authorize them to use her copyrighted material, but if she did, she expected to be paid for it. As I say, you can have alternative legal theories, but you can't have alternative facts. You give a set of facts that translate into [the conclusion that] they used her copyrighted material without her permission, and, quite frankly, you imply, if not directly say, not only without her permission, but without her knowledge, until she found out that it was in the *Billions* show. So where does it say that she should be compensated?

(Apr. 18, 2019 Oral Arg. Tr., ECF No. 66, at 58:24–59:22.) This Court asked whether there was some agreement that Shull would be compensated for her services. Counsel said yes and no. Such

---

[7] Defendants further assert that, to state a claim for an implied-in-fact contract, Plaintiffs' idea would require novelty or originality, which it does not. (*See* Defs.' Mem. at 28 (quoting *Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp. 2d 177, 185 (S.D.N.Y. 2000) ("Where an idea is 'so unoriginal or lacking in novelty that its obviousness bespeaks widespread and public knowledge of the idea, and such knowledge is therefore imputed to the buyer . . . . a court may conclude, as a matter of law, that the idea lacks . . . the novelty to the buyer necessary to support a contract claim.'")).) Defendants assert that because Shull was not the first to theorize the idea of the psychiatric performance coach, Plaintiffs do not allege "the 'ideas' at issue are sufficiently original or novel to state an implied-in-fact contract claim." (Defs.' Mem. at 29.) Because Plaintiffs fail to plead mutual assent, this Court need not decide this particular issue. Still, it bears mention that "the 'novelty to the buyer' standard comports with traditional principles of contract law. While an idea may be unoriginal or non-novel in a general sense, it may have substantial value to a particular buyer who is unaware of it and therefore willing to enter into contract to acquire and exploit it." *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 377 (2d Cir. 2000) (quoting *Apfel v. Prudential-Bache Securities, Inc.*, 81 N.Y.2d 470, 475–76 (1993)).

uncertainty clearly denotes that there was no manifestation of mutual assent, and no inferences that could "be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *Betty, Inc.*, 283 F. Supp. 3d at 166–67.  Indeed, if Shull believed that Defendants intended to contract with her, she would have pleaded as such.

### 2. Plaintiffs Fail to Allege that Shull's Name and Persona Were Used to Promote *Billions*.

Plaintiffs also claim that Defendants used her status as a preeminent performance coach to advertise the show *Billions*.  (*See* Opp'n at 24–25.)  Section 51 of New York Civil Rights Law grants individuals a "limited statutory right of privacy," making it unlawful to use a person's "name, portrait, picture or voice . . . for advertising purposes or for the purposes of trade without the written consent first obtained."  N.Y. Civ. Rights Law §§ 50, 51; *see also Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 451 (S.D.N.Y. 2008); *Bement v. N.Y.P. Holdings, Inc.*, 307 A.D.2d 86, 760 N.Y.S.2d 133, 136 (1st Dep't 2003); *Messenger ex. rel. Messenger v. Gruner + Jahr Printing & Publ'g.*, 94 N.Y.2d 436, 441, 706 N.Y.S.2d 52, 54 (2000), *cert. denied,* 531 U.S. 818 (2000) (citations omitted).  Plaintiffs contend that Defendants benefitted "from articles concerning Ms. Shull and her unique role as a performance coach to hedge funds because these articles piqued interest in *Billions* and made the story all the more believable." (Opp'n at 24.)  However, Plaintiffs fail to allege any articles written by Defendants which use Shull's name, picture, or persona without her permission *in order to* advertise for *Billions*.  The *Dealbook* article is the only publication that Plaintiffs identify, but this article does not even mention *Billions*.  Furthermore, though Plaintiffs note that an article can be "an advertisement in disguise," (*Id.*), Plaintiffs fail to allege how the *Dealbook* article was disguised to promote *Billions*.  Therefore, without more, Plaintiffs' right of privacy claim is dismissed.

### 3. Plaintiffs' Unjust Enrichment Claims Also Fail.

Plaintiffs also fail to adequately allege that Defendants were unjustly enriched by Shull's on-set consultation. As stated above, to the extent that Plaintiffs' unjust enrichment claim arises out of an alleged misappropriation of their copyrighted material, it is dismissed. *See* v *Am. Movie Classics Co.*, 922 F. Supp. at 933–34 (S.D.N.Y. 1996) (stating that claims of unjust enrichment under state law deriving from unauthorized use of material are preempted by copyright law). That leaves Plaintiffs' allegations that "Defendants, except Defendant Nevins, led Ms. Shull to believe she would be compensated for her time and insights." (Opp'n at 27.) However, this Court has already established that Plaintiffs have failed to plead any such promises. Accordingly, Plaintiffs' unjust enrichment claim is similarly dismissed.[8]

## V.    DEFENDANTS' REQUEST FOR ATTORNEYS' FEES IS DENIED.

Section 505 of the Copyright Act provides that a court "may allow the recovery of full costs by or against any party" in its discretion. 17 U.S.C. § 505. "Factors that may be considered in determining whether to award fees include "'frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'"" *Hoepker v. Kruger*, 200 F. Supp. 2d 340, 355 (S.D.N.Y. 2002) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 535 n.19 (1994). Plaintiffs' claims are not sufficiently frivolous to warrant an imposition of attorneys' fees and costs. Accordingly, Defendants' request for attorneys' fees is DENIED.

---

[8] Because this Court has dismissed Plaintiffs' copyright claims, it will not further exercise ancillary jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3)–(4) (providing that a district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction"); *see also* Compl. ¶ 16 ("The Court has federal question jurisdiction over this action under 17 U.S.C. § 101, *et seq.*, 15 U.S.C. §1125(a), *et seq.*, and 28 U.S.C. §§ 1331, 1338(a) and 1367(a) because the Court has original jurisdiction over Plaintiffs' copyright infringement and Lanham Act claim(s) and supplemental jurisdiction over Plaintiffs' claims arising under New York law.").

## VI.   CONCLUSION

Defendants' motion to dismiss Plaintiffs' copyright infringement claim    (ECF No. 56), is GRANTED.  Defendants' request for attorneys' fees and costs is DENIED.  The Clerk of Court is directed to close the motion, accordingly.

Dated: October 4, 2019
        New York, New York                          SO ORDERED.

                                        _George B. Daniels_

                                        GEORGE B. DANIELS
                                        UNITED STATES DISTRICT JUDGE